**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|                                         |     |                                    |
| --------------------------------------- | --- | ---------------------------------- |
| VECTURA LIMITED,                        | )   |                                    |
|                                         | )   |                                    |
| Plaintiff,                              | )   | **REDACTED - PUBLIC VERSION**      |
|                                         | )   |                                    |
| v.                                      | )   |                                    |
|                                         | )   |                                    |
| GLAXOSMITHKLINE LLC and GLAXO           | )   | C.A. No. 1:16-cv-00638-RGA         |
| GROUP LIMITED,                          | )   |                                    |
|                                         | )   |                                    |
| Defendants.                             | )   | **JURY TRIAL DEMANDED**            |

**JOINT [PROPOSED] PRETRIAL ORDER**

Pursuant to Federal Rule of Civil Procedure 16, D. Del. Local Rule 16.3, and the Court's oral order scheduling the Pretrial Conference (D.I. 181) in this matter, Plaintiff Vectura Limited ("Vectura") and Defendants GlaxoSmithKline LLC and Glaxo Group Limited (collectively, "GSK") submit this Joint [Proposed] Pretrial Order. The Pretrial Conference was held on April 12, 2019, and a jury trial is scheduled to begin on April 29, 2019 at 9:30 a.m.

The Parties have stipulated to the following matters as to the conduct of trial and the Court hereby orders:

## I.    <u>NATURE AND ACTION OF THE PROCEEDINGS</u>

1.     This is a patent infringement action in which Vectura asserts that GSK has infringed and continues to infringe U.S. Patent Nos. 8,303,991 ("the '991 Patent") and 8,435,567 ("the '567 Patent") (collectively, the "Asserted Patents").  Vectura alleges that GSK infringes claim 3 of the '991 Patent and claim 3 of the '567 Patent.  GSK asserts that it does not infringe either of the asserted claims of the Asserted Patents and that the asserted claims are invalid.

2.     The operative pleadings are Vectura's Third Amended Complaint (D.I. 53) and GSK's Answer to Vectura's Third Amended Complaint (D.I. 52).[1]  GSK did not assert any counterclaims.

3.     The Court issued a Memorandum Opinion on claim construction on October 1, 2018 (D.I. 167).  The Court issued an Order on claim construction on October 10, 2018 (D.I. 169).  To the extent Vectura's or GSK's proposed constructions were not adopted, all parties object to the claim constructions and preserve their rights on those issues for appeal.

---

[1] Vectura is no longer asserting U.S. Patent No. 8,956,661 (D.I. 117).

RLF1 21123165v.1

## II.     FEDERAL JURISDICTION

4.     This is a civil action arising under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.* This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).  Venue and personal jurisdiction are not disputed in this case.

## III.     FACTS THAT ARE ADMITTED AND REQUIRE NO PROOF

5.     Vectura is a corporation organized and existing under the laws of the United Kingdom, having its principal place of business at One Prospect West, Chippenham, Wiltshire SN14 6FH, United Kingdom.

6.     GlaxoSmithKline LLC is a Delaware limited liability company having its headquarters in Philadelphia, Pennsylvania.

7.     Glaxo Group Limited is a company incorporated in England and Wales.

8.     Vectura is the assignee and owner of the '991 Patent.

9.     The application for the '991 Patent was filed on April 26, 2010.  The '991 Patent issued on November 6, 2012.

10.     Vectura is the assignee and owner of the '567 Patent.

11.     The application for the '567 Patent was filed on October 7, 2011.  The '567 Patent issued on May 7, 2013.

12.     The "asserted claims" are claim 3 of the '991 Patent and claim 3 of the '567 Patent.

13.     The "Accused Products" are the BREO® ELLIPTA® 100/25 (fluticasone furoate 100 mcg and vilanterol 25 mcg inhalation powder), BREO® ELLIPTA® 200/25 (fluticasone furoate 200 mcg and vilanterol 25 mcg inhalation powder) (collectively, "Breo®"), ANORO® ELLIPTA® (umeclidinium and vilanterol inhalation powder) ("Anoro®"), and INCRUSE® ELLIPTA® (umeclidinium inhalation powder) ("Incruse®") products.

-2-

14.     GlaxoSmithKline LLC sells the Accused Products in the United States.

15.     Breo® is known as Relvar® in the United Kingdom.

## IV.     FACTS THAT REMAIN TO BE LITIGATED

### A.     Vectura

16.     Vectura presents the following statement of issues of fact that remain to be litigated. This statement is based on the current status of the case and the Court's rulings to date. Vectura reserves the right to modify or supplement this statement in response to subsequent Court rulings and/or GSK's attempts to introduce different or additional facts. The following statement of issues of fact is not exhaustive, and Vectura reserves the right to prove any matters identified in the pleadings, interrogatory responses, and/or expert reports. Vectura intends to offer evidence as to the issues of fact and issues of law identified in this Joint [Proposed] Pretrial Order. Vectura further intends to offer evidence to rebut evidence offered by GSK. Should the Court determine that any issue identified here is more appropriately considered an issue of law, Vectura incorporates such issues by reference into its Statement of Issues of Law That Remain to Be Litigated (*infra*). To the extent that Vectura's Statement of Issues of Law That Remain to Be Litigated contains issues that the Court deems to be issues of fact, those issues are incorporated herein by reference. Vectura reserves its right to revise this statement

17.     Whether Vectura has proven by a preponderance of the evidence that the Accused Products infringe claim 3 of the '991 Patent and/or claim 3 of the '567 Patent, literally or under the doctrine of equivalents.

18.     Whether Vectura has proven by a preponderance of the evidence that GSK has willfully infringed claim 3 of the '991 Patent and/or claim 3 of the '567 Patent.

RLF1 21123165v.1

19.     Whether GSK has proven by clear and convincing evidence that claim 3 of the '991 Patent and claim 3 of the '567 Patent are invalid as anticipated by the prior art pursuant to 35 U.S.C. § 102.  If the Court grants Vectura's pending motion for summary judgment of no invalidity by anticipation, then this issue will no longer remain to be litigated at trial.

20.     Whether GSK has proven by clear and convincing evidence that claim 3 of the '991 Patent and claim 3 of the '567 Patent are invalid as obvious in light of the prior art pursuant to 35 U.S.C. § 103.

21.     Whether GSK has proven by clear and convincing evidence that claim 3 of the '991 Patent and claim 3 of the '567 Patent are invalid for lack of written description pursuant to 35 U.S.C. § 112.

22.     Whether GSK has proven by clear and convincing evidence that claim 3 of the '991 Patent and claim 3 of the '567 Patent are invalid for lack of enablement pursuant to 35 U.S.C. § 112.

23.     In the event the jury finds that GSK infringes claim 3 of the '991 Patent and/or claim 3 of the '567 Patent, the amount of damages that Vectura is entitled to recover for GSK's infringement.

## B.     GSK

24.     GSK submits the following issues of fact that remain to be litigated.  The following statements are not exhaustive, and GSK reserves the right to prove any matters identified in its pleadings, discovery responses, and/or expert reports.  GSK intends to offer evidence as to the issues of fact and issues of law identified in this Joint [Proposed] Pretrial Order.  GSK further intends to offer evidence to rebut evidence offered by Vectura.  GSK reserves the right to modify or amend this statement to the extent necessary to reflect any future rulings by the Court, and to

supplement or amend this statement to fairly respond to any new issues that Vectura may raise. To the extent that GSK's Statement of Issues of Law that Remain to Be Litigated (*infra*) contains issues of fact, those issues are incorporated herein by reference. Moreover, if any issue of fact identified below should properly be considered an issue of law, then such statement should be considered to be part of GSK's Statement of Issues of Law that Remain to Be Litigated. GSK incorporates by reference its expert reports in support of any proof to be presented by expert testimony.

25.     Whether Vectura has proved by a preponderance of the evidence that GSK infringes any of the asserted claims of the '991 and '567 Patents.

26.     Whether the asserted claims of the '991 and '567 Patents are invalid under 35 U.S.C. § 103 as obvious in view of the prior art.

27.     Whether the asserted claims of the '991 and '567 Patents are invalid for failure to satisfy the enablement requirement under 35 U.S.C. § 112.

28.     Whether the asserted claims of the '991 and '567 Patents are invalid for failure to satisfy the written description requirement under 35 U.S.C. § 112.

29.     Whether GSK is entitled to attorneys' fees under 35 U.S.C. § 285, and if so, in what amount.

30.     If the jury finds that GSK infringes any of the asserted claims of the '991 and '567 Patents, whether Vectura is entitled to damages, and if so, in what amount.

31.     Whether Vectura has proved by a preponderance of the evidence that GSK's alleged infringement was willful, and if so, whether any enhancement of damages is appropriate.

32.     Whether Vectura is entitled to attorneys' fees under 35 U.S.C. § 285, and if so, in what amount.

## V. ISSUES OF LAW THAT REMAIN TO BE LITIGATED

### A. Vectura

33.     Vectura identifies the following issues of law that remain to be litigated, with a citation to authorities relied upon. This statement is based on the arguments Vectura expects to make as well as its understanding of the arguments GSK is likely to make. If GSK seeks to introduce different legal arguments, Vectura reserves the right to supplement this statement. This statement is based on the current status of the case and the Court's rulings to date. Vectura reserves the right to modify or supplement this statement in response to subsequent Court rulings and/or GSK's attempts to introduce different or additional legal arguments. If an issue identified herein is more properly considered an issue of fact, it should be so considered. If any issues of fact are more properly considered issues of the law, those statements are incorporated into this statement. The authority cited herein is not exhaustive; Vectura may rely on authority not cited in this statement.

#### 1. Infringement

34.     Under 35 U.S.C. § 271(a), an accused infringer is liable for direct infringement if, without authorization from the patentee, the accused infringer "makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor." 35 U.S.C. § 271(a).

35.     The infringement analysis involves two steps. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The first step is to define disputed terms of the patent consistent with how those terms would be understood by a person of ordinary skill in the art. *Id.; Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).

36.     This Court construed the disputed terms in a Memorandum Opinion dated October 1, 2018 (D.I. 167) and in an Order dated October 10, 2018 (D.I. 169).  GSK and its experts subsequently attempted to reargue claim constructions that the Court had rejected. *See* D.I. 286.  None of those opinions or arguments is reliable or helpful to the jury because they fail to adhere to the Court's constructions. *AVM Techs. LLC v. Intel Corp.*, No. 15-33-RGA, 2017 WL 2938191, at *3 (D. Del. Apr. 19, 2017).  In open Court on March 4, 2019, the Court declined to modify its claim construction and ordered GSK to submit a revised expert report from its expert Dr. Russell that is consistent with the Court's claim constructions.  (*See, e.g.*, Mar. 4, 2019 Hearing Tr. at 100:5-17.)

37.     The second step is to determine whether the accused product infringes the patent, which is done by comparing the accused product with the properly construed claims. *Markman*, 52 F.3d at 976.

38.     Direct infringement is a strict-liability offense. *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1926 (2015). "[I]ntent is not an element of direct infringement." *Hilton Davis Chem. Co. v. Warner-Jenkinson Co.*, 62 F.3d 1512, 1527 (Fed. Cir. 1995) (en banc) ("Infringement is, and should remain, a strict liability offense."), *rev'd on other grounds*, 520 U.S. 17 (1997).

39.     Literal infringement of a claim occurs when every limitation recited in the claim appears in the accused device. *Amgen Inc. v. F. Hoffman-La Roche Ltd*, 580 F.3d 1340, 1374 (Fed. Cir. 2009).

40.     Infringement under the doctrine of equivalents may be found when the accused device contains an "insubstantial" change from the claimed invention. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 610 (1950). Whether equivalency exists may be determined based on the "insubstantial differences" test or based on the "triple identity" test, namely, whether the

-7-

element of the accused device "performs substantially the same function in substantially the same way to obtain the same result." *Id.* at 607-08. "It is not controlling whether the inventor foresaw and described this potential equivalent at the time the patent application was filed." *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1220 (Fed. Cir. 1995); *Energy Transp. Group, Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1354 (Fed. Cir. 2012) ("While the improvement in technology allows Defendants' products to constantly recalculate filter coefficients using electronics located on the hearing aid, the accused devices nonetheless perform the same function in substantially the same way, with substantially the same result claimed by the '850 Patent, thus providing substantial evidence for the jury's infringement verdict.").

41.    A patentee may prove infringement by "'any method of analysis that is probative of the fact of infringement,' and circumstantial evidence may be sufficient." *Martek Bioscis. Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1372 (Fed. Cir. 2009) (citation omitted); *see also Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1219 (Fed. Cir. 2006) ("There is no requirement that direct evidence be introduced, nor is a jury's preference for circumstantial evidence over direct evidence unreasonable *per se*."). A patentee is not required to duplicate the accused infringer's manufacturing process in order to show infringement and may rely on documents in lieu of testing. *Amgen*, 580 F.3d at 1385.

### 2.    <u>Validity</u>

42.    Issued patent claims are presumed by statute to be valid. 35 U.S.C. § 282.

43.    The presumption that an issued patent claim is valid can be overturned only with clear and convincing evidence of invalidity. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S.Ct. 2238, 2240-41 (2011).

### a)  **Obviousness**

44.     The ultimate determination of obviousness is a question of law based on underlying

factual findings, including: (1) the scope and content of the prior art; (2) the level of ordinary

skill in the pertinent art; (3) the differences between the claimed invention and the prior art; and

(4) such secondary considerations as commercial success, long felt but unsolved needs, failure of

others, etc. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007); *Graham v. John Deere

Co.*, 383 U.S. 1, 17-18 (1966).

45.     Obviousness is determined from the perspective of the POSA at the time of the invention.

35 U.S.C. § 103(a).

46.     A patent claim is obvious if "the differences between the subject matter sought to be

patented and the prior art are such that the subject matter as a whole would have been obvious at

the time the invention was made to a person having ordinary skill in the art in the art to which

said subject matter pertains." 35 U.S.C. § 103(a); *see also In re Hedges*, 783 F.2d 1038, 1041

(Fed. Cir. 1986) (to determine obviousness, prior art must be considered as a whole).

47.     "Generally, a party seeking to invalidate a patent as obvious must demonstrate by clear

and convincing evidence that a skilled artisan would have had reason to combine the teaching of

the prior art references to achieve the claimed invention, and that the skilled artisan would have

had a reasonable expectation of success from doing so." *In re Cyclobenzaprine*, 676 F.3d 1063,

1068-69 (Fed. Cir. 2012) (internal quotations and citations omitted).

48.     The party challenging the patent bears the burden of persuasion with respect to the issue

of obviousness and must present evidence sufficient to establish a rational reason to select and

combine teachings of the prior art to produce the claimed invention with a reasonable

expectation of success. *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009).

49.     A finding of obviousness cannot be based upon hindsight selection of elements of the claimed invention from among the disclosures of the prior art. *Otsuka Pharm. Co. v. Sandoz, Inc.,* 678 F.3d 1280, 1296 (Fed. Cir. 2012) ("The inventor's own path itself never leads to a conclusion of obviousness; that is hindsight."); *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1374 n.3 (Fed. Cir. 2008) (It is impermissible to use "hindsight reconstruction of references to reach the claimed invention without any explanation as to how or why the references would be combined to produce the claimed invention."); *In re Hedges*, 783 F.2d at 1041 ("It is impermissible within the framework of section 103 to pick and choose from any one reference only so much of it as will support a given position, to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to one of ordinary skill in the art." (internal citations omitted)).

50.     Reasoning that simply retraces the path of the inventor with hindsight, and discounts the number and complexity of available alternatives, is always inappropriate. *See Ortho-McNeil Pharm. Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008); *In re Wesslau*, 353 F.2d 238, 241 (C.C.P.A. 1965); *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 840 F.2d 902, 907 (Fed. Cir. 1988) ("Care must be taken to avoid hindsight reconstruction by using the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit." (internal citations omitted)).

51.     "[A] patent composed of several elements is not proved obvious merely be demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 401; *see also Unigene Labs., Inc. v. Apotex Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011) ("Obviousness

requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination.").

52.     It is important that the record supply a reason, available within the knowledge of a POSA, to take particular steps or make particular modifications to achieve the claimed invention. *See KSR*, 550 U.S. at 418 ("it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does"); *Eli Lilly & Co. v. Teva Pharms. USA, Inc.*, 619 F.3d 1329, 1336-37 (Fed. Cir. 2010) (methods of using compound known to have low bioavailability were not obvious where there was "no evidence from before the time of the invention that would teach, suggest, or motivate or supply any common sense reason for a person of ordinary skill in the art to reject the bioavailability concerns and routinely, simply, or easily arrive at the inventive result").

53.     Merely stating that there is a "general motivation" to develop an invention is insufficient proof of a motivation to combine particular references. *See Innogenetics*, 512 F.3d at 1373 ("[K]nowledge of a problem and motivation to solve it are entirely different from motivation to combine particular references to reach the particular claimed [invention]."); *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1352 (Fed. Cir. 2008); *Corning Inc. v. SRU Biosystems*, 400 F. Supp. 2d 653, 670-71 (D. Del. 2005) (criticizing expert's analysis where expert relied only on references selected by counsel, used the claims of the patent-in-suit to select and focus on particular disclosures of those references, and referred only to "general motivations" to combine references); *Personal Web Techs. LLC v. Apple Inc.*, 848 F.3d 987, 993-94 (Fed. Cir. 2017) ("not enough" to simply "say . . . that a skilled artisan, once presented with the two references, would have understood that they ***could be*** combined. . . . [I]t does not imply a motivation to pick out those two references and combine them to arrive at the claimed invention") (emphasis original).

54.     Consideration of whether the prior art contains a teaching, suggestion, or motivation to make the claimed invention can guard against hindsight analysis. *See Ortho-McNeil*, 520 F.3d at 1364-65 (explaining that *KSR* approved the "teaching, suggestion, or motivation" test for guarding against hindsight).

55.     The Court must look to the hypothetical POSA to determine whether such a person would have had a reasonable expectation of success in achieving the claimed invention. *See Eli Lilly*, 619 F.3d at 1340 (rejecting argument that inventors' pursuit of reloxifene as a treatment indicates that a POSA would have a reasonable expectation of success; "the record will not allow this court to conflate Lilly scientists with those of ordinary skill in the art"); *Amgen Inc. v. F. Hoffmann-La Roche Ltd.*, 580 F.3d 1340, 1363 (Fed. Cir. 2009) (rejecting argument that inventor's expectation that cells would produce desired protein supported obviousness case).

56.     An invention claimed in a patent is not obvious unless a person of ordinary skill in the art could reasonably have predicted that the invention would succeed in solving the problem. *In re Cyclobenzaprine*, 676 F.3d at 1070-73; *Abbott Labs.*, 544 F.3d at 1351-52.

57.     Objective indicia, such as long felt-but unmet need, failure of others, and licensing of the patents can serve as probative evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *see, e.g., Impax Labs., Inc. v. Lannett Holdings Inc.*, 893 F.3d 1372, 1377 (Fed. Cir. 2018) (affirming finding that license agreement  supported a showing of nonobviousness).

58.     Objective indicia evidence is not meant to shift the burden of persuasion from the party challenging the patent to the patentee, but rather it gives the patentee an opportunity to produce additional evidence that can be used in the Court's analysis on the issue of obviousness. *See In re Cyclobenzaprine*, 676 F.3d at 1075-76.

### b)    Written Description

59.    The written description requirement is met if the specification and the existing knowledge in the art reasonably convey "to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1355 (Fed. Cir. 2010). The test for reasonably conveying possession of an invention is a flexible one, "requir[ing] an objective inquiry into the four corners of the specification from the perspective of a [POSA]." *Id.*

60.    A failure to "specifically mention a limitation that later appears in the claims is not a fatal one when one skilled in the art would recognize upon reading the specification that the new language reflects what the specification shows has been invented." *All Dental Prodx, LLC v. Advantage Dentals Prods, Inc.*, 309 F.3d 774, 779 (Fed. Cir. 2002).

61.    A specification implicitly satisfies the written description requirement if a POSA would find it "reasonably clear what the invention is and that the patent specification conveys that meaning." *All Dental Prodx.*, 309 F.3d at 779.  That is, the "reasonably conveys" standard does not require the disclosure and claims to match exactly. *Ariad Pharm.*, 598 F.3d at 1352 ("the [written] description requirement does not demand any particular form of disclosure or that the specification recite the claimed invention *in haec verba*").

62.    Nor will a claim be invalidated simply because the embodiments of the specification do not contain examples explicitly covering the full scope of the claim language. *See Ralston Purina Co. v. Far-Mar-Co., Inc.*, 772 F.2d 1570, 1575-76 (Fed. Cir. 1985) (specification's disclosure preferring a lower operating range, yet indicating no upper limit, combined with the industry knowledge at the time, was sufficient for a POSA to discern that higher ranges could be used).

RLF1 21123165v.1

### c)    **Enablement**

63.    A patent may be enabling even though it does not expressly state some information if a person of ordinary skill in the field could make and use the invention without having to perform undue experimentation. 35 U.S.C. § 112 ¶ 1; *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986).

64.    Factors considered in determining whether experimentation is undue or excessive include: (1) the scope of the claimed invention; (2) the amount of guidance presented in the patent; (3) the amount of experimentation necessary; (4) the time and cost of any necessary experimentation; (5) how routine any necessary experimentation is in the applicable field; (6) whether the patent discloses specific working examples of the claimed invention; (7) the nature and predictability of the field; and (8) the level of ordinary skill in the field. *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

65.    Even a considerable amount of routine experimentation required to practice a claimed invention does not violate the enablement requirement. *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1336 (Fed. Cir. 2013); *PPG Indus. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1565 (Fed. Cir. 1996).

66.    The specification preferably omits information that would already be known to a POSA. *Streck v. Res. & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1288 (Fed. Cir. 2012).

67.    It is irrelevant whether the specification contains data proving that embodiments within the scope of the claims are operable, and the burden is on the party alleging invalidity to prove a significant number of inoperable embodiments. *Alcon Res. Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1188-90 (Fed. Cir. 2014; *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1576-77 (Fed. Cir. 1984). There is no lack of enablement where a POSA would recognize

compositions that must be excluded from the inoperative embodiment inquiry. *Senju Pharm. Co. v. Apotex Inc.*, 717 F. Supp. 2d 404, 428-29 (D. Del. 2010).

### 3. Remedies

#### a) Damages

68.     Section 284 of the Patent Act specifies that "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284.

69.     A reasonable royalty is calculated by considering the factors discussed in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified*, 446 F.2d 295 (2d Cir. 1971).  The reasonable royalty must be based on a hypothetical negotiation between a willing licensee and a willing licensor at the time of the alleged infringement. *See id.* at 1120-21. The *Georgia-Pacific* framework sets forth a "flexible" analysis of relevant factors to calculate a reasonable royalty. *See Lucent Techs., Inc. v. Gateway, Inc*., 580 F.3d 1301, 1335 (Fed. Cir. 2009).

70.     The first step in a reasonable royalty calculation is to ascertain the date on which the hypothetical negotiation would have occurred. *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 870 (Fed. Cir. 2003). In general, the date of the hypothetical negotiation is the date that the infringement began. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 75 (Fed. Cir. 2012) (*citing Georgia-Pacific*, 318 F. Supp. at 1123).

71.     Pre-judgment interest on a damages award for patent infringement "is the rule" under 35 U.S.C. § 284. *Sensonics, Inc. v. Aerosonic Corp*., 81 F.3d 1566, 1574 (Fed. Cir. 1996); *see General Motors Corp. v. Devex Corp*., 461 U.S. 648 (1983). Under 35 U.S.C. § 284, the Court

"shall award the claimant damages adequate to compensate for the infringement . . . together with interest and costs as fixed by the court." "In the typical case, an award of prejudgment interest is necessary to ensure that the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement." *General Motors*, 461 U.S. at 655-56.

72.     Post-judgment interest at the federal statutory rate "shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a).

### b)     Willfulness and Enhanced Damages

73.     Conduct that is "willful, wanton, malicious, bad faith, deliberate, consciously wrongful, or flagrant" may justify the award of enhanced damages. *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016). "The subjective willfulness of a patent infringer, intentional or knowing, may warrant enhanced damages, without regard to whether his infringement was objectively reckless." *Id.* at 1933. An example of subjective willfulness is a defendant who acted despite a risk of infringement that was "either known or so obvious that it should have been known to the accused infringer." *Id.* at 1930 (citation omitted).

### c)     Exceptional Case and Attorneys' Fees

74.     Section 285 of the Patent Act authorizes a district court to award "reasonable attorney fees to the prevailing party" if a case is found to be "exceptional." 35 U.S.C. § 285. The Supreme Court has implemented a flexible standard, holding that "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014).

75.     "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id*. The grant of fees does not require a finding of "litigation-related misconduct of an independently sanctionable magnitude." *Id*. "A case presenting either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award." *Id.* at 1757.

76.     Furthermore, a movant need only establish their right to fees by a preponderance of the evidence. *Id*. at 1758. And, the court may award interest on the attorneys' fees. *See Advanced Magnetic Closures, Inc. v. Rome Fastener Corp*., 607 F.3d 817, 833 (Fed. Cir. 2010).

### 4.      **Evidentiary Issues**

77.     Vectura has submitted as Schedule 4 its motions *in limine* that identify evidentiary issues that it will ask the Court to resolve prior to trial. Vectura expects that other evidentiary issues will arise, and it will present them to the Court as necessary at the appropriate time.

### B.      **GSK**

### 1.      **Claim Construction**

78.     "[T]he words of a claim are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

79.     The ordinary meaning may be determined by reviewing various sources, such as the claims themselves, the specification, the prosecution history, dictionaries, and any other relevant evidence. *See Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).

### 2. **Infringement**

80.     Although infringement is a question of fact, limitations on the applicability of the

doctrine of equivalents—including whether a patentee is estopped from asserting the doctrine of

equivalents based on statements or amendments made during prosecution, whether a finding of

equivalence would vitiate a claim limitation, and whether a finding of equivalence would ensnare

the prior art—are questions of law.

#### a) **Direct Infringement**

81.     "[I]t is axiomatic that the *patentee* bears the burden of proving infringement." *Ultra-Tex

Surfaces, Inc. v. Hill Bros. Chem. Co.*, 204 F.3d 1360, 1364 (Fed. Cir. 2000) (emphasis in

original).  Infringement must be proven by a preponderance of the evidence.  *Centricut, LLC v.

Esab Grp., Inc.*, 390 F.3d 1361, 1367 (Fed. Cir. 2004).

82.     To determine whether a patentee has met this burden, courts apply a two-part test: "First,

the claim must be properly construed to determine its scope and meaning.  Second, the claim as

properly construed must be compared to the accused device or process."  *Ethicon Endo-Surgery,

Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998) (citation omitted).

83.     "To show infringement of a patent, a patentee must supply sufficient evidence to prove

that the accused product or process contains, either literally or under the doctrine of equivalents,

every limitation of the properly construed claim."  *Seal-Flex, Inc. v. Athletic Track & Court

Constr.*, 172 F.3d 836, 842 (Fed. Cir. 1999).

84.     The patentee fails to carry its burden "when two scenarios are equally likely" because "no

jury could determine which one was more likely than not."  *Mosel Vitelic Corp. v. Micron Tech.,

Inc.*, No. CIV.A. 98-449-GMS, 2000 WL 1728346, at *2 (D. Del. Mar. 14, 2000).

### b)  Literal Infringement

85.     Literal infringement requires the presence of each limitation, exactly as written in the claim. *See DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1331 (Fed. Cir. 2001) ("Literal infringement of a claim occurs when every limitation recited in the claim appears in the accused device, *i.e.*, when the properly construed claim reads on the accused device exactly." (internal quotation marks omitted)).

86.     "If even *one limitation* is missing or not met as claimed, there is no literal infringement." *Mas-Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998) (emphasis added) (citation omitted).

### c)  Infringement Under the Doctrine of Equivalents

87.     Under the doctrine of the equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is `equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 523 F.3d 1304, 1312 (Fed. Cir. 2008); *see also Toro Co. v. White Consol. Indus., Inc.*, 266 F.3d 1367, 1370 (Fed. Cir. 2001) ("To infringe a claim under the doctrine of equivalents, an accused device must include an equivalent for each literally absent claim limitation.").

88.     To prove equivalence, the patentee must "show[] that the difference between the claimed invention and the accused product [is] insubstantial." *Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1364 (Fed. Cir. 2007).

89.     "One way of doing so is by showing on a limitation by limitation basis that the accused product performs substantially the same function in substantially the same way with substantially the same result" as the corresponding limitation claimed in the patent. *Id.*

90.     The doctrine of equivalents must be applied to each individual element of a claim, not to the invention as a whole.  *Warner-Jenkinson Co. v. Hilton Davis Chem. Co*., 520 U.S. 17, 29 (1997).

91.     A patentee must present "particularized testimony and linking argument" to support a theory of infringement under the doctrine of equivalents.  *Am. Calcar, Inc. v. Am. Honda Motor Co*., 651 F.3d 1318, 1338-39 (Fed. Cir. 2011).

### (1)     Ensnarement

92.     Additionally, the doctrine of "[e]nsnarement bars a patentee from asserting a scope of equivalency that would encompass, or 'ensnare,' the prior art."  *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1322 (Fed. Cir. 2009).

93.     If a hypothetical patent claim, constructed on the basis of the patentee's doctrine of equivalents theory to literally cover the accused device, would be unpatentable as anticipated or obvious, then "the patentee has overreached, and the accused device is noninfringing as a matter of law."  *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1380 (Fed. Cir. 2001).

94.     "[T]he burden of persuasion that the hypothetical claim does not ensnare the prior art remains with the patentee."  *Streamfeeder, LLC v. Sure-Feed Sys., Inc.*, 175 F.3d 974, 983 (Fed. Cir. 1999).  Ensnarement is a question of law to be decided by the Court, not the jury.  *DePuy Spine*, 567 F.3d at 1324.

### 3.     Invalidity

95.     Section 103 of the Patent Act (pre-AIA) provides:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject

matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103(a).

96.     "[O]bviousness is a matter of law based on findings of underlying fact." *Sanofi-Synthelabo v. Apotex, Inc*., 550 F.3d 1075, 1085 (Fed. Cir. 2008).

97.     The underlying factual considerations include:

the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained and the level of ordinary skill in the pertinent art resolved.  Against this background, the obviousness or nonobviousness of the subject matter is determined.  Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)); *see also ABT Sys., LLC v. Emerson Elec. Co.*, 797 F.3d 1350, 1357 (Fed. Cir. 2015).

98.     Obviousness can be established by noting that "there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims." *KSR,* 550 U.S. at 420.

99.     Furthermore, it is not only the specific problem motivating the patentee which is relevant, but rather "any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.*

### a)     Person of Ordinary Skill in the Art ("POSA")

100.    "The person of ordinary skill in the art is a hypothetical person who is presumed to know the relevant prior art." *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).  In determining the level of skill in the art, district courts may consider "the type of problems encountered in the

art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field." *Id.*

101. A POSA may possess the knowledge of a collaborative team that would work together in the relevant field. *See, e.g.*, *Takeda Pharm. Co. v. Mylan Inc.*, No. 13-cv-04001-LHK, 2014 WL 5862134, at *16 (N.D. Cal. Nov. 11, 2014).

102. Courts "can consider the inferences and creative steps a person of ordinary skill in the art would employ." *KSR*, 550 U.S. at 401. In addition, because "[a] person of ordinary skill is also a person of ordinary creativity," he will be able to "fit the teachings of multiple patents together like pieces of a puzzle," regardless of whether each piece of prior art was designed to solve the problem at hand. *Id.* at 420-21; *see also Leapfrog Enters., Inc. v. Fischer-Price, Inc.*, 485 F.3d 1157, 1161-1162 (Fed. Cir. 2007).

## b) <u>Obviousness</u>

103. Even though an invention may not have been identically disclosed or described before it was made by an inventor, in order to be patentable, the invention must not have been obvious to a person of ordinary skill in the field of technology of the patent at the time the invention was made. A patentee must prove that a patent claim is invalid by showing, by clear and convincing evidence, that the claimed invention would have been obvious to persons having ordinary skill in the art at the time the invention was made. Final Jury Instructions, *Alarm.com, Inc. v. SecureNet Techs. LLC*, No-15-807-RGA, ECF 268, at 17 (D. Del. Feb. 7, 2019).

104. Because obviousness is to be judged under "an expansive and flexible approach" driven by "common sense," an award of patentability requires "more than the predictable use of prior art elements according to their established functions." *KSR*, 550 U.S. at 415-418. This flexible

standard expands the obviousness analysis beyond just "published articles and the explicit content of issued patents." *Id.* at 419.

105.    As the Supreme Court has articulated, a patent that merely combines "familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.* at 416 (recognizing that when a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result).

106.    Similarly, where a person of ordinary skill in the art simply pursues "known options" from a "finite number of identified, predictable solutions," obviousness under § 103 results. *Id.* at 421.

107.    In determining whether a claimed invention is obvious, the jury must consider: (1) the scope and content of the prior art, (2) the level of ordinary skill in the pertinent art, and (3) the differences between the claimed invention and the prior art. Final Jury Instructions, *Alarm.com, Inc. v. SecureNet Techs. LLC*, No-15-807-RGA, ECF 268, at 17 (D. Del. Feb. 7, 2019).

108.    In deciding what the level of ordinary skill is, the jury should consider all the evidence introduced at trial, including but not limited to: (1) the levels of education and experience of the inventor and other persons actively working in the field; (2) the types of problems encountered in the field; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; and (5) the sophistication of the technology. *Id.*

109.    To determine the scope and content of the prior art, the jury must determine what prior art is reasonably pertinent to the particular problems with which the inventors were faced. The person of ordinary skill in the art is presumed to be aware of all of the pertinent prior art. *Id.* at 18.

110.     The next factor that the jury must consider is the differences, if any, between the prior art and the claimed inventions.  Importantly, a claim is not proved obvious merely by demonstrating that each of the elements was independently known in the prior art.  Most, if not all, inventions rely on building blocks of prior art, and claimed discoveries almost of necessity will likely be combinations of what is already known.  In considering whether a claimed invention is obvious, the jury may but is not required to find obviousness if the jury finds that at the time of the claimed invention there was a reason that existed at the time of the invention that would have prompted a person of ordinary skill in the art in the relevant field to combine the known elements in the way the claimed invention does.  The motivation to modify the prior art to arrive at the claimed invention need not be explicitly stated in the prior art to be combined nor the same motivation that the inventor had.  *Id.*

111.     In deciding the obviousness question, the jury may take into account such factors as:

  a.  Whether the claimed invention was merely the predictable result of using prior art elements according to their known functions;
  b.  Whether the claimed invention provides an obvious solution to a known problem in the relevant field;
  c.  Whether the prior art teaches or suggests the desirability of combining elements claimed in the invention;
  d.  Whether the prior art teaches away from combining elements in the claimed invention; and
  e.  Whether it would have been obvious to try the combinations of elements, such as when there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions.

  *Id.*

112.     In determining whether the claimed invention was obvious, the jury is to consider each claim separately.  The jury is not to use hindsight, i.e. consider only what was known at the time of the invention.  *Id.* at 19.

113.     In making obviousness determinations, the jury should take into account any objective evidence (sometimes called "secondary considerations") that may have existed at the time of the

invention and afterwards that may shed light on the obviousness or not of the claimed invention, such as whether the invention was commercially successful as a result of the merits of the claimed invention (rather than the result of design needs or market-pressure advertising or similar activities). *Id.* at 19.

114.    Finding secondary considerations may suggest that the claim was not obvious. However, there must be a connection between the evidence showing any of these factors and the claimed inventions if this evidence is to be given weight by the jury in arriving at its conclusion on the obviousness issue. For example, if commercial success is due to advertising, promotion, salesmanship or the like, or is due to features of the products other than those claimed in the patents in suit, then any commercial success may have no relation to the issue of obviousness. *Id.*

**c)    <u>Non-Enablement</u>**

115.    To satisfy the enablement requirement, the asserted patents must describe the invention and "the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same." 35 U.S.C. § 112, ¶ 1.

116.    It is not enough to enable a subset of what is claimed, a patent specification "must teach those skilled in the art how to make and use *the full scope of the claimed invention* without undue experimentation." *Amgen Inc. v. Sanofi*, 872 F.3d 1367, 1375 (Fed. Cir. 2017) (quoting *Genentech, Inc. v. Novo Nordisk A/S,* 108 F.3d 1361, 1365 (Fed. Cir. 1997)) (emphasis added). "[T]he full scope of a claim is not enabled when there is an embodiment within the claim's scope that a person of ordinary skill, reading the specification, would be unable to practice without

undue experimentation." *MorphoSys AG v. Janssen Biotech, Inc.*, No. 16-221-LPS, 2019 WL 337091, at \*9 (D. Del. Jan. 25, 2019).

117. The following factors may be considered in determining whether a disclosure requires undue experimentation:

    a.   the quantity of experimentation necessary;
    b.   the amount of direction or guidance presented;
    c.   the presence or absence of working examples;
    d.   the nature of the invention;
    e.   the state of the prior art;
    f.   the relative skill of those in the art;
    g.   the predictability or unpredictability of the art; and
    h.   the breadth of the claims.

*In re Wands,* 858 F.2d 731, 737 (Fed. Cir. 1988).

118. A patentee may choose to claim his invention narrowly or broadly, but "[a] patentee who chooses broad claim language must make sure the broad claims are fully enabled. The scope of the claims must be less than or equal to the scope of the enablement." *Sitrick v. Dreamworks, LLC,* 516 F.3d 993, 999 (Fed. Cir. 2008) (internal quotation marks omitted); *see also Trs. of Boston Univ. v. Everlight Elecs. Co.,* 896 F.3d 1357, 1364-65 (Fed. Cir. 2018) (invalidating claim to "six permutations" because only "five out of the six" permutations were enabled).

119. "Enabling the full scope of each claim is part of the *quid pro quo* of the patent bargain." *Sitrick,* 516 F.3d at 999 (internal quotation marks omitted). A patentee cannot satisfy the enablement requirement if he claims an invention that cannot be practiced by one skilled in the art upon reading the specification. *See ALZA Corp. v. Andrx Pharm., LLC,* 603 F.3d 935, 940 (Fed. Cir. 2010) ("To be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.'") (quoting *Genentech,* 108 F.3d at 1365).

120.     Although a specification need not disclose what is well-known in the art, it "must supply the novel aspects of an invention in order to constitute adequate enablement." *Genentech,* 108 F.3d at 1366; *see also Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.,* 501 F.3d 1274, 1283 (Fed. Cir. 2007). "Patent protection is granted in return for an enabling disclosure of an invention, not for vague intimations of general ideas that may or may not be workable." *Genentech,* 108 F.3d at 1366.

121.     A patentee "cannot simply rely on the knowledge of a person of ordinary skill to serve as a substitute for the missing information in the specification." *ALZA Corp.*, 603 F.3d at 941; *see also Genentech,* 108 F.3d at 1366.

122.     In an unpredictable art, where it is necessary to make and test candidate examples that may meet the functional limitations of patent claims, and where the patent is silent as to how to structurally modify disclosed examples in a way to preserve their functionality, undue experimentation may be needed to practice the full scope of the invention. *Wyeth v. Abbott Labs.,* 720 F.3d 1380, 1384-85 (Fed. Cir. 2013); *see also White Consol. Indus. Inc. v. Vega Servo-Control, Inc.,* 713 F.2d 788, 791 (Fed. Cir. 1983) (holding that patent claims were not enabled where post-priority-date expert evidence showed that "1½ to 2 man years of effort" would be needed to practice an invention.).

123.     "Undue experimentation is a matter of degree" and "routine experimentation is not without bounds." *Wyeth*, 720 F.3d at 1385-86 (internal quotation marks omitted). In an "unpredictable" field, practicing the full scope of a claim requires undue experimentation when the patent merely discloses a method of trial-and-error testing. *Id.* at 1386; *see also ALZA Corp.,* 603 F.3d at 943 (finding that one of ordinary skill "would have been required to engage in an

iterative, trial-and-error process to practice the claimed invention even with the help of the . . . specification.").

### d)     <u>Written Description</u>

124. The written description requirement of 35 U.S.C. § 112 provides, in pertinent part, that a patent specification: shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

125. A patent's written description "must clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." *Ariad Pharm., Inc. v. Eli Lilly & Co.,* 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (alteration in original) (internal quotation marks omitted).

126. "[T]he applicant must 'convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention,' and demonstrate that by disclosure in the specification of the patent." *Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.,* 541 F.3d 1115, 1122 (Fed. Cir. 2008) (citation omitted) (quoting *Vas-Cath Inc. v. Mahurkar,* 935 F.2d 1555, 1563-64 (Fed. Cir. 1991)); *see also Ariad,* 598 F.3d at 1351.

127. Such "possession as shown in the disclosure" requires "an objective inquiry into the four corners of the specification," *Ariad,* 598 F.3d at 1351, and the specification must "describ[e] the invention, with all its claimed limitations." *Lockwood v. Am. Airlines, Inc.,* 107 F.3d 1565, 1572 (Fed. Cir. 1997) (emphasis removed).

128.     "The disclosure must allow one skilled in the art to visualize or recognize the identity of the subject matter purportedly described." *Univ. of Rochester v. G.D. Searle & Co., Inc.,* 358 F.3d 916, 923 (Fed. Cir. 2004) (quoting *Enzo Biochem, Inc. v. Gen-Probe Inc.,* 323 F.3d 956, 968 (Fed. Cir. 2002)).

129.     "The purpose of the written description requirement is to ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification." *Ariad,* 598 F.3d at 1353-54 (internal quotation marks omitted).

### 4.     Exceptional Case

130.     In patent law, a court "in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285.

131.     The Supreme Court has held that an "exceptional" case is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.,* 134 S. Ct. 1749, 1756 (2014).

132.     A party moving for attorney fees must demonstrate, by a preponderance of the evidence, that a case is "exceptional." *Id.* at 1758.

133.     Exceptional cases involve "litigation misconduct; vexatious, unjustified, and otherwise bad faith litigation; a frivolous suit or willful infringement." *Epcon Gas Sys. Inc. v. Bauer Compressors, Inc.,* 279 F.3d 1022, 1034 (Fed. Cir. 2002).

134.     "[A] district court may award minimal or no fees after considering the amount of success to the prevailing party." *SSL Servs. LLC v. Citrix Sys. Inc.,* 769 F.3d 1073, 1087 (Fed. Cir. 2014).

**5.** **Damages**

135.    Upon a finding of patent infringement, the patentee shall be awarded "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284.

136.    The amount of a prevailing patentee's damages is a finding of fact on which the patentee bears the burden of proof by a preponderance of the evidence. *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1370 (Fed. Cir. 2002); *see also SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1164 (Fed. Cir. 1991).

**a)** **Reasonable Royalty Damages**

137.    A reasonable royalty is the amount that the defendant would have paid for a license to the asserted patents if the parties had negotiated a license prior to the first alleged infringement. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 60 & n.2 (Fed. Cir. 2012). This is often referred to as the "hypothetical negotiation." *See, e.g.*, *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1357 (Fed. Cir. 2012).

138.    "While the Federal Circuit has not prescribed a specific methodology for calculating a reasonable royalty, courts rely upon the fifteen factors set forth in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)." *St. Clair Intellectual Prop. Consultants, Inc. v. Canon, Inc.*, 2004 WL 2213562, at *2 (D. Del. Sept. 28, 2004); *see also Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1231 (Fed. Cir. 2014).

139.    "[A] reasonable royalty analysis requires a court to hypothesize, not to speculate." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010).

140.     "At all times, the damages inquiry must concentrate on compensation for the economic

harm caused by infringement of the claimed invention.  Thus, the trial court must carefully tie

proof of damages to the claimed invention's footprint in the market place."  *Id.*  (internal citation

omitted); *see also Ericsson, Inc.*, 773 F.3d at 1226 ("What is taken from the owner of a utility

patent (for purposes of assessing damages under § 284) is only the patented technology, and so

the value to be measured is only the value of the infringing features of an accused product.").

141.     The purpose of compensatory damages is not to punish the infringer, but to make the

patentee whole.  *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1223 (Fed. Cir. 1995).

## b)      Apportionment

142.     Under 35 U.S.C. § 284, damages awarded for patent infringement "must reflect the value

attributable to the infringing features of the product, and no more."  *Ericsson, Inc.*, 773 F.3d at

1226.

143.     "When the accused infringing products have both patented and unpatented features,

measuring [the value of the patented technology] requires a determination of the value added by

such features. . . .   The essential requirement is that the ultimate reasonable royalty award must

be based on the incremental value that the patented invention adds to the end product."  *Ericsson,*

*Inc.*, 773 F.3d at 1226.

144.     "No matter what the form of the royalty, a patentee must take care to seek only those

damages attributable to the infringing features."  *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308,

1326 (Fed. Cir. 2014).

### c)     <u>Comparable Licenses</u>

145.     "[U]sing sufficiently comparable licenses is a generally reliable method of estimating the value of a patent." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1325 (Fed. Cir. 2014) *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015).

146.     "Prior licenses . . . are almost never perfectly analogous to the infringement action" and "allegedly comparable licenses may cover more patents than are at issue in the action." *Ericsson, Inc.*, 773 F.3d at 1227; *see also VirnetX*, 767 F.3d at 1330 ("[W]e have never required identity of circumstances" for a license to be "sufficiently comparable to the hypothetical license at issue in suit." (internal quotation marks omitted)).

147.     Actual licenses to the patented technology, especially between the parties, are highly probative as to what constitutes a reasonable royalty for those patent rights because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace. *LaserDynamics*, 694 F.3d at 79.

148.     Likewise, a patentee's license proposals "should carry considerable weight in calculating a reasonable royalty rate." *Unisplay S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 519 (Fed. Cir. 1995); *see also Wright v. United* States, 53 Fed. Cl. 466, 475 (2002) ("[T]he Court is swayed by the fact that an actual proffer by Plaintiff constitutes credible evidence of a ceiling on a hypothetical royalty rate.").

### d)     <u>Enhancement of Damages Under 35 U.S.C. § 284</u>

149.     Under certain circumstances where the defendant has engaged in reprehensible behavior or bad faith, "the court may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284.

150.     As the Supreme Court recently clarified in *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S.

Ct. 1923 (2016), the only sort of "willful misconduct" that can warrant enhanced damages is

conduct that is "egregious"—for example, "the 'wanton and malicious pirate' who intentionally

infringes another's patent-with no doubts about its validity or any notion of a defense-for no

purpose other than to steal the patentee's business." *Id.* at 1932, 1934; *see also id.* at 1932

(explaining that enhanced damages are "not to be meted out in a typical infringement case, but

are instead designed as a 'punitive' or 'vindictive' sanction for egregious infringement

behavior").

151.     "The district court has the discretion to decide whether the case is sufficiently the amount

of enhancement that is warranted (up to the statutory limit of treble damages)." *WBIP, LLC v.

Kohler Co.*, 829 F.3d 1317, 1342 (Fed. Cir. 2016).

152.     Even "a finding of willfulness does not require an award of enhanced damages; it merely

permits it." *In re Seagate Tech., LLC*, 497 F.3d at 1368 (en banc), *abrogated on other grounds*,

*Halo*, 136 S. Ct. 1923 (citing 35 U.S.C. § 284); *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d

1259, 1274 (Fed. Cir. 1999)); *Funai Elec. Co. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1376-77

(Fed. Cir. 2010) (affirming denial of enhanced damages after a jury finding of willfulness);

*Greatbatch Ltd. v. AVX Corp.*, C.A. No. 13-723-LPS, 2016 WL 7217625, at *6 (D. Del. Dec. 13,

2016) ("A finding of willfulness may be a necessary-but is not a sufficient-condition to permit

the Court to exercise its discretion.").

153.     Enhanced damages represent a "'punitive' or 'vindictive' sanction" reserved for

"egregious" or "malicious" misdeeds. *Halo*, 136 S. Ct. at 1932.

154.     "[T]he decision to enhance damages is a discretionary one that the district court should

make based on the circumstances of the case." *Stryker Corp. v. Zimmer, Inc.*, 837 F.3d 1268,

1279 (Fed. Cir. 2016). "Courts consider several factors when determining whether an infringer has acted in bad faith and whether damages should be increased. They include: '(1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; . . . (3) the infringer's behavior as a party to the litigation;' (4) 'defendant's size and financial condition;' (5) 'closeness of the case;' (6) 'duration of defendant's misconduct;' (7) 'remedial action by the defendant;' (8) 'defendant's motivation for harm; and (9) whether defendant attempted to conceal its misconduct.'" *Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1225 (Fed. Cir. 2006) (quoting *Read Corp. v. Portec. Inc.*, 970 F.2d 816, 826-27 (Fed. Cir. 1992), *superseded on other grounds as recognized in Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir. 1996)).

155.    The Supreme Court has "eschew[ed] any rigid formula for awarding enhanced damages under § 284." *Halo*, 136 S. Ct. at 1934.

156.    Whether an accused infringer has reasonable litigation defenses is relevant to whether or not its conduct is "egregious" enough to enhance damages. *WesternGeco L.L.C. v. ION Geophysical Corp.*, 837 F.3d 1358, 1363 (Fed. Cir. 2016), *rev'd on other grounds*, 138 S. Ct. 2129 (2018) (quoting *Halo*, 136 S. Ct. at 1930) (observing that, after *Halo*, "objective reasonableness is one of the relevant factors" in determining whether to enhance damages); *see also Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979, 1988-1989 (2016) (in exercising discretion to award attorney's fees under the Copyright Act, a district court should give "substantial weight" to the reasonableness of the defendant's litigation positions).

## 6. **Willful Infringement**

157.   In order to demonstrate willful infringement, a plaintiff must prove by a preponderance of the evidence that an accused infringer infringed "deliberate[ly]," in a "consciously wrongful" manner, and "without any reason to suppose [its] conduct [was] arguably defensible." *Halo*, 136 S. Ct. at 1932, 1933; *see also WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016) (willful infringement is a question of fact).

158.   A Plaintiff must prove that an accused infringer "acted despite a risk of infringement that was 'either known or so obvious that it should have been known to the accused infringer.'" *WesternGeco L.L.C. v. ION Geophysical Corp.*, 837 F.3d 1358, 1362 (Fed. Cir. 2016), *rev'd on other grounds*, 138 S. Ct. 2129 (2018) (quoting *Halo*, 136 S. Ct. at 1930).

159.   "To determine whether an accused infringer's conduct was subjectively willful, the Court must 'measure[]' the accused infringer's 'culpability . . . against the knowledge of the actor at the time of the challenged conduct.'" *Masimo Corp. v. Philips Elecs. N. Am. Corp.*, C.A. No. 09-80-LPS, 2016 WL 6542726, at *15 (D. Del. Oct. 31, 2016) (quoting *Halo*, 136 S. Ct. at 1933).

160.   An accused infringer's conduct may only be found to amount to willful infringement if it is "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or-indeed-characteristic of a pirate." *Halo*, 136 S. Ct. at 1932.

161.   Awareness of the patents-in-suit, without more, cannot establish willful infringement. *See Vehicle IP, LLC v. AT&T Mobility LLC*, 227 F. Supp. 3d 319, 331 (D. Del. 2016) ("Vehicle IP does not identify other evidence, beyond pre-suit knowledge of the patent, that could show that the TCS Defendants' infringement was 'egregious,' 'deliberate,' 'wanton,' or otherwise characteristic of the type of infringement that warrants the Court exercising its discretion to

impose the 'punitive' sanction of enhanced damages."); *Greatbatch Ltd. v. AVX Corp.*, C.A. No. 13-723-LPS, 2016 WL 7217625, at *3 (D. Del. Dec. 13, 2016) ("[A] party's pre-suit knowledge of a patent is not sufficient, by itself, to find 'willful misconduct' of the type that may warrant an award of enhanced damages."); *see also Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1332-33 (Fed. Cir. 2004) (affirming JMOL of no willfulness despite stipulation that defendant had knowledge of the asserted patents); *Ajinomoto Co. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338, 1351-52 (Fed. Cir. 2000) (affirming finding of no willfulness despite defendant's knowledge of asserted patent).

162.    To show willfulness, a patentee must prove that the alleged infringer acted without a "reasonable basis for believing it had a right to do the acts." *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1565 (Fed. Cir. 1983) ("[M]ore is necessary to support a finding of 'willfulness' than that the infringing acts were not inadvertent.  The court must determine that the infringer acted in disregard of the patent, that is, that the infringer had no reasonable basis for believing it had a right to do the acts."); *see also Vulcan Eng'g Co. v. Fata Aluminum, Inc.*, 278 F.3d 1366, 1378 (Fed. Cir. 2002) ("The tort of willful infringement arises upon deliberate disregard for the property rights of the patentee. . . . When it is found that the infringer acted without a reasonable belief that its actions would avoid infringement, the patentee has established willful infringement, which may be accompanied by enhanced damages."); *Read*, 970 F.2d at 826 ("[T]his court has approved such awards where the infringer acted in wanton disregard of the patentee's patent rights, that is, where the infringement is willful.").

163.    Reasonable defenses that were known to the accused infringer at the time of the alleged culpable conduct are thus highly relevant to assessing an accused infringer's subjective intent. *See Greatbatch Ltd.*, C.A. No. 13-723-LPS, 2016 WL 7217625, at *4 (holding that "reasonable

defenses . . . known to [the accused infringer] at the time of the challenged, culpable conduct" are "pertinent to assessing . . . subjective intent").

164.    Beyond that, relevant factors include whether the alleged infringer acted consistently "with the standards of commerce for its industry," "made a good-faith effort to avoid infringing the patent," or "tried to cover up its infringement." *WesternGeco*, 837 F.3d at 1363 n.2. "[A] party's pre-suit knowledge of a patent is not sufficient, by itself, to find 'willful misconduct' of the type that may warrant an award of enhanced damages." *Vehicle IP*, 227 F. Supp. 3d at 331; *see also Norian Corp.*, 363 F.3d at 1332 ("Willful infringement is not established by the simple fact of infringement, even though [the defendant] stipulated that it had knowledge of [the plaintiff's] patents.  The patentee must present threshold evidence of culpable behavior." (citation omitted)).

165.    A finding of willful infringement does not require that damages be enhanced.  *See Halo*, 136 S. Ct. at 1933 ("[N]one of this is to say that enhanced damages must follow a finding of egregious misconduct."); *WBIP, LLC*, 829 F.3d at 1341 n.13 ("[T]his is not to say that a jury verdict of willful infringement ought to result in enhanced damages.").

166.    Indeed, as *Halo* indicates, willfulness is, at most, a factor the Court may consider when deciding whether to exercise its discretion to award enhanced damages under 35 U.S.C. § 284. *See Halo*, 136 S. Ct. at 1931-1932 (Section 284 "contains no explicit limit or condition" on a district court's discretion except that enhanced damages are "reserved for egregious cases of culpable behavior"); *see also Trs. of Boston Univ.*, C.A. No. 12-11935-PBS, 2016 WL 3976617, at *2 ("[T]he touchstone for awarding enhanced damages after *Halo* is egregiousness.").

167.    "The failure of an infringer to obtain the advice of counsel with respect to any allegedly infringed patent, or the failure of the infringer to present such advice to the court or jury, may not

be used to prove that the accused infringer willfully infringed the patent . . . ." 35 U.S.C. § 298. "Nor is there a universal rule that to avoid willfulness one must cease manufacture of a product immediately upon learning of a patent, or upon receipt of a patentee's charge of infringement, or upon the filing of suit. Exercising due care, a party may continue to manufacture and may present what in good faith it believes to be a legitimate defense without risk of being found on that basis alone a willful infringer." *Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*, 897 F.2d 508, 511 (Fed. Cir. 1990) (citation omitted).

168.    The Supreme Court's decision in *Halo* makes clear that "willfulness" is no longer a separate claim but is just one factor for the Court to consider in deciding whether to enhance damages under § 284. *Halo*, 136 S. Ct. at 1933. This is apparent from *Halo*'s unitary abuse-of-discretion standard for reviewing enhanced damages determinations, which leaves no room for "substantial evidence" review of a jury's verdict. *See id.* at 1934.[2]

## VI.    EXHIBITS TO BE OFFERED AT TRIAL

169.    The parties agree that the descriptions of documents on their respective exhibit lists are provided for convenience only and shall not be used as an admission or otherwise as evidence regarding the document.

170.    Subject to the remaining provisions of this Joint Proposed Pretrial Order, except for demonstrative exhibits and documents used solely for cross-examination and/or impeachment, no party may use at trial an exhibit not present on its final exhibit list as submitted to the Court, or the opposing party's final exhibit list as submitted to the Court, absent agreement of the parties or good cause shown.

---

[2] In *WBIP, LLC*, the Federal Circuit "[did] not interpret *Halo* as changing the established law that the factual components of the willfulness question should be resolved by the jury." 829 F.3d at 1341. But the court did not consider *Halo*'s new, unitary standard of review.

171.    The parties reserve the right to offer an exhibit on the opposing party's exhibit list, even if not introduced by the opposing party.  All objections to such exhibits are preserved.  Any exhibit, once admitted, may be used equally by either party subject to any limitations as to its admission into evidence.  Exhibits used solely for impeachment may not be admitted into evidence.

172.    The parties reserve their right to raise the objections set forth on the trial exhibit lists.  The listing of an exhibit does not constitute an admission as to the admissibility of the exhibit or a waiver of any applicable objection.

173.    Each party reserves any right to make objections under FRE 104, 105, 401, 402, and 403 to any evidence offered by the other party, at the time such evidence is offered, in view of the specific context in which such evidence is offered.

174.    The parties stipulate to the authenticity of the documents listed in the attached exhibit lists unless such objections are specifically and expressly preserved therein.

175.    The parties agree that any documents, including electronic documents, produced from the files of a party during the course of this case and authored by employees of that party are, in the form produced during discovery, records of regularly conducted activity pursuant to Federal Rules of Evidence 803(6) and 902(11) that were: a) made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters; b) kept in the course of the regularly conducted activity; and c) made by the regularly conducted activity as a regular practice.

### A.    Vectura

176.    Vectura's exhibit list is submitted as Schedule 1.

**B.**     **GSK**

177.    GSK's exhibit list is submitted as Schedule 2.

**VII.    WITNESSES TO BE CALLED AT TRIAL**

**A.     Vectura**

178.    Vectura identifies the following list of witnesses for trial. Vectura reserves the right to
modify this list. Vectura further incorporates by reference and reserves the right to call all
witnesses GSK lists on its witness list. Vectura also reserves the right to call witnesses to
authenticate documents and rebuttal witnesses or impeachment witnesses as may be necessary
upon reasonable notice. Vectura is not required to present testimony from any witness on its list
of witnesses.

**WILL CALL LIST**

| WITNESS | LIVE OR BY DEPOSITION |
|---------|----------------------|
| Qi (Tony) Zhou | Live |
| Kim Schenk | Live |
| John Koleng | Live |
| Hugh Smyth | Live |
| Tim Wright | Live |

**MAY CALL LIST**

| WITNESS | LIVE OR BY DEPOSITION |
|---------|----------------------|
| Mark Whitaker | By deposition |
| Trevor Riley | By deposition |
| Trevor Roche | By deposition |

| | |
|---|---|
| David A. V. Morton | Live or by deposition |
| Matthew Green | Live or by deposition |
| Haggis Harris | Live |
| Nicholas D. Childerhouse | Live or by deposition |
| David Fergenson | Live or by deposition |
| Paolo Colombo | Live or by deposition |
| Alan Reynolds | Live |

B. **GSK**

179.     GSK identifies the following list of witnesses for trial.  GSK reserves the right to revise

or supplement this list consistent with the Pretrial Order or as otherwise permitted by the Court.

If any witness GSK intends to call to testify live is unavailable, GSK reserves the right to offer

deposition testimony from such witness.  GSK also reserves the right to call live or by deposition

anyone appearing on Vectura's witness list.  GSK further reserves the right to call live or by

deposition any witness to provide foundational testimony should any party contest the

authenticity or admissibility of any material proffered at trial.  Finally, GSK reserves the right to

call live or by deposition any fact witness designated by Vectura in its witness list who Vectura

elects not to call at trial.

**WILL CALL LIST**

| **WITNESS** | **LIVE OR BY DEPOSITION** |
|---|---|
| Trevor Riley | Live |
| Trevor Roche | Live |
| Paolo Colombo, Pharm.D., Ph.D. | Live |

| Lynn Russell, Ph.D. | Live |
|---|---|
| William Kerr, Ph.D. | Live |
| Tim Wright | Live |

**MAY CALL LIST**

| **WITNESS** | **LIVE OR BY DEPOSITION** |
|---|---|
| David Morton | Live or by deposition |
| Matthew Green | Live or by deposition |
| Nick Childerhouse | Live or by deposition |
| David Fergenson | Live or by deposition |

### C. Live Witnesses

180. If a party intends to call a witness live who is not listed on its will call list, it will notify the other party by April 22.

181. The parties agree that any witness will only be called live once at trial. To the extent a party wants to call a witness of the other party in its case, the party may either go outside the scope of the direct on cross of that witness when the other party calls the witness live or may play or read deposition testimony from that witness. If a party intends to go outside the scope of direct on cross of the witness in accordance with this paragraph, then two days before the witness is to be put on the stand, after receiving identification of the exhibits that the calling party intends to use with the witness on direct, the party intending to outside the scope of the direct on cross must identify by 9:30 pm the exhibits that it wishes to introduce through the witness during the portion of the cross examination that goes outside the scope of the direct. The calling party will provide any objections to these exhibits by 10:30 pm and the parties shall meet and confer at

11:00 pm that evening and will present any unresolved objections to the Court. On the evening before the witnesses is put on the stand, after receiving the demonstratives that the calling party intends to use with the witness on direct, the party intending to go outside the scope of the direct on cross must provide by 9:00 pm the demonstratives to be used with the witness for the portion of the cross examination that goes outside the scope of the direct. The calling party will then provide its objections to those demonstratives by 10:30 pm, and the parties will meet and confer at 11:00 pm and will present any unresolved objections to the Court the following morning.

### D. Deposition Designations

182. With respect to those witnesses who will not be called to testify live at trial, each party has designated the specific pages and lines of transcript that it intends to read or play during its case-in-chief. Absent good cause shown, no deposition testimony not previously designated by either party pursuant to this Pretrial Order may be later added for these witnesses. The parties agree that there no distinction will be made whether the testimony was labeled as a designation, counter-designation, or counter-counter designation in the parties' exchanges.

183. The parties' designated testimony and objections are attached as Schedule 3.

184. The deposition designations identified by the Parties include and are subject to any errata sheets.

185. Each party reserves the right to offer testimony designated by any other party (whether as a designation or counter-designation), even if not separately listed on its own deposition designation list.

186. A party's designation of deposition testimony does not constitute an admission as to the admissibility of the testimony or a waiver of any applicable objection.

187.    Any deposition testimony may be used at trial for the purpose of impeachment, regardless of whether a party specifically identified that testimony on its list of deposition designations, if the testimony is otherwise competent for such purpose.

## VIII.    VECTURA'S STATEMENT OF INTENDED PROOF

188.    Vectura respectfully submits its statement of intended proof as to what it expects to prove in support of its claims. Vectura's statement is limited to its expected proof with regard to its claims, and does not address the proof that it may choose to present in response to the defenses for which GSK has the burden of proof and may present at trial. Vectura's statement is based on the current disposition and status of the case and the Court's current rulings. Vectura reserves the right to revise this statement in light of further decisions or orders of the Court, including without limitation any rulings on pending motions.

189.    During trial in this matter, Vectura intends to establish that one or more of GSK's Accused Products infringe claim 3 of the '991 Patent and/or claim 3 of the '567 Patent. Vectura intends to establish that it is entitled to reasonable royalties from GSK for its infringement of the '991 Patent and/or the '567 Patent in an amount to be determined at trial. Vectura further intends to establish that GSK willfully infringed claim 3 of the '991 Patent and/or claim 3 of the '567 Patent.

## IX.    GSK'S STATEMENT OF INTENDED PROOF

190.    GSK submits the following brief statement of what GSK intends to prove as defenses at trial.  This statement is not exhaustive, and GSK reserves the right to prove any matter identified in its pleadings, discovery responses, expert reports, and the accompanying statements of issues of facts and issues of law that remain to be litigated at trial.  GSK may also provide additional proof to rebut any proof offered by Vectura before and during trial, in response to rulings by the

Court, or for other good cause. GSK reserves the right to modify or amend this statement to the extent necessary to reflect any future rulings by the Court, and to supplement or amend this statement to fairly respond to any new issues that Vectura may raise. GSK incorporates by reference its expert reports in support of any proof to be presented by expert testimony.

## A.     Non-Infringement of the Patents-in-Suit

191.     Vectura bears the burden of proof on infringement of the '991 and '567 Patents. To prove infringement, Vectura must prove by a preponderance of the evidence that any of GSK's Accused Products contains every limitation of an asserted claim. GSK will introduce evidence to rebut Vectura's infringement contentions. In particular, GSK will show that under the proper application of the Court's claim constructions, none of GSK's Accused Products contains every limitation of either asserted claim, whether literally or under the doctrine of equivalents. Additionally, GSK will rebut any evidence of alleged willfulness presented by Vectura.

## B.     Invalidity of the Patents-in-Suit

192.     GSK will prove by clear and convincing evidence that the asserted claims of the '991 and '567 Patents are invalid under 35 U.S.C. § 103 as obvious in view of the prior art. Additionally, GSK will rebut any evidence of alleged secondary considerations supporting non-obviousness presented by Vectura.

193.     GSK will prove by clear and convincing evidence that the asserted claims of the '991 and '567 Patents are invalid for failure to satisfy the enablement requirement under 35 U.S.C. § 112.

194.     GSK will prove by clear and convincing evidence that the asserted claims of the '991 and '567 Patents are invalid for failure to satisfy the written description requirement under 35 U.S.C. § 112.

### C.     Damages

195.    To the extent that at least one of claim 3 of the '991 Patent and claim 3 of the '567 Patent is infringed and not invalid, Vectura will not be able to prove by a preponderance of evidence that Vectura is entitled to a reasonable royalty ███ of U.S. net sales of the Accused Products as a result of the Defendants' infringement of one or more valid claims.

196.    To the extent that at least one of claim 3 of the '991 Patent and claim 3 of the '567 Patent is infringed and not invalid, Vectura will not be able to prove by a preponderance of evidence that Vectura is entitled to enhanced damages pursuant to 35 U.S.C. § 284 or that Defendants have willfully infringed one or more valid claims.

### D.     Exceptional Case

197.    GSK will prove that this is an exceptional case under 35 U.S.C. § 285, and GSK should be awarded attorneys' fees.  Additionally, GSK will rebut any allegation by Vectura that Vectura is entitled to attorneys' fees under 35 U.S.C. § 285.

## X.    AMENDMENTS OF THE PLEADINGS

198.    The Parties do not propose any amendments to the current pleadings.

199.    This Court's rulings and decisions on pending motions may affect the issues otherwise to be tried in this case.  The Parties therefore reserve their respective rights to amend, or seek amendment of, the pleadings, so that they conform with and are consistent with the Court's decisions and rulings and the evidence presented at trial.

## XI.    CERTIFICATION OF GOOD-FAITH SETTLEMENT EFFORTS

200.    The Parties hereby certify that they have engaged in a good faith effort to explore resolution of the controversy by settlement.  The Parties have been unable to reach agreement.

## XII.   OTHER MATTERS

### A.   Length of Trial

201.   See D.I. 293 Order.

### B.   Motions in Limine

#### 1.   Vectura

202.   Vectura's motions in limine, along with GSK's respective responses, and Vectura's replies, are submitted as Schedule 4.

#### 2.   GSK

203.   GSK's motions in limine #1, #2, and #3, along with Vectura's respective responses, and GSK's replies, are submitted as Schedule 5.

### C.   Jury Procedures

204.   The Parties agree that the current version of the Federal Judicial Center Introduction to the Patent System video (2013 revision) will be played as part of the Court's preliminary jury instructions.

205.   On the first day of trial, each member of the jury shall be provided a binder containing the preliminary jury instructions, the Asserted Patents, a list of the claim terms of the Asserted Patents that have been construed and their constructions, a list of acronyms or terms likely to be used during trial with definitions on which the Parties agree, and several blank sheets for notes.

206.   The Parties agree that the jurors be permitted to write notes by hand in their provided binders during the trial, and that jurors be permitted to bring their provided binders into the deliberation room.  The Parties further propose that the jurors be instructed not to exchange or share their binders with one another (although they may discuss the contents of their binders) and

that the jurors' binders be collected by the Clerk each evening after daily recess, and collected and destroyed without review after the jury's discharge.

### D.   Order of Proof

207.   The Parties agree that the presentation of evidence will be as follows: Vectura will present its case on infringement and damages; GSK will answer Vectura's infringement and damages case and present its case on invalidity; Vectura will answer GSK's invalidity case.

### E.   Confidential Information

208.   GSK anticipates that the Parties will present evidence at trial containing particularly sensitive GSK technical and financial information, the disclosure of which would cause competitive harm.  That information relates to the specific formulations and manufacturing processes for the accused products and revenue and profitability information of GSK.  GSK specifically requests that before such evidence is presented, the Court put procedures in place to maintain the confidentiality of GSK's information, including consideration of closing the courtroom to the public during presentation of that evidence, sealing the transcript related to the presentation of that evidence, and sealing any exhibits containing GSK's confidential information.  GSK is prepared to discuss specifically what technical and financial information is competitively sensitive.

### F.   Sequestration

209.   The parties request that the Court prevent a fact witness from hearing any testimony of other (fact or expert) witnesses prior to the fact witness's testimony.  Expert witnesses may be present in the courtroom at any time during trial.

### G.   Stipulations Regarding Exchanges During Trial

210.   The Parties stipulate to the following procedures:

### 1. Exchange of Exhibits and Demonstratives to be Used in Opening Statements

211.    By no later than 5:00 p.m. on the calendar day before the opening statements, the Parties shall exchange by email lists of any to be admitted exhibits for which there are unruled-upon objections and color copies of demonstrative exhibits that they intend to use in their respective opening statements.  By no later than 7:00 p.m. that same day, any objections to the demonstrative exhibits shall be lodged.  By no later than 8:00 p.m. that same day, the parties shall meet and confer to resolve any objections, which if necessary will be raised with the Court the following morning.

### 2. Exchange of Exhibits and Demonstratives to be Used with Witnesses During Trial

212.    By 8:00 p.m. two calendar days before a witness is put on the stand, the party offering the witness will identify exhibits that the party intends to use in direct examination.  For any physical exhibits to be used, the party seeking to use the exhibit must make it available for inspection and must provide, via email, a color representation as a PDF of such exhibits.  The parties need not identify any exhibits for use in cross examination prior to the start of cross examination.

213.    By 8:00 p.m. the evening before a witness is put on the stand, the party offering the witness will provide color copies of slides or demonstratives to be used with the witness in PDF form.  For any video or animations to be used, the party seeking to use the demonstrative will provide such demonstratives in an electronic form that enables the receiving party to play the video or animation as it is intended to be used in court.  The parties need not identify any demonstratives for use in cross examination prior to the start of cross examination.

214.    By 10:00 p.m. the evening before a witness is put on the stand, the opposing party will identify any objections to the exhibits and demonstratives.

215.   The Parties shall meet and confer on any objections by 11:00 p.m. that evening.

216.   Any unresolved issues will be presented to the Court the morning of the proposed use of the disputed exhibits and/or demonstratives.

217.   The notice provisions in this section do not apply to demonstrative exhibits created in the courtroom, or to the enlargement, highlighting, ballooning, or excerpting of trial exhibits, demonstratives, or testimony in the courtroom.

218.   The party cross examining a witness shall provide the exhibits and demonstratives reasonably anticipated to be used during the cross examination to the opposing party at the start of cross examination.

### 3.   Exchange of Demonstratives to be Used in Closing Statements

219.   By 7:00 a.m. the morning of closing statements, the parties shall exchange copies of any demonstrative exhibits not previously used during trial that they intend to use in their respective closing statements. By no later than 8:00 a.m. that same day, the party receiving these demonstrative exhibits shall inform the other party any objections to such exhibits. The parties shall then meet and confer to resolve any objections, which if necessary will be raised with the court before the start of closing arguments.

### 4.   Identification of Order of Witnesses

220.   Each party will identify all trial witnesses, whether live or by deposition, in the order in which the party expects to call them, by 8:00 p.m. two calendar days before the witnesses will be called (*e.g.*, notice must be given by 8:00 p.m. on Monday for witnesses to be called on Wednesday).

221.   If later events cause the need to remove a witness from a party's witness list, the parties agree to notify the other side as soon as possible.  In the event that a party will not call a witness

that it had previously indicated would appear live as a "will call" witness, the other party may designate and offer deposition testimony from such witness (subject to the Federal Rules of Evidence). Counter-designations may also be provided. In the event that such designations cannot be completed by the times agreed to below, the parties shall work in good faith to set deadlines for the disclosure of such.

### 5. Presentation of Deposition Designations

222. All counter-designations will be played/read together with the original designations in the order that the witness provided the testimony.

223. The parties may offer some or all of the deposition testimony set forth herein at trial. A party's decision not to introduce some or all of the testimony of a witness designated by that party herein shall not be commented upon by the other party at trial.

224. Where a video recording of a deposition is available, the offering party shall play portions of the video containing the designated testimony at trial. If no videotape is available, the testimony shall be read into the record. The party offering the witness will prepare the video clips/transcript to be played/read presenting all portions of the designated testimony in sequence. To that end, the following procedure will apply.

225. By 12:00 p.m. three calendar days before a witness is put on the stand by deposition, the party offering the witness will identify those portions of the transcript that will be presented to the jury.

226. By 12:00 p.m. two calendar days before the witness is put on the stand by deposition, the responsive party will identify any objections to the testimony and counter-designate portions of the transcript that will be presented to the jury.

RLF1 21123165v.1

227.    By 8:00 p.m. two calendar days before the witness is put on the stand by deposition, the party offering the witness will identify any counter-counter-designations and objections to the counter designations.

228.    By 10:00pm two calendar days before the witness is put on the stand by deposition, the responsive party will identify any objections to the counter-counter designations.

229.    The Parties shall meet and confer on any objections by 11:00 p.m. two calendar days before the witness is put on the stand by deposition, and will present any unresolved issues to the Court the following morning.  The Parties shall submit highlighted copies of the disputed materials (with each side's designated testimony highlighted in a different color) and an itemized list of the remaining objections.

230.    By 6:00 p.m. the evening before the witness is put on the stand by deposition, the party offering the witness will provide a copy of the video and the transcript clip or transcript containing both Parties' designations, consistent with any objections resolved by the Court.  All irrelevant and redundant material, including colloquy between counsel, objections, and pauses will be eliminated when the deposition is read or played at trial.  The parties shall provide the court with a stipulated record of the total time allocated to each party's designations.

231.    Copies of exhibits referred to during the deposition testimony will be offered into the trial record to the extent admissible.

### 6.    Notice of Intention to Rest

232.    By 6:00 p.m. the day before a party intends to rest its case, the resting party shall give the other party notice of its intention to rest.

### H.     Other Stipulations

233.     The parties agree not to make any reference at trial to the fact that any claims or defenses (including any asserted patents/claims) were dropped or dismissed (voluntarily or otherwise) or to any *Daubert* challenges or Court rulings regarding any experts.

234.     The parties agree not to make any reference at trial to the December 13, 2018 Approved Judgment in the UK Proceeding between the parties ("UK Judgment") or any statements made by the Court or the parties during the UK proceeding or during any other unrelated litigation or foreign proceeding between the parties.

### I.     Other Issues to Be Raised at the Pretrial Conference

235.     The parties may request permission from the Court to set up a small number of additional monitors during their trial presentations to facilitate viewing of visual evidence.

## XIII.     ORDER TO CONTROL COURSE OF ACTION

236.     This order shall control the subsequent course of the action, unless modified by the Court to prevent manifest injustice.

237.     The Parties reserve the right to seek leave to supplement or amend this final pretrial order based on subsequent events or by agreement.

RLF1 21123165v.1

Of Counsel:

Dominick A. Conde
Christopher P. Borello
Brendan M. O'Malley
Damien N. Dombrowski
VENABLE LLP
1290 Avenue of the Americas
New York, NY 10104-3800
(212) 218-2100
dconde@venable.com
cborello@venable.com
bomalley@venable.com
ddombrowski@venable.com

*/s/ Kelly E. Farnan*
Kelly E. Farnan (#4395)
Christine D. Haynes (#4697)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com
haynes@rlf.com

Attorneys for Plaintiff

Of Counsel:

Martin J. Black
Kevin M. Flannery
Robert Ashbrook
Sharon K. Gagliardi
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
(215) 994-4000

Blake B. Greene
DECHERT LLP
300 West 6th Street, Suite 2010
Austin, TX 78701
(512) 394-3000

*/s/ Jack B. Blumenfeld*
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
jtigan@mnat.com

Attorneys for Defendants

Dated: April 16, 2019