IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VECTURA LIMITED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 16-638 (RGA) |
| | ) | |
| GLAXOSMITHKLINE LLC and | ) | |
| GLAXO GROUP LIMITED, | ) | |
| | ) | |
| Defendants. | ) | |

**GSK'S OPENING BRIEF IN SUPPORT OF ITS RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW AND
<u>MOTION FOR A NEW TRIAL OR REMITTITUR</u>**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
jtigan@mnat.com

*Attorneys for Defendants*

OF COUNSEL:

Martin J. Black
Kevin M. Flannery
Robert Ashbrook
Sharon K. Gagliardi
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA  19104-2808
(215) 994-4000

Blake B. Greene
DECHERT LLP
300 West 6th Street, Suite 2010
Austin, TX  78701
(512) 394-3000

Katherine A. Helm
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY  10036

June 13, 2019

## TABLE OF CONTENTS

Page

I.      NATURE AND STAGE OF THE PROCEEDINGS ....................................................... 1

II.     SUMMARY OF ARGUMENT ................................................................................. 1

III.    THE COURT SHOULD GRANT JMOL OF NON-INFRINGEMENT OR, IN
        THE ALTERNATIVE, A NEW TRIAL ..................................................................... 2

        A.      Legal Standard for JMOL of Non-Infringement.................................................. 2

        B.      There Was Insufficient Evidence to Support a Finding that the ELLIPTA®
                Products Satisfied the Dispersion Limitation ....................................................... 3

                1.      Pretrial proceedings on the dispersion limitation....................................... 3

                2.      Dr. Zhou never tied Study 2 to the accused formulations......................... 4

                        a.      Dr. Zhou ignored many meaningful differences between the
                                commercial vilanterol formulation and Blend 6 in Study 2........... 5

                        b.      There was no substantial evidence in support of the
                                assertion that Blend 5 was a proper control ................................. 8

                        c.      There is no dispersion testing of any kind supporting an
                                inference of infringement with respect to GSK's umec
                                products.................................................................................... 10

        C.      Vectura Failed to Prove the Presence of the Claimed CAPs ............................... 11

        D.      In the Alternative, the Court Should Grant a New Trial...................................... 12

IV.     THE COURT SHOULD GRANT JMOL OF OBVIOUSNESS OR, IN THE
        ALTERNATIVE, A NEW TRIAL............................................................................ 13

        A.      Legal Standard for JMOL of Obviousness ........................................................ 14

        B.      There Was Almost Complete Agreement on the *Graham* Factors and No
                Substantial Evidence to Support Vectura's Safety Story..................................... 14

                1.      *Graham* Factor #1: Scope and content of the prior art ............................ 14

                2.      *Graham* Factor #2: Differences between the prior art and the claim ...... 15

                3.      *Graham* Factor #3: The level of ordinary skill in the art........................ 15

                4.      *Graham* Factor #4: Secondary considerations......................................... 16

                5.      Vectura's safety story ............................................................................. 16

i

V.      THE COURT SHOULD GRANT JMOL OF NO WILLFUL INFRINGEMENT
        OR, IN THE ALTERNATIVE, A NEW TRIAL ........................................................ 20

VI.     GSK IS ENTITLED TO A NEW TRIAL ON DAMAGES TO ADDRESS
        VECTURA'S FAILURE TO APPORTION ........................................................... 22

        A.      The Apportionment Requirement ......................................................... 22

        B.      Ms. Schenk Failed to Apportion Away Non-Accused Components ................... 23

        C.      Ms. Schenk Failed to Perform a Technical Comparability Analysis of the
                Licenses and Gave Conclusory Testimony on Economic Comparability .......... 24

VII.    GSK IS ENTITLED TO A NEW TRIAL ON ALL ISSUES DUE TO
        VECTURA'S APPEAL TO JURY PREJUDICE, OR A SUBSTANTIAL
        REMITTITUR ................................................................................................. 26

        A.      Vectura's Repeated References to "Billions" and Its "Pennies on the
                Dollar" Argument Were Prejudicial .................................................... 26

        B.      A New Trial Should Be Granted to Permit Introduction of Evidence on the
                Exercise of the Option in the 2010 Agreement ...................................... 29

        C.      Vectura's Misconduct on Infringement and Validity Issues Was
                Prejudicial ...................................................................................... 30

        D.      In the Alternative, the Court Should Grant a Remittitur ............................ 30

VIII.   CONCLUSION .............................................................................................. 30

<u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*ABT Sys., LLC v. Emerson Elec. Co.*,
    797 F.3d 1350 (Fed. Cir. 2015)................................................................................14

*Alcon Res. Ltd. v. Barr Labs., Inc.*,
    745 F.3d 1180 (Fed. Cir. 2014)..................................................................................8

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
    839 F.3d 1034 (Fed. Cir. 2016) (en banc)...............................................................14

*Bayer HealthCare LLC v. Baxalta Inc.*,
    No. 16-1122-RGA, 2019 WL 330149 (D. Del. Jan. 25, 2019)................................23

*Becton Dickinson & Co. v. Tyco Healthcare Grp. LP*,
    No. 02-1694-GMS, 2008 WL 11383361 (D. Del. Sept. 11, 2008).........................12

*Bos. Sci. Corp. v. Cordis Corp.*,
    777 F. Supp. 2d 783 (D. Del. 2011).........................................................................29

*Brigham & Women's Hosp., Inc. v. Perrigo Co.*,
    761 F. App'x 995 (Fed. Cir. 2019) .........................................................................3, 7

*C.R. Bard v. AngioDynamics Inc.*,
    No. 15-218-JFB, 2019 WL 1877165 (D. Del. Apr. 26, 2019)...................................2

*Carrier Corp. v. Goodman Global, Inc.*,
    162 F. Supp. 3d 345 (D. Del. 2016).........................................................................20

*Cordis Corp. v. Bos. Sci. Corp.*,
    658 F.3d 1347 (Fed. Cir. 2011)..................................................................................7

*Ericsson, Inc. v. D-Link Sys., Inc.*,
    773 F.3d 1201 (Fed. Cir. 2014)..........................................................................22, 25

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
    879 F.3d 1299 (Fed. Cir. 2018)................................................................................22

*Fromson v. W. Litho Plate & Supply Co.*,
    853 F.2d 1568 (Fed. Cir. 1988)................................................................................29

*Galderma Labs., L.P. v. Tolmar, Inc.*,
    737 F.3d 731 (Fed. Cir. 2013)............................................................................16, 17

*Garretson v. Clark,*
    111 U.S. 120 (1884)..................................................................................23

*Graham v. John Deere Co.,*
    383 U.S. 1 (1966)............................................................................14, 15, 16

*Greatbatch Ltd. v. AVX Corp.,*
    No. 13-723-LPS, 2016 WL 7217625 (D. Del. Dec. 13, 2016) ..............................22

*Greatbatch Ltd. v. AVX Corp.,*
    No. 13-723-LPS, 2018 WL 1568872 (D. Del. Mar. 30, 2018)........................20, 26

*Greenleaf v. Garlock, Inc.,*
    174 F.3d 352 (3d Cir. 1999)........................................................................20, 26

*Halo Elecs., Inc. v. Pulse Elecs., Inc.,*
    136 S. Ct. 1923 (2016) ...............................................................................20

*Hoffmann-La Roche Inc. v. Apotex Inc.,*
    748 F.3d 1326 (Fed. Cir. 2014)..............................................................17, 18, 19

*In re Ethicon, Inc.,*
    844 F.3d 1344 (Fed. Cir. 2017)....................................................................17

*In re Maatita,*
    900 F.3d 1369 (Fed. Cir. 2018)....................................................................12

*Kim v. ConAgra Foods, Inc.,*
    465 F.3d 1312 (Fed. Cir. 2006)....................................................................3, 8

*KSR Int'l Co. v. Teleflex, Inc.,*
    550 U.S. 398 (2007)...............................................................................14, 16

*L & W, Inc. v. Shertech, Inc.,*
    471 F.3d 1311 (Fed. Cir. 2006)....................................................................3

*LaserDynamics, Inc. v. Quanta Computer, Inc.,*
    694 F.3d 51 (Fed. Cir. 2012).......................................................................26

*Lucent Techs., Inc. v. Gateway, Inc.,*
    580 F.3d 1301 (Fed. Cir. 2009)....................................................................23, 26

*M2M Sols., LLC v. Enfora, Inc.,*
    167 F. Supp. 3d 665 (D. Del. 2016)................................................................23

*Medtronic Vascular, Inc. v. Bos. Sci. Corp.,*
    No. 06-cv-78, 2008 WL 2744909 (E.D. Tex. July 11, 2008) ..............................3, 8

*Meiresonne v. Google, Inc.*,
    849 F.3d 1379 (Fed. Cir. 2017)..................................................................17

*Merck & Cie v. Gnosis S.P.A., et al.*,
    808 F.3d 829 (Fed. Cir. 2015)....................................................................16

*Paradox Sec. Sys., Ltd. v ADT Sec. Servs, Inc.*,
    388 F. App'x 976 (Fed. Cir. 2010) ..............................................................3

*Perkin-Elmer Corp. v. Computervision Corp.*,
    732 F.2d 888 (Fed. Cir. 1984)......................................................................2

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    904 F.3d 965 (Fed. Cir. 2018)....................................................................23

*Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*,
    563 F.3d 1358 (Fed. Cir. 2009)..................................................................12

*Richardson-Vicks Inc. v. Upjohn Co.*,
    122 F.3d 1476 (Fed. Cir. 1997)..................................................................14

*Roberts Tech. Grp., Inc. v. Curwood, Inc.*,
    695 F. App'x 48 (3d Cir. 2017) ...................................................................2

*Spence v. Bd. of Educ. of Christina Sch. Dist.*,
    806 F.2d 1198 (3d Cir. 1986)....................................................................30

*Sprint Commc'ns Co. L.P. v. Comcast IP Holdings, LLC*,
    No. 12-1013-RGA, 2015 WL 456154 (D. Del. Jan. 30, 2015)..................25

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
    918 F.3d 1368 (Fed. Cir. 2019)....................................................................2

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011)......................................................23, 26, 29

*Unisplay, S.A. v. Am. Elec. Sign Co., Inc.*,
    69 F.3d 512 (Fed. Cir. 1995)......................................................................30

*Univ. of Md. Biotech. Inst. v. Presens Precision Sensing GmbH*,
    711 F. App'x 1007 (Fed. Cir. 2017) ..........................................................17

*VirnetX, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014)..................................................................22

*Wang Labs., Inc. v. Toshiba Corp.*,
    993 F.2d 858 (Fed. Cir. 1993)....................................................................29

*Wordtech Sys., Inc. v. Integrated Network Solutions, Inc.*,
  609 F.3d 1308 (Fed. Cir. 2010)................................................................................23

*XpertUniverse, Inc. v. Cisco Sys., Inc.*,
  No. 12-540-RGA, 2013 WL 6118447 (D. Del. Nov. 20, 2013) .................................2

**Other Authorities**

FED. TRADE COMM'N, *The Evolving IP Marketplace: Aligning Patent Notice and
  Remedies with Competition*, 188-91 (Mar. 2011)....................................................29

**Rules and Statutes**

35 U.S.C. § 284................................................................................................22, 29

<u>TABLE OF ABBREVIATIONS</u>

The following table lists the abbreviations used throughout this brief.

| Abbreviation | Description |
|---|---|
| '991 patent | U.S. Patent No. 8,303,991 |
| CAP(s) | Composite active particle(s) |
| Dr. Colombo or Colombo | GSK's expert Dr. Paolo Colombo |
| Dr. Kerr or Kerr | GSK's expert Dr. William Kerr |
| Dr. Russell or Russell | GSK's expert Dr. Lynn Russell |
| Dr. Smyth or Smyth | Vectura's expert Dr. Hugh Smyth |
| Dr. Zhou or Zhou | Vectura's expert Dr. Qi (Tony) Zhou |
| GSK | GlaxoSmithKline LLC and Glaxo Group Limited |
| JMOL | Judgment as a matter of law |
| MgSt | Magnesium stearate |
| Ms. Schenk or Schenk | Vectura's expert Kimberly Schenk |
| POSA | Person of ordinary skill in the art |
| Umec | Umeclidinium |
| Vectura | Vectura Limited |

**Note**: All quoted emphasis is added, and internal quotation marks, brackets, and citations are omitted, unless otherwise indicated.

## I.      NATURE AND STAGE OF THE PROCEEDINGS

On May 3, 2019, following a five-day trial, the jury returned a verdict that GSK's ELLIPTA® products infringed claim 3 of the '991 patent.  The jury rejected GSK's invalidity defense, found GSK's infringement to be willful, and awarded Vectura $89,712,069 for infringement through December 31, 2018.  *See* D.I. 321.  The Court entered judgment on May 16, 2019.  D.I. 333.  GSK now moves for renewed judgment as a matter of law or, in the alternative, for a new trial or remittitur.

## II.      SUMMARY OF ARGUMENT

This is a case of broken promises.  Vectura promised that it would tie Study 2 to the Court's claim construction and establish that Blend 6 was "representative" of the accused ELLIPTA® products.  That never happened.  Vectura's flawed approach to infringement—to rely on tests of something other than the accused products—should be rejected.  The Federal Circuit has never accepted such speculative infringement proofs, let alone in support of a massive verdict.

Vectura also promised that it would provide evidence of the value of the alleged CAPs in GSK's products and never did so.  Vectura's infringement theory was that GSK made an unknown quantity of accidental CAPs while using high shear blenders.  There was no evidence in the record as to the number and quality of the alleged CAPs, much less the real world impact on dispersion.  Undeterred by the lack of valuation evidence, Vectura's damages expert used the entire market value of the inhalers as the royalty base, refused to apportion to the value of the invention, and failed to perform a technical comparability analysis of the license agreements on which she relied.  Vectura's counsel then inflamed the jury with repeated references to "billions" of dollars.

The result of all this was a runaway jury.  But even viewing the evidence in the light most favorable to Vectura, GSK is entitled to post-trial relief.  There was no infringement here, GSK

1

established obviousness as a matter of law, the damages are wildly inflated, and there was certainly no willful conduct.

## III.   THE COURT SHOULD GRANT JMOL OF NON-INFRINGEMENT OR, IN THE ALTERNATIVE, A NEW TRIAL

The Court construed the dispersion limitation to require "isolating the impact of the [CAPs] on the overall dispersion of the composition." D.I. 167 at 17. Dr. Zhou ignored that requirement and elected not to perform a test of his own, relying instead on experimental test results for a different formulation from 2006. He provided no evidence whatsoever with respect to umec formulations and insufficient testimony to support a finding that the alleged CAPs were present in the accused formulations. Based on his conclusory testimony, no reasonable jury could have concluded that the ELLIPTA® products infringed.

### A.   Legal Standard for JMOL of Non-Infringement

In reviewing motions for JMOL in patent cases, district courts apply the law of the regional circuit. *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 918 F.3d 1368, 1380 (Fed. Cir. 2019). In the Third Circuit, JMOL is appropriate when "it is apparent that the verdict is not supported by legally sufficient evidence." *Roberts Tech. Grp., Inc. v. Curwood, Inc.*, 695 F. App'x 48, 52 (3d Cir. 2017). The Court reviews the trial record for "substantial evidence," which is "such relevant evidence from the record taken as a whole as might be acceptable by a reasonable mind as adequate to support the finding under review." *XpertUniverse, Inc. v. Cisco Sys., Inc.*, No. 12-540-RGA, 2013 WL 6118447, at *1 (D. Del. Nov. 20, 2013) (quoting *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984)).

When the patent holder fails to present evidence on an element of a claim, JMOL of non-infringement is appropriate. *See C.R. Bard v. AngioDynamics Inc.*, No. 15-218-JFB, 2019 WL 1877165, at *1, 3 (D. Del. Apr. 26, 2019) (granting JMOL of non-infringement). Conclusory

expert testimony is insufficient to carry the plaintiff's burden.  *See, e.g.*, *Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312, 1320 (Fed. Cir. 2006) (affirming JMOL where expert offered conclusory testimony without testing or examining the accused products); *Paradox Sec. Sys., Ltd. v ADT Sec. Servs, Inc.*, 388 F. App'x 976, 981-82 (Fed. Cir. 2010) (affirming JMOL where plaintiff's expert failed to point to structures in the accused products).  Where, as here, the patent holder relies on test data, it cannot simply "assume" that untested products are like tested products for purposes of proving infringement.  *See L & W, Inc. v. Shertech, Inc.*, 471 F.3d 1311, 1318 (Fed. Cir. 2006) (noting that the patentee "cannot simply 'assume' that all of [the accused] products are like the one [] tested"); *Medtronic Vascular, Inc. v. Bos. Sci. Corp.*, No. 06-cv-78, 2008 WL 2744909, at *3 (E.D. Tex. July 11, 2008) (granting JMOL of non-infringement for untested accused products). As the Federal Circuit recently stated in affirming a JMOL of non-infringement, "[d]ata merely correlating to the claimed limitation does not suffice to prove literal infringement."  *Brigham & Women's Hosp., Inc. v. Perrigo Co.*, 761 F. App'x 995, 1004 (Fed. Cir. 2019).

## B.   There Was Insufficient Evidence to Support a Finding that the ELLIPTA® Products Satisfied the Dispersion Limitation

### 1.   Pretrial proceedings on the dispersion limitation

Claim 3 of the '991 patent requires that particulate MgSt "promotes the dispersion of the composite active particles upon actuation of a delivery device."  PTX-3.  But what does it mean to "promote dispersion" and how does one prove it?  This was a hotly contested issue both before and during trial.

At claim construction, GSK asserted that the dispersion limitation was indefinite because there is no objective way to determine whether an additive promotes dispersion.  D.I. 167 at 16. The Court disagreed, finding reasonable certainty in the claim by construing the dispersion limitation to require "isolating the impact of the [CAPs] on the overall dispersion of the

composition" and identifying a test that "control[s] for all variables that may contribute to dispersion." *Id.* at 17. The Court pointed to Example 4 of the patent, which disclosed a comparison of different dispersion test values for an active particle and the associated CAPs. *See id.* at 17-18; PTX-3 at 14:31-15:48.

Having survived an indefiniteness challenge based on appeal to the scientific method, Vectura began backpedaling on what was required to prove infringement. Although Vectura had all the ingredients and equipment, it failed to perform a test on the accused products and a control. Tr. 358:14-25, 359:19-360:5 (Zhou). Instead, Vectura's expert Dr. Zhou chose to rely on GSK's exploratory testing from 2006 on *different* formulations made under *different* conditions, the so-called "Study 2." *See* PTX-185; Tr. 360:6-21, 361:5-7 (Zhou).

GSK called foul and, at summary judgment, asked the Court to hold Vectura to the test described in the *Markman* Order. *See* D.I. 191. Vectura argued that it did not need to test the accused products and corresponding controls, promising that it would pass the Court's test by proving that Blend 6 in Study 2 was "representative" of GSK's accused formulations and that Blend 5 was an "appropriate control." *See* D.I. 210 at 5, 17. Based on that crucial promise, the Court allowed the case to proceed to trial.

### 2.    Dr. Zhou never tied Study 2 to the accused formulations

Dr. Zhou did not deliver the promised testimony. Instead, he admitted that Blend 6 was different from GSK's ELLIPTA® products. Tr. 358:4-13 ("Q. Dr. Zhou, it's not GSK's commercial product; right? A. No. Q. And it's not prepared by GSK's commercial process; right? A. No."), 385:4-14, 386:2-19, 388:7-389:18. He never uttered the word "representative" at trial, let alone explained on what basis a scientist would accept "representativeness" in lieu of evidence. Without that link, Vectura's infringement case failed.

4

## a.   *Dr. Zhou ignored many meaningful differences between the commercial vilanterol formulation and Blend 6 in Study 2*

GSK uses a multi-step process to manufacture its accused commercial products.  *See generally* PTX-34; DTX-446 at 62; Tr. 534:24-537:17 (Riley).  In the first step, fine and coarse lactose are pre-blended with MgSt (without any active) in a high speed TRV blender, which results in lactose particles coated with MgSt.  In the second step, the active ingredient is mixed with a portion of the coated lactose.  In the third step, the step 2 output is mixed in a high speed TRV blender with the rest of the coated lactose.  Each step has specific parameters for time, mixing speed, and the amount of the components added.

The processes for making Blend 6 and GSK's actual products differ in just about every conceivable way—the mixing steps are different, the mixing times and speeds are different, and the processes are polar opposites.  *Compare* PTX-185 at GSKV00058157 *with* PTX-34; *see also* Tr. 713:13-715:20 (Colombo).  For example, the first step in the GSK process is to coat the coarse and fine lactose together with MgSt; each is separately coated in the Blend 6 process.  The second step in the GSK process requires a Comil; there is no Comil in the Blend 6 process.  For steps 1 and 3, GSK uses conventional TRV blenders; Blend 6 used a special high energy piece of equipment called a mechanofuser.  And most importantly, GSK adds the active in pure form to the coated lactose; Blend 6 used 100% mechanofused CAPs.

A reasonable juror could not ignore the many differences between Blend 6 and the ELLIPTA® powders and simply jump to the conclusion that there is infringement here. The differences "are extremely important to consider in terms of the results" for dispersion performance.  Tr. 713:20-715:20 (Colombo).  Even inventor Matthew Green testified that dry powders are "very complex" and that "it would be difficult to work out exactly what contributes to what" with respect to dispersion performance such that a formulation scientist "[a]bsolutely"

5

should experiment and not make assumptions.  Tr. 162:4-21.  He was simply restating what was well known, which is that powder formulation performance is an unpredictable art.  *See* DTX-163 at 258-59 ("conclusions drawn from a particular study" of a complex dry powder "may apply only for the conditions chosen" in that study and by "varying any of the variables that are not subject of the study, an opposite effect may be obtained"); Tr. 715:7-718:7 (Colombo).

The discussion of Blend 6 was a diversion.[1]  The infringement question put to the jury begins and ends with the accused products, and the behavior of the 100% mechanofused Blend 6 drug particles says nothing about the behavior of the GSK accused formulations, *which do not pre-coat the active or use mechanofusion*.  Dr. Zhou did not even offer testimony on what percentage of the GSK active drug was converted to the alleged CAPs or how much MgSt was on the drug particles.  He simply speculated that there were sufficient CAPs to impact dispersion.

When asked on direct what the relevance of Study 2 was to the commercial products—and with the entire case on the line—Dr. Zhou testified as follows:

> Q. And so can you reasonably apply the information in this study to the commercial products and why?
>
> A. Because in the – I think most information is here.  Where in the Blend 6, we coat both the lactose particles and the drug particles.  And also like in the – I think also use the high energy, high-shear blending process, and we know the magnesium stearate has at least these kind of properties.  And also the same in the GSK products, they use these high-shear, high energy.  We have same ingredients there.  And also, it's similar process to coat both the lactose particles and also drug particles.  So, yeah.

---

[1] Blend 6 is not the accused product; however, it does bear a striking resemblance to one of the preferred embodiments in the patent.  *See* PTX-3 at 4:29-36.  That is because inventor Dr. Morton suggested that GSK experiment with Blend 6.  Tr. 383:16-384:15 (Zhou).  Vectura tried to conflate the accused products with an embodiment of the '991 patent and to paint GSK as an ungrateful company that refused to pay for Dr. Morton's inventions.  *See* Tr. 1004:5-1005:21.  This may well have confused the jury, but these atmospherics have no relevance to the question of whether GSK's *commercial* products infringed.

Tr. 326:24-327:1-10.  This undecipherable, speculative, and conclusory answer is all that supports the $89 million verdict.  It is simply not science.  No reasonable jury could conclude that this answer justifies a scientific leap of logic that the dispersion properties of Blend 6 reflect those of the vilanterol powder in GSK's accused inhalers, let alone the umec powder.  Dr. Zhou assumed away the relevance of the manufacturing process, the number of CAPs in the powders, differences in surface coverage of MgSt on the active, and many other variables.  Relying solely on his generic and undefined term "coated," Dr. Zhou disposed of those factors with the conclusory statement: "It's not important to draw conclusions about improving the dispersion if [an active is] coated." Tr. 389:17-18.  That assumption contradicts the Court's claim construction which "requires measuring the efficiency of dispersal of a composition with unmodified particles, measuring the efficiency of the composition with composite active particles, and looking for increased dispersal." D.I. 167 at 17; *see also Cordis Corp. v. Bos. Sci. Corp.*, 658 F.3d 1347, 1357 (Fed. Cir. 2011) (affirming JMOL of non-infringement and noting that expert testimony must be "disregard[ed]" if it "was based on an incorrect understanding of the claim construction").

The Federal Circuit has approved the grant of JMOL of non-infringement in the face of far more compelling evidence than Vectura presented here.  In *Brigham*, the issue was whether the accused antacid product provided immediate relief from certain symptoms.  761 F. App'x at 997-98.  The patentee relied upon clinical studies of its branded product to make inferences regarding the generic copy.  *Id.* at 998.  The Federal Circuit recognized that one of the studies "might" suggest that the accused product met the immediate relief limitation, but found that "speculative data" insufficient.  *Id.* at 1003-04.  The Federal Circuit rejected the attempt to rely on "[d]ata merely correlating to the claimed limitation" as constituting impermissible speculation and conjecture.  *Id.* at 1004.

In *Kim*, the patentee attempted to compare the accused product to her own invention, but failed to provide particularized evidence on the differences between the two compositions and why the differences were irrelevant. *See* 465 F.3d at 1319-20 (affirming JMOL of non-infringement where patentee's infringement case was based on "conclusory [expert] testimony"). And in *Alcon*, the patentee attempted to rely on an internal study of the accused infringer to prove a functional chemical stability limitation of the patent claim. *Alcon Res. Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1187 (Fed. Cir. 2014). The patentee "extrapolated" from the study to argue for infringement of the accused product. *Id.* The Federal Circuit rejected that analysis because the "composition of the [] product proposed in [the] ANDA is significantly different from the compositions tested in [the] study" and affirmed the finding of no infringement. *Id.*

What all these cases teach is that if a patentee wants to rely on test data to prove infringement, particularized linking testimony is required to account for any differences between the tested product, on the one hand, and the accused product, on the other. *See Medtronic Vascular*, 2008 WL 2744909, at *3 (granting JMOL of non-infringement for untested accused products). This is basic science and common sense. Yet, Dr. Zhou failed to identify the differences between Blend 6 and the accused products and failed to provide any justification other than a conclusory say so as to why they could be ignored. Such conclusory testimony cannot support the verdict.

**b.      *There was no substantial evidence in support of the assertion that Blend 5 was a proper control***

Proof of improved dispersion requires two numbers: the dispersion value for a formulation with CAPs and a control with unmodified active particles. The supposed Blend 5 "control" was made under very different conditions than the accused vilanterol or umec powders. It cannot possibly serve as a "control" from which to draw inferences regarding the accused products. A few of the differences are identified below.

| Parameter | Blend 5 | Vilanterol Powder | Umec Powder |
|---|---|---|---|
| **Active drug** | Vilanterol | Vilanterol | Umec |
| **Fine Lactose Mechanofusion Step** | Fine mechanofused with MgSt | Not present | Not present |
| **Lactose/MgSt Mixing Protocol** | Step 1: Fine and MgSt mechanofused separately for 20 minutes<br><br>Step 2: Coarse and MgSt blended separately for 30 minutes in TRV Blender<br><br>Step 3: Step 1 and 2 output combined in QMM Blender for 2 minutes | Fine + Coarse + MgSt in TRV Blender for 9 minutes | Fine + Coarse + MgSt in TRV Blender for 6 minutes |
| **Comil Step** | Not Present | Present | Present |
| **Mixing of Coated Lactose with Active - Mixing Apparatus** | Turbula Low Shear Blender | TRV High Shear Blender | TRV High Shear Blender |
| **Mixing of Coated Lactose with Active - Mixing Time** | 20 minutes | 8.5 minutes | 10 minutes |
| **Content Uniformity** | 25% | <3% | <3% |

*Compare* DTX-23 at GSKV00060908-911 & PTX-185 at GSKV00058157-158 *with* PTX-34; *see also* Tr. 568:16-569:4, 576:18-577:17 (Roche), 713:13-715:19 (Colombo).

The Court's *Markman* opinion states that "to test whether the additive is promoting [] dispersion, [a POSA] would need to control for **_all_** variables that may contribute to dispersion." D.I. 167 at 17 (emphasis added). Dr. Zhou did not control for **_any_** of these variables.

In addition to fundamental mismatches between Blend 5 and the accused products, such as absent process steps, Dr. Zhou did not address the differences in the basic parameters of mixing protocol and content uniformity. It was undisputed that mixing protocol is a critical variable in

9

analyzing dispersion "[b]ecause it ultimately controls the structure of what you make." *See* Tr. 175:17-25 (Morton). Yet, Dr. Zhou ignored mixing protocol differences. Similarly, he failed to address content uniformity, the measure of how well the powder is mixed. The Study 2 analysis on which he relied explicitly stated that the 25% uniformity of Blend 5 was so poor that it was "not possible" to reach conclusions on the dispersion data for the blend. DTX-23 at GSKV00060915; Tr. 390:12-391:17, 403:20-406:19 (Zhou), 576:18-580:24 (Roche). Yet, that data was the cornerstone of his analysis. Given these differences—as well as the many differences in other process steps and parameters—no reasonable jury could conclude that the dispersion data from Blend 5 had any relevance to the infringement of GSK's ELLIPTA® powders, much less carry Vectura's burden of proof.

### c. *There is no dispersion testing of any kind supporting an inference of infringement with respect to GSK's umec products*

The Court should grant JMOL of non-infringement for the INCRUSE® and ANORO® products, both of which incorporate umec, for a separate reason. The sole active ingredient in INCRUSE® is umec, and ANORO® is a combination product having two separate blister strips: one with the vilanterol powder and one with the umec powder. There is no evidence in the record with respect to the dispersion of umec powders or combination powders.[2] The sole basis for Dr. Zhou's opinion that the umec formulation meets the dispersion limitation is the following conclusory, speculative statement: "Umec is also drug particles, and also they have the same lactose coated in that formulation, and also I think the process is also high shear coating. So yeah." Tr. 324:16-23. Dr. Zhou admitted that he made a "major assumption" to conclude that the umec

---

[2] Claim 3 requires the measurement of dispersion data upon the "actuation of a delivery device." PTX-3. The vilanterol-only test of Study 2 says nothing about the impact on dispersion upon actuation in the combined umec/vilanterol cloud in ANORO® or the combined vilanterol/fluticasone furoate cloud in BREO®. Nor was there any testimony on this subject.

formulation infringes claim 3 based on the Study 2 test results for vilanterol.  Tr. 363:15-364:3.

Like his other assumptions made to get to the goal line on infringement, he failed to support it with

legally sufficient evidence.

### C.    Vectura Failed to Prove the Presence of the Claimed CAPs

Claim 3 (through claim 1) requires use of an "additive material that promotes the dispersion

of the composite active particles upon actuation of a delivery device."  The Court construed

"composite active particles" to mean "[a] single particulate entit[y/ies] made up of a particle of

active material to which one or more particles of additive material are fixed such that the active

and additive particles do not separate in the airstream."  D.I. 169 at 1.  The construction excluded

particles colliding and sticking together in the airstream or remaining together through something

as simple as contact adhesion.  D.I. 167 at 9 ("These two intrinsic references to 'fusion' clarify

only that the relevant fusion is stronger than 'simple contact adhesion' and strong enough to

prevent dissociation of the particles in formula or upon actuation."), 11 ("I agree with Defendants

that the 'fusion' contemplated by the patents is something more than a 'secure attachment[.]'").

In order to show the presence of the dispersion promoting CAPs, the particles had to be fixed

before actuation and remain together until exiting the airstream.  D.I. 167 at 11; Tr. 613:22-614:3

(Russell); *see also* Tr. 376:22-378:4 (Zhou).

Dr. Zhou presented no pre-actuation evidence to establish that the products as sold by GSK

had CAPs in them.  Indeed, at no point did he use the word "fixed" to describe those

products.  Instead, he presented evidence relating solely to the characteristics of the particles in the

airstream.  Moreover, that evidence was insufficient to establish that the particles were fixed.  He

referred to the concepts of "coating" and "co-association."  But an undefined "coating" would

include a simple contact adhesion or secure attachment, *see* Tr. 173:14-174:18 (Morton), which

the Court excluded from the construction.  Nor does Dr. Zhou's vague testimony regarding "co-

association" suffice.  The Court told Vectura: "You know, in the end, using a word like co-associated, if that's what the expert actually testifies, that's meaningless."  Pretrial Hr'g Tr. at 20:12-18.  Vectura failed to present sufficient evidence from which the jury could conclude that the required CAPs were present in the accused products.

### D.    In the Alternative, the Court Should Grant a New Trial

A new trial may be granted when the verdict is against the clear weight of the evidence, the trial was unfair, or substantial errors were made in the admission or rejection of evidence.  *Becton Dickinson & Co. v. Tyco Healthcare Grp. LP*, No. 02-1694-GMS, 2008 WL 11383361, at *2 (D. Del. Sept. 11, 2008); *see also Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1371-72 (Fed. Cir. 2009).  As discussed above, the jury's verdict was against the weight of the evidence.  Moreover, the Court should grant a new trial to ensure that both parties are held to the same standard of proof.  It is an elementary principle of patent law that "the same tests must be applied to infringement and anticipation."  *In re Maatita*, 900 F.3d 1369, 1377 (Fed. Cir. 2018). If the loose dispersion theory submitted at trial by Vectura is sufficient to establish infringement, then GSK was entitled to present its evidence on anticipation by Musa under that same standard.

In its summary judgment opinion, the Court held that GSK had not proffered sufficient evidence to support an anticipation defense based on the Musa reference, U.S. Patent No. 6,528,096, which GSK showed disclosed the same type of CAPs and active particles "coated" with MgSt that Vectura alleged were present in GSK's products.  *See* D.I. 254 at 6-7; D.I. 208 at 3-5; D.I. 125, Ex. 2 ¶¶ 71-79, 110-114; D.I. 125, Ex. 4 ¶ 7; D.I. 142, Ex. 2 at Ex. A & Ex. 2; D.I. 142, Ex. 3 at Ex. A; D.I. 196, Ex. 10 at 89:14-95:24.  Specifically, the Court granted summary judgment for Vectura on the ground that GSK's experts did not provide evidence of a disclosure in Musa of

"an additive material [that] promotes the dispersion of the composite active particles."  D.I. 254 at 6-7.

At trial, Dr. Zhou presented the conclusory opinion that "[i]t's not important to draw conclusions about improving the dispersion if both coated."  Tr. 389:14-18.  He therefore argued to the jury that mere proof of coating the active with MgSt was sufficient to meet Vectura's burden of proof for the dispersion limitation, even without testing the products at issue.  As discussed above, this is not a scientifically valid way to approach proof of the dispersion limitation and is contrary to the Court's claim construction.  However, if the Court accepts this evidence as proof of infringement, thereby loosening the standard used to decide the summary judgment motion, then it would be a grave injustice to deny GSK the right to present its anticipation defense to the jury under the same theory Vectura advanced.  *See* D.I. 208 at 12; Summ. J. Hr'g Tr. 66:12-67:22.

## IV.   THE COURT SHOULD GRANT JMOL OF OBVIOUSNESS OR, IN THE ALTERNATIVE, A NEW TRIAL

At trial, there was no dispute that the Fults and Kawashima references disclosed the claimed CAPs and that MgSt for use in inhaled powders was well known.  The experts disagreed only on whether it would have been obvious to make CAPs with MgSt.  Given the ubiquity of MgSt in inhalation products and the high level of skill in the art, GSK provided an overwhelming *prima facie* case of obviousness.  Vectura's principal response was to argue that MgSt was too dangerous to inhale and so a POSA would never have thought to try the combination.  But no reasonable jury could credit Vectura's safety story when the Musa reference established safety before the priority date and Vectura's expert admitted that the existence of an approved product on the market was dispositive.  Even when viewing the factual record in the light most favorable to Vectura, claim 3 is obvious.

13

### A.      Legal Standard for JMOL of Obviousness

"Obviousness is a question of law based on underlying facts." *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 839 F.3d 1034, 1047 (Fed. Cir. 2016) (en banc).  The factual matrix for the obviousness inquiry entails analyzing the four *Graham* factors: (1) the scope and content of the prior art, (2) differences between the prior art and the claims at issue, (3) the level of ordinary skill in the pertinent art, and (4) the impact of any secondary considerations.  *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007).

Following a verdict of non-obviousness, a court must presume that the jury resolved any underlying facts in favor of the patentee.  *Apple*, 839 F.3d at 1047.  However, like all other facts underpinning a jury verdict, courts will review the implicit findings for substantial evidence.  *Id.* The ultimate conclusion of obviousness based on those facts is one of law, and therefore, appropriate for resolution by judgment as a matter of law.  *See, e.g.*, *ABT Sys., LLC v. Emerson Elec. Co.*, 797 F.3d 1350, 1352-53 (Fed. Cir. 2015) ("[E]ven assuming that the jury correctly resolved pertinent factual disputes in favor of [the plaintiff], the prior art still renders the claims of the [asserted] patent obvious as a matter of law."); *Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1479 (Fed. Cir. 1997) (noting that a jury verdict "does not mean that [courts] are free to abdicate [their] role as the ultimate decision maker on the question of obviousness").

### B.      There Was Almost Complete Agreement on the *Graham* Factors and No Substantial Evidence to Support Vectura's Safety Story

#### 1.      *Graham* Factor #1: Scope and content of the prior art

It was undisputed that all of the elements of claim 3 were in the prior art.  There was no dispute that CAPs were known before the priority date.  *See, e.g.*, Tr. 141:12-15 (Wright); 690:17-22 (Colombo).  Dr. Smyth agreed: "And the CAPs were in the prior art, correct?  A. That's correct."  Tr. 918:11-20.  GSK's expert Dr. Colombo presented two prior art references,

Kawashima and Fults, that disclosed specific examples which met the limitations of claims 1 and 2—from which asserted claim 3 depends. *See, e.g.*, DTX-112 (Kawashima); DTX-97 (Fults); Tr. 721:6-724:11, 726:25-731:15, 741:11-18.

It was also undisputed that MgSt was a well-known additive in prior art dry powder inhalation formulations. *See* Tr. 731:16-736:12 (Colombo), 919:8-11, 920:1-8 (Smyth); DTX-54; DTX-58; DTX-70; DTX-101; DTX-104; DTX-408.  Indeed, it was one of the leading additives for such formulations in the late 1990s. *See* Tr. 690:22-25, 726:20-24, 773:7-13 (Colombo).  By 2000, there was a dry powder inhaler product on the market that contained MgSt. *See* Tr. 734:10-735:13 (Colombo); DTX-70 at GSKV00014554.  The art reported that MgSt had been "approved for delivery via the lung."  PTX-283 at 5:10-12.  Safety studies had been done on MgSt, concluding it was safe.  DTX-408 (Musa) at 11:15-60.  Dr. Morton did a literature search before the '991 patent and concluded that metal stearates, including MgSt, had "wide application." *See* Tr. 176:14-23, 178:19-179:4, 180:17-20; DTX-564 at MORTON000048-049.  As Dr. Colombo summed it up, "[m]agnesium stearate was well known as an additive for dry powder inhalers since the '90s. . . . And in my opinion, it was obvious to try magnesium stearate.  It's certainly the best substance to use and most easily [sic] substance to be used in inhalation." *See* Tr. 743:16-23.

### 2. *Graham* Factor #2: Differences between the prior art and the claim

The sole difference between the prior art and claim 3 was that there was no explicit disclosure in the prior art of the use of MgSt as the additive in CAPs.  Tr. 743:5-15 (Colombo).

### 3. *Graham* Factor #3: The level of ordinary skill in the art

There was no dispute that the POSA was a scientist with a Ph.D. or a Master's degree and work experience in the pharmaceutical field.  Tr. 720:16-721:1 (Colombo).

15

### 4.    *Graham* **Factor #4: Secondary considerations**

Dr. Smyth did not offer any testimony on secondary considerations.  Nevertheless, Vectura asked for a secondary considerations charge, arguing, over GSK's objection, that the Novartis agreement, which licensed numerous patents, was proof of commercial success of the '991 patent. Tr. 963:12-966:22.  Despite voicing serious doubts, the Court allowed the issue to go to the jury. Tr. 966:14-22.  In closing, Vectura then argued: "Now as you heard, Novartis licensed the '991 patent from Vectura.  If this invention was so obvious, would Novartis have licensed it?"  Tr. 1020:17-19.  There was simply no evidence of the required nexus at trial, and without that, no relevant secondary considerations evidence.  *See, e.g.*, *Merck & Cie v. Gnosis S.P.A., et al.*, 808 F.3d 829, 837-38 (Fed. Cir. 2015) (affirming finding of no nexus where there was insufficient evidence to determine the extent to which licensing agreement was a result of the alleged novel features of patent at issue, as opposed to other patents involved).

### 5.    **Vectura's safety story**

In closing, Vectura's counsel also argued that despite the wide use of MgSt in inhalers and the high level of skill of the POSA, the invention was not obvious because of "concerns regarding toxicity when magnesium stearate is inhaled."  Tr. 1020:20-23.[3]  Presumably, this argument was meant to invoke the concept of "teaching away," a narrow principle that applies only when a negative teaching would be serious enough to dissuade a POSA from even trying a particular path. *See Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 738-39 (Fed. Cir. 2013) (finding no

---

[3] Vectura also suggested that a POSA would have focused only on the specific conditions employed in Kawashima and Fults.  The highly skilled POSA had every motivation to make CAPs with MgSt and would have used ordinary skill and common sense to achieve that goal.  *See KSR*, 550 U.S. at 421.  For example, as Dr. Colombo explained: "[i]f you have hydrophilic drug and you want to improve the dispersion of this drug, what you can do is modify the surface using a hydrophobic excipient," and "the leading hydrophobic substance or additive that people were working with" before the '991 patent was MgSt.  Tr. 724:18-726:24.

teaching away from the selection of 0.3% adapalene based on alleged dose-dependent increases in side effects where the prior art did not "indicate in any way that the side effects would be serious enough to dissuade the development of a 0.3% adapalene product"). "A reference teaches away 'when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken' in the claim." *Meiresonne v. Google, Inc.*, 849 F.3d 1379, 1382 (Fed. Cir. 2017) (quoting *Galderma*, 737 F.3d at 738). "[T]eaching away requires 'clear discouragement' from implementing a technical feature." *Univ. of Md. Biotech. Inst. v. Presens Precision Sensing GmbH*, 711 F. App'x 1007, 1011 (Fed. Cir. 2017) (citing *In re Ethicon, Inc.*, 844 F.3d 1344, 1351 (Fed. Cir. 2017)). In evaluating teaching away, the art as a whole must be considered, and teaching away fails if there are additional references contradicting the negative teaching. *See Hoffmann-La Roche Inc. v. Apotex Inc.*, 748 F.3d 1326, 1333 (Fed. Cir. 2014).

Thus, the question is not whether there were safety considerations with an excipient like MgSt; there are always safety concerns for pharmaceuticals. *See* Tr. 566:6-18 (Roche), 738:20-740:4 (Colombo). The issue is whether any safety concerns with MgSt were so overwhelming that a POSA with a Ph.D. would not have even considered trying it as an additive for CAPs, despite MgSt's status as a leading excipient in dry powders. Based on the trial record, no reasonable jury could have credited the "safety" theory for the following reasons.

***First***, on cross-examination, Dr. Smyth made a crucial admission, which left the parties' experts largely in agreement on the safety issue. Dr. Smyth acknowledged that his opinion about MgSt would change if there had been an approved product that delivered MgSt to the lungs before the priority date of the '991 patent. Tr. 923:15-23. He was then confronted with evidence of such

17

an approved product.  Specifically, he was shown the following disclosure from the Arakis patent

application, which listed '991 inventors Dr. Morton and Dr. Staniforth as inventors:

> Particularly preferred materials include metal stearates, in particular magnesium
> stearate, which has been approved for delivery via the lung.

*See* PTX-283 at 5:10-12; Tr. 923:24-925:19 (Smyth).  Given that even Dr. Smyth agreed that such

evidence would be sufficient to change his opinion, there is simply nothing in the trial record to

defeat the *prima facie* case of obviousness.  At the time of the priority date, the POSA would have

known that MgSt had "been approved for delivery via the lung."[4]

**Second**, as inventor Mr. Green admitted, the inventors "weren't trying to solve any type of

safety problem that had been known to exist in the prior art."  Tr. 160:11-19.  It is unsurprising,

therefore, that the '991 patent is silent about any safety concerns.  *See* Tr. 160:20-22.

**Third**, the Musa reference (DTX-408) disclosed safety studies using MgSt before the

priority date.  Multiple studies in Example 9 reported that MgSt was safe for delivery to the lungs:

- "This amount [of magnesium stearate] has been demonstrated to be safe after
  toxicity studies in dog."  DTX-408 at 11:38-39.

- "Furthermore, acute and long term tolerance trials were carried out to evaluate
  toxicity of magnesium stearate in humans."  *Id.* at 11:40-42.

- "The introduction of 0.25% magnesium stearate in powdery pharmaceutical
  formulation resulted to be safe."  *Id.* at 11:47-49.

- "Bronchial biopsies and broncho-alveolar lavages performed at the beginning and
  at the end of trial did not evidence accumulation of magnesium in bronchi or in
  alveolar cells either in Pulvinal® or control group."  *Id.* at 11:56-60.

*See generally id.* at 11:15-60; Tr. 736:13-738:19 (Colombo).  Musa contradicts the safety story.

Whether there were others who had "concerns" before or after the priority date is irrelevant.  *See*

---

[4] On redirect, counsel asked a leading question implying that the reference referred only to coating
lactose.  Tr. 926:9-17.  That was designed to deceive the jury, as the reference has nothing to do
with coating lactose.  It discusses microparticles for inhalation made of active and, e.g., MgSt.  *See*
PTX-283 at 5:1-12.

*Hoffmann-La Roche*, 748 F.3d at 1333 (finding no teaching away by one study when another study established safety).

   ***Fourth***, the widespread research being done with MgSt prior to the November 2000 priority date demonstrated that POSAs did not consider it "too hot to handle."  As noted above, MgSt was the leading additive in prior art dry powder inhalation formulations in the late 1990s.

   ***Fifth***, Vectura used improper scare tactics to try to rebut the overwhelming trial record, repeatedly and improperly characterizing MgSt as a deadly material that had caused fatalities, for example, during cross-examination of Dr. Colombo:

- "Do you know if anyone has ever died from inhaling magnesium stearate?"  Tr. 763:5-6.

- "Do you know if anyone, any human being has ever died or been killed from inhaling magnesium stearate?"  Tr. 763:8-9.

- "So fatalities means people have died from inhaling magnesium stearate; correct?"  Tr. 764:14-15.

- "But you agree, the sentence, as any human being would read, that indicates that inhaling magnesium stearate has killed people; correct?"  Tr. 764:25-765:2.

- "This teaching in PTX-428, the handbook from 1994, that inhalation of magnesium stearate powder is harmful and has resulted in fatalities, this is a suggestion to avoid making composite active particles with magnesium stearate; correct?"  Tr. 766:9-13.

*See generally* Tr. 763:1-766:18.  Vectura's remarks were inflammatory and highly prejudicial. They were also based on a snippet from an outdated version of an excipient handbook, and the "fatality" language had been removed in the version available at the priority date.  Vectura's counsel knew this because Vectura quickly and unobtrusively introduced the updated handbook language the following day.  *See* Tr. 828:18-830:7 (Colombo).  But let there be no mistake as to intent, because in closing, Vectura's counsel *again* quoted the outdated language that MgSt "was reported to be harmful and had resulted in fatalities."  Tr. 1020:20-25.  Although this inflammatory

and improper line may have made for good theater, it is not substantial evidence in support of validity.

In summary, Vectura's discredited safety story cannot save claim 3, and the Court should grant JMOL of obviousness.  In the alternative, the Court should grant a new trial.  The "fatality" argument improperly appealed to the passion and prejudice of the jury, the Novartis secondary consideration instruction was not supported by the evidence, and the verdict was against the weight of the evidence.  *See, e.g.*, *Carrier Corp. v. Goodman Global, Inc.*, 162 F. Supp. 3d 345, 367 (D. Del. 2016) ("The words chosen by counsel (and the last to be heard by the jury) compound the prejudice.  The court grants the motion for a new trial as to indirect infringement."); *Greatbatch Ltd. v. AVX Corp.*, No. 13-723-LPS, 2018 WL 1568872, at *2 (D. Del. Mar. 30, 2018) (citing *Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 363 (3d Cir. 1999)).

## V.    THE COURT SHOULD GRANT JMOL OF NO WILLFUL INFRINGEMENT OR, IN THE ALTERNATIVE, A NEW TRIAL

In *Halo*, the Supreme Court set a new standard for willfulness.  *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1935 (2016).  GSK proposed that the Court instruct the jury using language taken directly from *Halo*—that willful infringement requires behavior that is "wanton, deliberate, consciously wrongful, flagrant, or in bad faith."  Tr. 953:8-11.  Over GSK's objection, the Court instructed the jury on a much more lenient standard that does not reflect the modern approach to willfulness.  Tr. 953:4-25.  This was error entitling GSK, at least, to a new trial.  And because there was insufficient evidence to support a finding of willfulness under either standard, the Court should grant JMOL of no willful infringement.

Correspondence shows that in 2014, GSK notified Vectura that it would not exercise an option on any of the patents in the 2010 Agreement.  Tr. 121:4-16 (Wright); DTX-488.  Vectura waited until February 2016 to raise the '991 patent, close to the termination date of the license

20

agreement in July.  Tr. 125:23-128:18 (Wright); PTX-464; PTX-473.  GSK maintained its position that it did not need to take a license under any of Vectura's other patents in the 2010 agreement, but GSK agreed to listen to Vectura's case.  PTX-473.  The subsequent correspondence between the parties up to the day suit was filed shows that GSK maintained its belief that it does not infringe the '991 patent and that Vectura did not present GSK with sufficient evidence of the alleged infringement.  PTX-69; PTX-71; PTX-464; PTX-465; PTX-466; PTX-468; PTX-470; PTX-473; PTX-475; PTX-480; DTX-495.  Conspicuously absent from the pre-suit submission was any evidence that the alleged CAPs in GSK's ELLIPTA® products promote dispersion.  *See* PTX-466 at VECTURA15171; Tr. 130:1-131:15 (Wright).

Indeed, GSK relied on Vectura's statements and conduct in forming its good faith belief that it did not infringe a valid patent.  Dr. Wright had contemporaneous notes of a July 25, 2016 call between the parties.  PTX-71; Tr. 137:2-142:10.  Having previously stated its belief that GSK does "not use the process you describe as being necessary to produce your claimed composite active particles," PTX-69 at VECTURA25715, GSK stated during the call that it uses MgSt "in a very traditional and conventional way."  Tr. 139:4-8; PTX-71.  GSK further stated its belief that prior art would show the existence of CAPs, and Dr. Wright admitted at trial that it is "absolutely clear" that "composite active particles were known before the patent-in-suit."  Tr. 140:7-141:16; PTX-71.  Dr. Wright's notes further show that during the call Vectura expressed its view that the claimed CAPs require "active smearing/fusing" and he admitted that what Vectura told GSK on the call "was that they would need a license for active smearing or fusing."  Tr. 141:16-142:10; PTX-71.  Dr. Wright further admitted that those were the only two things told to GSK that were important enough to put in his notes: "one, active smearing; and two, fusing."  *Id.*

21

It is undisputed that GSK used a conventional TRV blender, not the active smearing/fusing that Vectura claimed infringed.  GSK had a good faith belief that there was no infringement and has maintained the same position through trial.  This is simply not a case where GSK should be punished for taking its case to the jury.  *See Greatbatch Ltd. v. AVX Corp.*, No. 13-723-LPS, 2016 WL 7217625, at *3-4 (D. Del. Dec. 13, 2016) (noting that reasonable pre-litigation defenses are pertinent to assessing subjective intent).

## VI.    GSK IS ENTITLED TO A NEW TRIAL ON DAMAGES TO ADDRESS VECTURA'S FAILURE TO APPORTION

Vectura packed a one-two punch in an attempt to evade the apportionment requirement.  First, its damages expert, Ms. Kimberly Schenk, declined to apportion the accused product revenues, claiming the entire market value of the ELLIPTA® inhalers as the royalty base.  Ms. Schenk then tried to make an end run around the entire market value rule by relying on comparable license agreements, but failed to account for technical and economic differences between these agreements and the hypothetical negotiation.   These errors combined to create a decidedly unreasonable royalty for the unproven benefit of the single asserted claim here.

### A.    The Apportionment Requirement

When assessing a reasonable royalty under 35 U.S.C. § 284, "the governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more."  *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) (citing *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014)).  Thus, the Federal Circuit has made clear that, in cases where the patented technology does not make up the entire accused product, damages ***must*** be apportioned.  *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1309-10 (Fed. Cir. 2018).  To ascertain the incremental value of an invention, "the patentee must 'give evidence tending to separate or apportion the [infringer]'s

profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative.'" *Id*. (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)); *see also Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018) ("[T]he value to be determined is only the value that the infringing features contribute to the value of an accused product."); *Bayer HealthCare LLC v. Baxalta Inc.*, No. 16-1122-RGA, 2019 WL 330149, at *8 (D. Del. Jan. 25, 2019) ("[T]he patentee must estimate what portion of that smallest salable unit is attributable to the patented technology.").

Because the apportionment requirement mandates a focus on the value of the claimed invention, when a patentee relies on comparable licenses, the patentee must account for differences between the hypothetical negotiation and the allegedly comparable license: "Comparisons of past patent licenses to the infringement must account for the technological and economic differences between them." *M2M Sols., LLC v. Enfora, Inc.*, 167 F. Supp. 3d 665, 675 (D. Del. 2016) (quoting *Wordtech Sys., Inc. v. Integrated Network Solutions, Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010)). A patentee cannot rely on license agreements that are "'radically different from the hypothetical agreement under consideration' to determine a reasonable royalty." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1316 (Fed. Cir. 2011) (quoting *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed. Cir. 2009)).

### B.    Ms. Schenk Failed to Apportion Away Non-Accused Components

Vectura did not invent the active ingredients in the accused ELLIPTA® products, nor did it invent the delivery mechanism in the inhaler or the process for making the powders contained in the blister packs.  In the case of BREO®, one of the blister packs did not even contain MgSt. Nevertheless, Vectura elected to swing for the fences and present an entire market value theory without doing any apportionment.

Prior to Ms. Schenk taking the stand, GSK lodged an objection that Vectura had failed to lay a predicate for her entire market value theory by providing evidence that the claimed invention drove demand for the accused inhalers.  Tr. 283:24-288:9, 428:11-441:16.  Vectura tried to justify its damages theory by arguing: "So her position is that because the formulation is so important to the product, you would not need to do an apportionment.  And there will be other testimony supporting that."  Tr. 287:22-25.  As the Court aptly noted: "That sounds pretty thin."  Tr. 288:2.

In fact, there was no "other testimony."  Dr. Zhou never even quantified the amount of CAPs in the accused products or whether the alleged dispersion improvement was minor, modest, or significant.  The infringement case was effectively a "gotcha" in which GSK was accused of making an unstated number of CAPs accidentally when using a high shear blender.  This is not a proper case for application of the entire market value rule.

### C.     Ms. Schenk Failed to Perform a Technical Comparability Analysis of the Licenses and Gave Conclusory Testimony on Economic Comparability

Ms. Schenk tried to fill the hole in her damages analysis by relying on the 2010 Agreement between GSK and Vectura, PTX-60, which used the inhaler revenues as the royalty base.  She also relied on an agreement between Vectura and Novartis.  PTX-64.  She failed, however, to account for technical and economic differences between the agreements and the hypothetical negotiation.

The 2010 GSK-Vectura Agreement covered dozens of patents and applications around the world; the hypothetical negotiation included one claim of the '991 patent.  *See* Tr. 516:5-9, 518:21-24 (Schenk).  Nevertheless, Ms. Schenk insisted that she did not need to adjust her damages calculation to reflect the narrowed scope of the hypothetical license:

Q. And the 2010 agreement included a whole bunch of other patents, we won't go over them in detail.  But you didn't make any adjustment in your conclusion based on the difference between that whole suite of patents and this one, correct?

A. No, I don't think it was appropriate to do so.

Tr. 518:6-11.   Ms. Schenk's failure to perform a technical comparability analysis renders her opinion of no weight and insufficient to support the verdict.   The law is crystal clear that when using a comparable license, an expert *must* account for differences in the scope of the licensed intellectual property.   *See Ericsson*, 773 F.3d at 1227 ("[A]llegedly comparable licenses may cover more patents than are at issue in the action . . . .   Testimony relying on licenses must account for such distinguishing facts when invoking them to value the patented invention."); *Sprint Commc'ns Co. L.P. v. Comcast IP Holdings, LLC*, No. 12-1013-RGA, 2015 WL 456154, at *2 (D. Del. Jan. 30, 2015) (excluding evidence of allegedly comparable licenses where expert witness did not account for economic differences or for the number of licensed patents, including patents not in suit ).

Ms. Schenk's testimony on economic comparability was no better.   She summarily concluded that the parties would have thrown the royalty cap away during negotiations.   Thus, she adopted the 3% royalty rate, but refused to adopt the integrated cap on royalties which was part and parcel of the royalty provision.   *See* Tr. 482:22-484:3.   Through this maneuver, she arbitrarily increased the amount of damages by tens of millions.

Her analysis of the Novartis Agreement was also flawed.   *See* Tr. 468:7-25.   That agreement is far from a simple patent license and reads more like a joint venture, requiring the parties to cooperate in clinical development work and clinical trials.   *See* Tr. 84:11-23 (Wright), 850:1-851:9 (Kerr).   The exclusive license agreement covered dozens of patents in addition to the '991 patent and a different product than those at issue in this case.   *See, e.g.*, Tr. 83:7-9 (Wright), 850:4-851:9 (Kerr); PTX-64 at Annex 1, Ex. B.   As Dr. Kerr testified, "[s]o, it just isn't comparable at all.   It's a very different kind of deal."   Tr. 851:8-9.   Ms. Schenk's justification for using the Novartis Agreement as a comparable was "because it includes the '991 patent and other Vectura

25

technology in the area of magnesium stearate as used in Novartis's products." Tr. 469:7-470:20, 482:3-12. This conclusory statement is insufficient to establish technical comparability. The Novartis Agreement was so "radically different from the hypothetical agreement under consideration" as to render its consideration improper. *See Lucent*, 580 F.3d at 1327-28 (finding such "radically different" agreements not to be proper as comparisons); *Uniloc*, 632 F.3d at 1316-17 ("[T]here must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case.").

## VII.   GSK IS ENTITLED TO A NEW TRIAL ON ALL ISSUES DUE TO VECTURA'S APPEAL TO JURY PREJUDICE, OR A SUBSTANTIAL REMITTITUR

### A.   Vectura's Repeated References to "Billions" and Its "Pennies on the Dollar" Argument Were Prejudicial

Vectura's repeated references to "billions" of dollars were highly prejudicial and constitute grounds for a new trial on damages. *See Greatbatch Ltd.*, 2018 WL 1568872, at *2 (granting new trial on damages) (citing *Greenleaf*, 174 F.3d at 363). "Admission of such overall revenues . . . only serve to make a patentee's proffered damages amount appear modest by comparison, and to artificially inflate the jury's damages calculation." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67-68 (Fed. Cir. 2012). Likewise, starting with too high a royalty base "carries a considerable risk" of misleading the jury, as "disclosure to the jury of the overall product revenues 'cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue.'" *Id.* at 68 (quoting *Uniloc*, 632 F.3d at 1320).

In *Uniloc*, the Federal Circuit upheld the district court's conditional grant of a new trial on damages resulting from "disclosure that a company has made $19 billion dollars in revenue from an infringing product." 632 F.3d at 1320. The plaintiff "exacerbated the situation" by engaging in colloquies minimizing the defendant's damages figure as a fraction of a percent of the total revenue of the product. *Id.* at 1320-21. This is exactly what Vectura did.

Vectura's counsel opened the case, and had scarcely uttered his name before letting the word "billions" spill out onto the courtroom floor.  The trial started thusly:

> Mr. Borello:  Thank you, Your Honor.  Good Morning.  My name is Chris Borello, and my team and I are proud to present Vectura, the patent owner in this case.  This case is about GSK using Vectura's patented technology without Vectura's permission making billions in profits and refusing to give Vectura its fair share.

Tr. 23:7-12.  And for any jurors who may have missed the point, Vectura made sure to finish the opening the same way:

> GSK made more than $1.5 billion on the three accused products in the US in 2018 alone, and more than 75 percent of that was gross profits to GSK.  Vectura is not asking for 30 percent, not asking for 10 percent, not even asking for five percent.  Vectura is asking for three percent of GSK's net sales, only what it is fairly owed.

Tr. 55:6-12.  Vectura then called its first witness, Dr. Wright, who opined that negotiations broke down because GSK was a "larger company versus Vectura being a smaller company . . . ."  Tr. 106:15-21.  Counsel followed up moments later with a contrived question about whether Dr. Wright kept track of GSK's 2018 sales, to which Dr. Wright dutifully replied—"in the region of $1.5 billion."  Tr. 108:21-109:2.  Thus, before the lunch break on the first day of trial, Vectura had called out GSK for being a large, profitable company, and the jury had heard the "billions" theme reinforced three times.

Concerned that Vectura was trying to blind the jury to the science, GSK took what action it could.  Far in advance of Ms. Schenk's damages testimony, GSK objected to the use of the total revenue figures for the accused products.  *See* Tr. 430:19-431:7.  The Court was alert to the concern and directed that the sales should not "be in any way emphasized beyond what's strictly required by the law.  So if I hear that happening, I will make my own objection and I will sustain it, because that shouldn't be an argument."  Tr. 439:20-440:5.

Despite this admonition, Vectura continued stressing the total revenue numbers to the jury. Vectura improperly raised the total revenue of the accused products both in direct examination of Ms. Schenk and in cross-examination of Dr. Kerr, GSK's damages expert. *See, e.g.*, Tr. 445:7:16, 465:1-14, 474:24-475:4, 486:7-8 (Schenk) ("Q. And the total accused infringing sales was about $3 billion, right?  A. 3.8 billion"); 887:10-15 (Kerr) ("Q. And you saw Ms. Schenk put a number on the screen.  It was $3 billion, right?).  The Court called a sidebar to admonish counsel, but nothing could erase the question from the jury's mind.  *See* Tr. 887:21-888:12 ("I was looking at Ms. Helm and I think I remember that I said I would take care of this myself.  Let's not talk any more about of 3 billion figure.").

Vectura's conduct was premeditated.  Prior to closing, the Court warned Vectura: "So I don't want to hear the overall sales figure mentioned."  Tr. 961:20-21.  In response, Vectura's counsel let the veneer slip, making the following candid admission:

> MR. CONDE: Understood your Honor, you don't want to hear the $3 billion mentioned.  I probably mentioned it enough today that I think they'll remember.  It was just in response –
>
> THE COURT: Don't build a record here.  Yeah, just make sure Mr. Borello knows about this.

Tr. 961:22-962:2.  Vectura knew that it had no scientific legs to stand on and nevertheless made a tactical decision to resort to a "pennies on the billions of dollar" damages case.  The Court warned Vectura of the risk:  "You can't appeal to, like, it's just pennies on the dollar, so what's the big deal?"  Tr. 439:20-440:5.  Vectura went for it anyway, framing its damages closing in terms of pennies on the dollar (specifically, three pennies) and GSK's damages figure as a miniscule percentage of total revenue: "So in the end, the question you'll be asking is under the circumstances, what is a reasonable royalty?  Is it Ms. Schenk's three percent or Dr. Kerr's 0.0178 percent?"  Tr. 1024:4-6.

Vectura's argument is the same improper argument that the Federal Circuit rejected in *Uniloc*. The only difference is that the patent litigation bar is well aware of *Uniloc* and the sensitivity of the issue. Vectura put its hands squarely on one of the third rails of patent damages —after being warned by the Court not do so—and came away with a verdict electrified by passion and prejudice. GSK is entitled to a new trial.

### B.    A New Trial Should Be Granted to Permit Introduction of Evidence on the Exercise of the Option in the 2010 Agreement

The Court set the hypothetical negotiation date as July 25, 2016, the day before GSK's option to extend the 2010 Agreement was to expire. D.I. 272. That put GSK in an unfair position. Vectura could (and did) take full advantage of the "lock-in" value caused by the fact that the negotiation date was extended due to the contract, but GSK was precluded from using the key to the lock, which was the extension option created by that same contract.

The hornbook rule is that "[i]nfringement begins when both the patent has issued and the accused products are sold," regardless of whether there is liability for damages at that time. *Bos. Sci. Corp. v. Cordis Corp.*, 777 F. Supp. 2d 783, 791 (D. Del. 2011) (citing *Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 869-70 (Fed. Cir. 1993)); *see also Fromson v. W. Litho Plate & Supply Co.*, 853 F.2d 1568, 1574 (Fed. Cir. 1988). The rule is in place to avoid the impermissible recovery of increased switching costs incurred by the alleged infringer once infringement begins. *See, e.g.*, FED. TRADE COMM'N, *The Evolving IP Marketplace: Aligning Patent Notice and Remedies with Competition*, 188-91 (Mar. 2011). It would frustrate the underlying rationale of the rule to allow Vectura to claim the "lock-in" value. That is not a "reasonable royalty" under § 284, but an excessive one. GSK should be permitted to offer whatever non-infringing alternatives it would have had on the hypothetical negotiation date, whether contractual or technical.

Accordingly, the Court should order a new trial and allow GSK to argue that it could have exercised the option during the hypothetical negotiation.

### C.     Vectura's Misconduct on Infringement and Validity Issues Was Prejudicial

Every part of the trial was impacted by Vectura's attempts to confuse and inflame the jury. As described in Section III, Vectura had no test results on the accused products, so worked to bias the jury by playing up Dr. Morton's irrelevant involvement in Study 2.  On validity, as described in Section IV, Vectura relied on a litigation-created safety story to try to avoid GSK's clear case of obviousness, punctuating its case with repeated, improper references to fatalities.  And of course, Vectura gave the jury "billions" of reasons to ignore the deficiencies in its case.  The Court should order a new trial to remedy the grave injustice caused by Vectura's conduct.

### D.     In the Alternative, the Court Should Grant a Remittitur

"The rationalization for, and use of, the remittitur is well established as a device employed when the trial judge finds that a decision of the jury is clearly unsupported and/or excessive." *Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1201 (3d Cir. 1986) (affirming remittitur).  "When calculating an amount to remit," courts follow "the 'maximum recovery rule,' which requires that the determination be based on the highest amount of damages that the jury could properly have awarded based on the relevant evidence." *Unisplay, S.A. v. Am. Elec. Sign Co., Inc.*, 69 F.3d 512, 519 (Fed. Cir. 1995).  When viewed in light of the deficiencies of Ms. Schenk's testimony, the only proper evidence in the record is Dr. Kerr's testimony that the reasonable royalty is $559,478, which sets the maximum remittitur.  Tr. 840:2-9.

## VIII.   CONCLUSION

For the above reasons, GSK respectfully requests the Court grant judgment as a matter of law in favor of GSK or, in the alternative, a new trial or remittitur.

OF COUNSEL:

Martin J. Black
Kevin M. Flannery
Robert Ashbrook
Sharon K. Gagliardi
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA  19104-2808
(215) 994-4000

Blake B. Greene
DECHERT LLP
300 West 6th Street, Suite 2010
Austin, TX  78701
(512) 394-3000

Katherine A. Helm
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY  10036

June 13, 2019

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Jack B. Blumenfeld

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
jtigan@mnat.com

*Attorneys for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 13, 2019, I caused the foregoing to be electronically filed with

the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered

participants.

I further certify that I caused copies of the foregoing document to be served on

June 13, 2019, upon the following in the manner indicated:

Kelly E. Farnan, Esquire                                      *VIA ELECTRONIC MAIL*
Christine D. Haynes, Esquire
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE  19801
*Attorneys for Plaintiff*

Dominick T. Conde, Esquire                                  *VIA ELECTRONIC MAIL*
Christopher P. Borello, Esquire
Brendan M. O'Malley, Esquire
Damien Dombrowski, Esquire
Michael Scerbo, Esquire
Steven C. Kline, Esquire
Joshua D. Calabro, Esquire
Zachary L. Garrett, Esquire
VENABLE LLP
1290 Avenue of the Americas
New York, NY  10104-3800
*Attorneys for Plaintiff*

/s/ Jack B. Blumenfeld

_____
Jack B. Blumenfeld (#1014)