**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| VECTURA LIMITED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 16-638 (RGA) |
| | ) | |
| GLAXOSMITHKLINE LLC and | ) | |
| GLAXO GROUP LIMITED, | ) | |
| | ) | |
| Defendants. | ) | |

**GSK'S REPLY BRIEF IN SUPPORT OF ITS RENEWED MOTION FOR
JUDGMENT AS A MATTER OF LAW AND MOTION FOR A
<u>NEW TRIAL OR REMITTITUR</u>**

OF COUNSEL:

Martin J. Black
Kevin M. Flannery
Robert Ashbrook
Sharon K. Gagliardi
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA  19104-2808
(215) 994-4000

Blake B. Greene
DECHERT LLP
300 West 6th Street, Suite 2010
Austin, TX  78701
(512) 394-3000

Katherine A. Helm
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY  10036

July 26, 2019

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
jtigan@mnat.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

Page

I.  THERE IS NO SUBSTANTIAL EVIDENCE OF INFRINGEMENT ............................. 1

    A.  The GSK Documents Do Not Contain Substantial Evidence of the
        Measurements Required by the Court's Claim Construction ................................. 1

    B.  Vectura Has Failed to Rebut GSK's Criticisms of the Study 2 Evidence .............. 4

    C.  The Court Should Grant JMOL on the Umec Products .......................................... 7

    D.  The Trial Record Lacks Substantial Evidence of CAPs ........................................ 7

    E.  In The Alternative, The Court Should Grant a New Trial ..................................... 8

II.  THE COURT SHOULD GRANT JMOL OF OBVIOUSNESS ....................................... 8

    A.  There is No Substantial Evidence of Teaching Away in Relation to MgSt............ 9

    B.  Vectura's Treatment of Kawashima and Fults Is Legally Erroneous ................... 10

    C.  There Was No Nexus Evidence of Secondary Considerations ............................. 13

III.  THE COURT SHOULD GRANT JMOL OF NO WILLFUL INFRINGEMENT .......... 13

IV.  THE COURT SHOULD GRANT A NEW TRIAL ON DAMAGES OR A
SUBSTANTIAL REMITTITUR ............................................................................................. 13

    A.  GSK's Legal Sufficiency Argument Cannot Be Waived ..................................... 13

    B.  Ms. Schenk Failed to Apportion in Accordance with Federal Circuit Law .......... 14

    C.  The Court Plainly Has the Power to Grant a New Trial ....................................... 15

V.  CONCLUSION ............................................................................................................. 15

## TABLE OF AUTHORITIES

Page

**Cases**

*Alcon Res. Ltd. v. Barr Labs., Inc.*,
    745 F.3d 1180 (Fed. Cir. 2014) ............................................................. 6

*Biestek v. Berryhill*,
    139 S. Ct. 1148 (2019) ........................................................................ 13

*Brigham and Women's Hosp., Inc. v. Perrigo Co.*,
    761 F. App'x 995 (Fed. Cir. 2019) ..................................................... 5, 6

*Enplas Display Device Corp. v. Seoul Semiconductor Co.*,
    909 F.3d 398 (Fed. Cir. 2018) ............................................................. 14

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)............................................................................... 5

*Kim v. ConAgra Foods, Inc.*,
    465 F.3d 1312 (Fed. Cir. 2006) ............................................................. 5

*KSR Int'l Co. v. Teleflex, Inc.*,
    550 U.S. 398 (2007)................................................................. 10, 11, 12

*L & W, Inc. v. Shertech, Inc.*,
    471 F.3d 1311 (Fed. Cir. 2006) .......................................................... 5, 6

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) ........................................................... 13

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
    579 F.3d 1363 (Fed. Cir. 2009) ............................................................. 5

*Mayne Pharma Int'l Pty. Ltd. v. Merck Sharp & Dohme Corp.*,
    927 F.3d 1232 (Fed. Cir. 2019) ........................................................... 10

*Medtronic Vascular, Inc. v. Bos. Sci. Corp.*,
    No. 06-78, 2008 WL 2744909 (D. Del. July 11, 2008) ...................... 5, 6

*Omega Patents, LLC v. CalAmp Corp.*,
    920 F.3d 1337 (Fed. Cir. 2019) ........................................................... 13

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000)............................................................................... 6

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
  __ F.3d __, 2019 WL 3162421 (Fed. Cir. Mar. 20, 2019)....................................................... 13

*Standard Oil Co. v. Am. Cyanamid Co.*,
  774 F.2d 448 (Fed. Cir. 1985) ................................................................................................ 9

*TC Tech. LLC v. Sprint Corp.*,
  No. 16-153-RGA, 2019 WL 2515779 (D. Del. June 18, 2019)................................................. 5

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) ............................................................................................. 15

*Wyers v. Master Lock Co.*,
  616 F.3d 1231, (Fed. Cir. 2010) ............................................................................................ 11

## TABLE OF ABBREVIATIONS

The following table lists the abbreviations used throughout this brief.

| Abbreviation | Description |
| --- | --- |
| '991 patent | U.S. Patent No. 8,303,991 |
| CAP(s) | Composite active particle(s) |
| Dr. Colombo or Colombo | GSK's expert Dr. Paolo Colombo |
| Dr. Fergenson or Fergenson | Vectura's witness Dr. David Fergenson |
| Dr. Kerr or Kerr | GSK's expert Dr. William Kerr |
| Dr. Russell or Russell | GSK's expert Dr. Lynn Russell |
| Dr. Smyth or Smyth | Vectura's expert Dr. Hugh Smyth |
| Dr. Zhou or Zhou | Vectura's expert Dr. Qi (Tony) Zhou |
| GSK | GlaxoSmithKline LLC and Glaxo Group Limited |
| JMOL | Judgment as a matter of law |
| MgSt | Magnesium stearate |
| Ms. Schenk or Schenk | Vectura's expert Kimberly Schenk |
| POSA | Person of ordinary skill in the art |
| Umec | Umeclidinium |
| Vectura | Vectura Limited |

**Note**: All quoted emphasis is added, and internal quotation marks, brackets, and citations are omitted, unless otherwise indicated.

I.      **THERE IS NO SUBSTANTIAL EVIDENCE OF INFRINGEMENT**

A.      **The GSK Documents Do Not Contain Substantial Evidence of the
        Measurements Required by the Court's Claim Construction**

Vectura survived summary judgment by promising it would produce evidence that Study 2 was representative of GSK's commercial products.  It failed to do so and now argues a new theory—that it can prove infringement based only on GSK's documents and absent any dispersion measurements.  The Court should reject Vectura's attempt to evade the Court's claim construction.

The Court construed the dispersion limitation of Claim 3 as follows:

> wherein **a composition** that contains active particles **has increased dispersion** of the active material upon activating a delivery device for inhalation into the lungs by a patient, **as compared to the same composition wherein unmodified active particles are substituted for the composite active particles**.

D.I. 167 at 15.

"The claim language requires measuring the efficiency of dispersal of a composition with unmodified active particles, measuring the efficiency of the composition with composite active particles, and looking for increased dispersal."  D.I. 167 at 17.  Thus, the construction requires measurements of the accused composition in two states—one with CAPs and one without.  *Id.* The Court provided a description of the necessary proof: "If a POSA wanted to determine whether composite active particle $C_2$ increased dispersion compared to active particle $C_1$ in a composition also containing particles A and B, she would not vary A and B during testing."  *Id.* at 17, n.9. During claim construction, Vectura agreed that "the claims require measuring the efficiency of dispersal of the claimed composition absent additive material."  *Id.* at 15 (citing D.I. 82 at 57).

On summary judgment, GSK argued that Vectura had no evidence of the dispersion measurements required to meet the claim construction.  Vectura responded that Study 2 was sufficient to meet its burden because Dr. Zhou would testify that the dispersion measurements for

1

Blends 5 and 6 of Study 2 were "representative" of the measurements for GSK's commercial products.  D.I. 210 at 10-11.

At trial, however, Dr. Zhou failed to utter the word "representative" or show that any dispersion measurements for Blends 5 and 6 were representative.  Vectura's post-trial brief does not do so either.  Instead, Vectura now offers snippets from GSK documents in place of the promised testimony.  D.I. 343 at 4-7.  None of the new evidence even remotely satisfies the burden required by the Court's construction.

The gravamen of Vectura's argument is that if MgSt is present, then there must be a dispersion improvement.  D.I. 343 at 4.  The Court rejected that position during claim construction, holding that the "relevant inquiry is [not] the presence or absence of additive material [] because the patent teaches that additive materials, as a general matter, were known in the prior art to promote dispersion."  D.I. 167 at 17-18.  The claim construction requires measurements of the accused formulation with and without CAPs.  Vectura cites to no such evidence in its response, because it offered none at trial.  That failure is set forth in detail below.

*First*, Vectura argues that GSK documents demonstrate that the ELLIPTA® products contain CAPs.  D.I. 343 at 4.  GSK contests the point, but even if that were correct, it would not constitute evidence of increased *dispersion* in the accused formulations.

*Second*, Vectura observes that MgSt is a lubricant and that Mr. Green and GSK experimented with MgSt due to its lubricant characteristics.  D.I. 343 at 5.  This background information again says nothing about the required *dispersion* measurements.

*Third*, Vectura points to Dr. Zhou's testimony that MgSt "is a very interesting and unique chemical" that delaminates.  D.I. 343 at 5.  According to Vectura, Dr. Zhou "testified that GSK's regulatory documents for each of the infringing products show" that GSK somehow admitted that

MgSt forms a particle-to-particle coating "on the surface of the other particles in the composition, including the active particles . . . ." *Id.* However, the three cited exhibits, PTX-119, 152, and 153, say nothing about coating the active, let alone relative dispersion measurements with and without CAPs. Vectura also cites PTX-35, but that document discusses coating the lactose, not the active: "***Blending magnesium stearate with lactose monohydrate*** . . . may facilitate the micronized vilanterol trifenatate particle to aerosolise more easily from the magnesium coated surface than a lactose monohydrate surface." PTX-35 at GSKV17512. Vectura then misleadingly points out a reference in PTX-35 to a paper co-authored by Vectura inventors allegedly demonstrating "that coating ***the*** active particles with magnesium stearate gives better dispersion[,]" implying that GSK was discussing the accused products. *See* D.I. 343 at 6. Yet, the GSK document is plainly referring to the inventors' assertion that "a mechanical fusion method" can "in theory" provide better results than "conventional methods of mixing."[1] PTX-35 at GSKV17508-09. The ELLIPTA® products use conventional mixing methods, not mechanofusion. These documents provide no evidence regarding the dispersion measurements required for a proper infringement analysis. If anything, these documents support GSK.

*Fourth*, Vectura points to three GSK regulatory and technical documents discussing MgSt's tendency to coat constituents of a composition. D.I. 343 at 6. The mere presence of a "coating" is insufficient to prove the presence of CAPs, much less to establish that the number and quality of CAPs is sufficient to promote dispersion. Moreover, none of the documents are even directed to dispersion. To the contrary, two of the documents are directed to dissolution studies

---

[1] The GSK document notes that results in the paper merely "suggest" an otherwise unremarkable point that MgSt CAPs can have better dispersion than MgSt-coated lactose. Vectura never entered the paper into the record and when asked to explain what the statement in the GSK document means to the jury, Dr. Zhou simply rephrased it. Tr. 295:7-18. Further, the paper is not directed to a composition with both CAPs and MgSt-coated lactose, so it is irrelevant.

and support a conclusion that MgSt has *no effect* on the actives in GSK's commercial products, as GSK showed in its opposition to Vectura's enhancement motion.  *See* D.I. 343 at 6 (citing PTX-158; PTX-37).  Another document, PTX-31, has a generic statement about particle coating that could not possibly support a conclusion on dispersion in the accused products.  D.I. 343 at 6.  And the remaining documents discuss addition of MgSt to the fine lactose particles, not the active ingredient.

*Fifth*, Vectura tries to shift its burden by arguing that GSK did not present any evidence disproving the "well-known positive effect" of using MgSt.  D.I. 343 at 6-7.  But GSK had no such burden, and generalities about MgSt or the coating of lactose with MgSt are insufficient to meet Vectura's burden regarding the accused compositions in any event.

Finally, Vectura points to Dr. Fergenson's SPAMS evidence.  D.I. 343 at 7.  But Dr. Fergenson admitted that the SPAMS reports show nothing about dispersion.  Tr. 223:25-224:8.

That is the sum total of the evidence Vectura offers on JMOL—other than Study 2, which is addressed below.  No reasonable jury could conclude that Vectura met its infringement burden on the dispersion limitation based on the proffered GSK documents and unsupported testimony by Dr. Zhou.

## B.       Vectura Has Failed to Rebut GSK's Criticisms of the Study 2 Evidence

Vectura does not answer GSK's specific criticisms of the Study 2 evidence, but continues to rely on the general observation in Study 2 that "coating all of the components with magnesium stearate gave a three-fold increase in dispersion."  D.I. 343 at 8.  Vectura offers no linking evidence to establish that the data on Blends 5 and 6 have relevance to measuring dispersion in the accused products, all of which are manufactured without mechanofusion, unlike the Study 2 compositions. The bare opinion of Dr. Zhou cannot fill the scientific holes in Vectura's case.

A conclusory expert opinion is insufficient to meet a patentee's infringement burden. *Brigham and Women's Hosp., Inc. v. Perrigo Co.*, 761 F. App'x 995, 1003 (Fed. Cir. 2019) (affirming grant of JMOL and finding test evidence insufficient to meet burden of proof); *Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312, 1320 (Fed. Cir. 2006) (affirming grant of JMOL of no infringement where patentee failed to test for impact of additive).

Vectura cites *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1372 (Fed. Cir. 2009), for the proposition that there is no "general rule requiring testing of accused products." D.I. 343 at 4 n.1. That is a straw man.[2] An expert who relies on test results of something other than the accused products must provide linking evidence explaining why it is appropriate to do so. *See Brigham*, 761 F. App'x at 1004. Here, Dr. Zhou offered no basis to extrapolate the results. The analytical gap between the accused products and Study 2 is too large and cannot be filled with conclusory testimony. *See TC Tech. LLC v. Sprint Corp.*, No. 16-153-RGA, 2019 WL 2515779, at *11 (D. Del. June 18, 2019) (rejecting expert testimony as "wholly conclusory" where plaintiff "fail[ed] to show that [the expert's] conclusions [were] based on sufficient facts or data" (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997))).

In this regard, the law simply mirrors basic scientific principles, which require evidence, not conjecture. *See L & W, Inc. v. Shertech, Inc.*, 471 F.3d 1311, 1318 (Fed. Cir. 2006) (noting patentee "cannot simply 'assume' that all of [the accused] products are like the one [] tested"); *Medtronic Vascular, Inc. v. Bos. Sci. Corp.*, No. 06-78, 2008 WL 2744909, at *3 (D. Del. July 11, 2008) (granting JMOL of non-infringement for untested accused products). Vectura tries to sweep

---

[2] The patentee in *Martek* called two experts, one of whom calculated the concentration of chloride ions present in two culture media and then opined on the impact of those concentrations on the corrosion of a steel vessel. *Martek*, 579 F.3d at 1372. Dr. Zhou provided nothing remotely like these calculations at trial.

aside *L & W* and *Medtronic* in a footnote on the ground that they are summary judgment decisions. D.I. 343 at 11 n.10.  In fact, *Medtronic* was a JMOL case.  Regardless, the legal standard for summary judgment and JMOL is the same.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) ("[T]he standard for granting summary judgment mirrors the standard for judgment as a matter of law, such that the inquiry under each is the same.").  A patentee cannot simply "assume" untested products are like tested, allegedly representative products for purposes of proving patent infringement.  *See L & W, Inc.*, 471 F.3d at 1318; *Medtronic*, 2008 WL 2744909, at *3.  A patentee must come forward with evidence showing that a claimed functional property would not vary with differences between the tested and the untested products.  *Medtronic*, 2008 WL 2744909, at *2-3.  Nor can Vectura distinguish *Brigham* or *Alcon*, in which the Federal Circuit approved JMOL of no infringement where patentees failed to test accused products.  *See Brigham*, 761 F. App'x at 1005; *Alcon Res. Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1187 (Fed. Cir. 2014).

Vectura tries to bolster Dr. Zhou by arguing that he considered the differences between Study 2 and GSK's commercial products.  *See* D.I. 343 at 8-9.  Although Dr. Zhou acknowledged the differences, he offered no cogent scientific explanation as to why those differences could be ignored.  Blend 6 involved mechanofusing an active and MgSt directly together, whereas under Vectura's theory, GSK's process results in only accidental rub off of some undetermined amount of MgSt from lactose to the active.  Surely, a scientist trying to determine dispersion measurements would have to take account of the difference between 100% mechanofused CAPs and the purported rub-off CAPs of the GSK products.  Indeed, in some formulations, the presence of CAPs actually *decreased* dispersion.[3]  Given the admitted complexity and unpredictability of the science, D.I.

---

[3] There is no scientific basis to assume CAPs always improve dispersion.  The inventors in fact reported that CAPs made with leucine, one of the preferred additives in the '991 patent, showed decreased dispersion.  *See* D.I. 121 at 8; D.I. 156 at 6-7 (submitted on summary judgment).

337 at 5-6, Dr. Zhou cannot simply assume away the relevance of the differences in process steps between Study 2 and the commercial products.

Finally, Vectura argues that the "jury was free to credit [Dr. Zhou's] testimony" and that the "jury rejected" the differences between Study 2 and GSK's actual products. D.I. 343 at 8-9. That begs the question. The jury had the power to return a verdict, but it had to be supported by substantial evidence. There was no such evidence here.

### C.     The Court Should Grant JMOL on the Umec Products

Vectura presented no evidence whatsoever on dispersion with respect to GSK's umec formulations in its ANORO® and INCRUSE® products. The entirety of Vectura's case on umec appears in the first paragraph of page 10 of its brief. All Vectura points to is a conclusory opinion from Dr. Zhou applying Study 2, which used vilanterol, to umec powders. That is insufficient to meet Vectura's burden of proof under the Court's claim construction. A study using vilanterol proves nothing about the properties of alleged CAPs with umec. *See* D.I. 337 at 5-6 (powder formulation performance is an unpredictable art).

### D.     The Trial Record Lacks Substantial Evidence of CAPs

Vectura points to the SEM-EDX, ToF-SIMS, and SPAMS testing as support for Dr. Zhou's opinion, D.I. 343 at 11, but none of these tests addressed the requirement of the claim construction that MgSt must be "fixed such that the active and additive particles do not separate in the airstream." D.I. 167 at 11. With respect to SEM-EDX, Dr. Zhou testified that the basis for his opinion is that "magnesium stearate is actually forming a coating layer on the drug particles." Tr. 341:11-18. Proof of a "coating" is not enough. The construction requires "something more than a 'secure attachment'" (D.I. 167 at 11), and indeed, requires that the particles remain together in the airstream. Vectura's ToF-SIMS testing only established whether two particles were "co-located" within a sample area, and said nothing about whether the particles were fixed together.

Tr. 646:10-652:23 (Russell).  And it was undisputed that SPAMS cannot determine particle morphology (e.g., the arrangement of components within a particle) or whether MgSt is on the surface of or coats the active drug.  *See* Tr. 215:13-216:12, 220:22-25 (Fergenson), 330:3-9 (Zhou), 641:14-22, 642:1-643:1, 644:16-645:9 (Russell).  Dr. Zhou's opinions on the CAPs limitation were not grounded in any data and do not, therefore, constitute substantial evidence of infringement.

### E.      In The Alternative, The Court Should Grant a New Trial

GSK took the Court's claim construction at face value when the Court wrote that measurements with and without CAPs were required for the dispersion limitation.  D.I. 167 at 17. To accept Vectura's position that the simple inclusion of MgSt in a formulation is sufficient to establish infringement would be tantamount to changing the construction to strike from the opinion all discussion regarding measurements.  Vectura argues waiver, but GSK cannot have waived a right it did not know it had—to prove claim 3 was anticipated without test measurements.  It would be manifestly unfair to use the watered-down claim construction to affirm the infringement verdict without allowing GSK to present evidence of invalidity under the same standard.

## II.     THE COURT SHOULD GRANT JMOL OF OBVIOUSNESS

Vectura does not dispute the key elements of GSK's obviousness case:  (1) CAPs were known, (2) MgSt was a known additive in inhalation products, and (3) the difference between the prior art and claim 3 was that there was no explicit combination of the two.  *See* D.I. 337 at 14-15. Dr. Smyth conceded that one additional fact would have changed his validity opinion—the approval before the priority date of an inhaled product that delivered MgSt to the lung.  Tr. 923:15-23.  GSK proved that as well.  *See* PTX-283 at 5:10-12; Tr. 923:24-925:18 (Smyth).  Nonetheless, Vectura maintains that one of skill in the art would not have been motivated to use MgSt as the additive in a CAP.  No reasonable jury could have accepted that assertion based on the trial record.

### A.   There is No Substantial Evidence of Teaching Away in Relation to MgSt

Vectura's center-stage non-obviousness argument at trial—the safety story—has now been relegated to a back-stage role in its answering brief.  Regardless whether that demotion is a product of GSK's overwhelming showing that no reasonable jury could credit Vectura's story, D.I. 337 at 16-19, or of the fact that what may be good theater in front of the jury is irrelevant to the legal determination of obviousness, it speaks volumes.  The case law sets a high threshold for establishing teaching away, *see* D.I. 337 at 16-17, and Vectura's proofs fell well short.

The fundamental flaw in Vectura's "teaching away" theory is its failure to focus on the POSA, *who is assumed to know all relevant prior art on the priority date*.  *See Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985).  Here, that includes the full scope of Musa, Example 9, which reported that the delivery of MgSt to the lungs was safe.  *See* DTX-408 at 11:15-60 (measuring the MgSt that can be delivered to the lungs and noting "[t]his amount [to be respirable] has been demonstrated to be safe"); Tr. 736:24-738:19, 778:4-780:9 (Colombo).  A POSA would also have known that there was a product already on the market in which MgSt was "approved for delivery via the lung."  PTX-283 at 5:10-12; Tr. 923:24-925:18 (Smyth).[4]  Contrary to the picture Vectura tried to paint, MgSt was not some horribly dangerous substance, but a common additive already inhaled by patients and even delivered to the lungs.

Vectura tries to deflect attention from a POSA's presumed knowledge of the relevant prior art several ways, arguing first that the jury could have rejected obviousness solely on the basis of Dr. Colombo's statement that he did not "think to coat the active ingredient with magnesium stearate."  D.I. 343 at 14.  That is legal error.  What Dr. Colombo personally thought of during his research is irrelevant and, in any case, he testified that if he had known of Musa (which we assume

---

[4] Vectura agrees that the Clenil product was the prior art product.  *See* D.I. 343 at 21.  There is no dispute that Clenil was in the prior art, even if, as Vectura asserts, the reference was not.

of a POSA), he would not have had any safety concerns. Tr. 830:21-831:8. Similarly, the Podczeck statements, PTX-378; PTX-379, actually undermine Vectura's position because they teach that MgSt can be inhaled for a time shorter than "months." And the generalized questions raised by the FDA reflect nothing more than typical pharmaceutical safety concerns. *See Mayne Pharma Int'l Pty. Ltd. v. Merck Sharp & Dohme Corp.*, 927 F.3d 1232, 1241 (Fed. Cir. 2019) ("[T]he specification does not comment on any adverse effects or toxicity. That is not surprising, as few pharmaceuticals are free of toxic effects in some circumstances and dosages."). Finally, the argument at trial regarding an old handbook and views on "fatalities" are not only prejudicial, but unavailing in the face of the later version of the handbook and Musa. *See* D.I. 337 at 18-19.

In light of the publication of Musa before the priority date, and the required assumption under the law that a POSA would be aware of its contents, Vectura's "teaching away" argument should be rejected as a matter of law. The relevant facts for purposes of making the final legal determination of obviousness are that MgSt was a ubiquitous additive in the field and an obvious candidate to try. On these facts, claim 3 of the '991 patent is obvious.

## B.     Vectura's Treatment of Kawashima and Fults Is Legally Erroneous

Vectura argues that "based on the teachings of Kawashima[5] and Fults, a POSA would not have been motivated to substitute magnesium stearate for the additives used in those references." D.I. 343 at 13. The substitution theory misstates the relevant legal principle on obviousness.

Vectura's myopic view of a POSA's motivation is contrary to the Supreme Court's "expansive and flexible approach" to a motivation analysis. *KSR Int'l Co. v. Teleflex, Inc.*,

---

[5] Vectura's footnote 13 is misleading. Kawashima was not reviewed by the Patent Office; a later publication by Kawashima was. And, as Dr. Colombo explained, at least one "major difference" between the two was that the title of the later publication did not say CAPs, and therefore "the Patent Office [did] not have the direct information that this product was a composite active particle." Tr. 755:3-756:10.

550 U.S. 398, 421 (2007). *KSR* held that a combination is obvious to try when "there are a finite number of identified, predictable solutions" to satisfy a "design need or market pressure to solve a problem." *KSR*, 550 U.S. at 421. Where the underlying facts in the analysis are undisputed, the legal finding of obviousness necessarily follows. Thus, in *Wyers v. Master Lock Co*., the Federal Circuit employed the post-*KSR* motivation analysis to reverse the denial of JMOL of obviousness after a jury verdict, stating that *KSR* and later cases establish that "obviousness may include recourse to logic, judgment, and common sense, in lieu of expert testimony." 616 F.3d 1231, 1238-39 (Fed. Cir. 2010). For this reason, "the ultimate inference as to the existence of a motivation to combine references may boil down to a question of 'common sense,' appropriate for resolution on summary judgment or JMOL." *Id.* at 1240.

Here, the factual inputs to the obviousness analysis were not in dispute—other than the "safety issue," which is addressed above.

*First*, Kawashima and Fults disclose the general utility of CAPs. As evident from the title of Kawashima ("Design of Inhalation Dry Composite Powders by Surface Modification of Drug Particles"), CAPs are designed to modify the surface of an active drug with an additive. *See* DTX-112. The utility of CAPs is not limited to specific actives, additives, or processing methods. *See* Tr. 722:22-723:3, 724:18-725:6, 789:15-24 (Colombo).

*Second*, in considering which additives to pair with which actives, a POSA would know that it is desirable to use a hydrophobic (water fearing) additive with a hydrophilic (water loving) active and, conversely, a hydrophilic additive with a hydrophobic active. *See* Tr. 724:12-726:24 (Colombo). Accordingly, if a POSA considered a hydrophilic drug, she would use a hydrophobic additive. *Id.*

*Third*, there are both hydrophobic and hydrophilic inhalation drugs.  Indeed, one "very well-known" inhalation drug was hydrophilic salbutamol sulfate.  Tr. 725:1-726:24 (Colombo).

*Fourth*, the leading inhalation additive in the art was hydrophobic MgSt, which had been used for years to coat lactose.  Tr. 690:22-25, 726:20-24, 743:16-23, 773:7-13 (Colombo), 920:1-8 (Smyth) (acknowledging the "well known" use of MgSt in dry powder inhalers).

Those facts set the stage for the legal determination of obviousness.  Given those facts and the breadth of claim 3, which is directed to the combination of any active and MgSt, common sense dictates that it would have been obvious for a POSA to try CAPs with MgSt to modify the surface of a hydrophilic active.  Tr. 726:11-24, 741:11-744:2 (Colombo).  To a POSA, a highly skilled artisan, the small step from the known art to claim 3 would have been obvious.

Dr. Smyth's only argument to the contrary was that a POSA would not have worked with hydrophobic additives because they were dangerous.  Tr. 903:22-904:16.  But no reasonable jury could accept that in the face of Musa.  Indeed, Fults itself teaches the use of hydrophobic materials in CAPs.  *See* DTX-97 at GSKV15909 ("Studies were performed to determine the effect on the dissolution rate of the drug in the presence of the hydrophobic materials. . . .  DSCG is a crystalline solid that may be subject to morphological changes when coated with hydrophobic materials.").[6] Plainly, based on Musa and Fults, the argument that the hydrophobic nature of MgSt rendered it an unsuitable candidate should be rejected.

---

[6] Vectura's attempt to show that MgSt would not have worked using the precise method disclosed in Fults misses the mark.  *See* D.I. 343 at 16.  Dr. Colombo's admission that "[f]ollowing Fults exactly is not amenable" using MgSt is irrelevant where the obviousness analysis is not bound by "[r]igid preventative rules."  *See* Tr. 790:9-19; *KSR*, 550 U.S. at 421.  As Dr. Colombo stated, a POSA could have employed a different solvent system than the one disclosed in Fults.  *See* Tr. 789:19-24.  Additionally, although Dr. Smyth testified that MgSt and fatty acids generally had "very different" chemical properties, Tr. 906:11-25, he did not explain why that mattered.  The prior art's teachings towards MgSt provided the motivation to use MgSt in Fults's CAPs.  *See* D.I. 337 at 14-15; Tr. 742:25-744:2 (Colombo).  Moreover, MgSt is related to the stearic acid additive used in Fults; indeed, it is its magnesium salt.  Tr. 726:25-727:12, 729:7-13 (Colombo).

### C.      There Was No Nexus Evidence of Secondary Considerations

Vectura contends that there is evidence "showing that Novartis uses the magnesium stearate technology of the '991 patent" in its products.  D.I. 343 at 22-23.  That is simply wrong. Nothing in the record indicates that the Novartis products embody claim 3.  Moreover, Vectura cites no case law for the proposition that merely listing a patent in the Orange Book is sufficient to establish the required nexus.  There are no relevant secondary considerations.

## III.    THE COURT SHOULD GRANT JMOL OF NO WILLFUL INFRINGEMENT

The jury instruction on willfulness improperly allowed the jury to find willful infringement from "simple intentional or knowing infringement."  *See SRI Int'l, Inc. v. Cisco Sys., Inc.*, __ F.3d __, 2019 WL 3162421, at *8 (Fed. Cir. Mar. 20, 2019).  But under any standard, the willfulness finding fails.  Dr. Wright told GSK that the '991 patent covered "active smearing" and "fusing." Tr. 141:25-142:7; PTX-71.  Given GSK's process, it was more than reasonable for GSK to assume it was not infringing.  The remaining points relevant to willfulness are addressed in GSK's brief opposing enhancement and the imposition of fees.  *See* D.I. 344.

## IV.    THE COURT SHOULD GRANT A NEW TRIAL ON DAMAGES OR A SUBSTANTIAL REMITTITUR

### A.     GSK's Legal Sufficiency Argument Cannot Be Waived

There is no waiver here on a motion for a new trial because GSK is challenging the legal sufficiency of Ms. Schenk's testimony, and such arguments cannot be waived.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1155 (2019) (noting that a party "cannot waive the substantial evidence standard").  "Failure to object to the admission of evidence does not act as waiver as to a challenge to the sufficiency of the evidence for the jury to award damages."  *Omega Patents, LLC v. CalAmp Corp.*, 920 F.3d 1337, 1350 n.12 (Fed. Cir. 2019) (remanding for a new trial on damages due to insufficient evidence to support the damages award) (citing *Lucent Techs., Inc. v. Gateway, Inc.*,

580 F.3d 1301, 1325, 1335 (Fed. Cir. 2009)); *see also Enplas Display Device Corp. v. Seoul Semiconductor Co.*, 909 F.3d 398, 411 n.2 (Fed. Cir. 2018).

### B.     Ms. Schenk Failed to Apportion in Accordance with Federal Circuit Law

At trial, GSK objected to Ms. Schenk's apportionment theory, and the Court observed "[t]hat sounds pretty thin." Tr. 287:16-288:9. In post-trial briefing, Vectura has been unable to muster any evidence of the value of claim 3 of the '991 patent, let alone a comparison to the other patents in the purportedly comparable 2010 license between the parties. Ms. Schenk simply did not do a proper comparable license analysis.

Vectura's contention that 97% of the active particles were, in fact, the CAPs of claim 3 is unsupported. *See* D.I. 343 at 24. At best, Dr. Fergenson testified that 97% of active particles were co-associated with MgSt in his SPAMS testing, Tr. 202:11-203:20, but as explained above, SPAMS cannot show CAPs. *See also* D.I. 337 at 11-12 (noting "co-association" is insufficient evidence of CAPs). Thus, while Ms. Schenk assumed that "97 percent or almost 100 percent of the particles of the active ingredient in GSK's products are coated with magnesium stearate," Dr. Ferguson said "[w]e do not determine whether one is coating the other . . . ." *See* Tr. 473:16-474:1 (Schenk), 216:6-12, 220:15-25 (Fergenson). Nor is there any evidence whatsoever of the relative improvement in dispersion caused by these supposed CAPs. To fill this gaping hole, Vectura calls on its old standby—Study 2—arguing that the improvement from Blend 5 to Blend 6 is somehow relevant to demonstrate the magnitude of improved dispersion in the accused products. D.I. 343 at 26. Dr. Zhou never said so, and the argument is pure conjecture, not science. There is no evidence of value in the record.

Ms. Schenk also failed to perform the required comparison between the '991 patent and the licensed patents under the 2010 agreement. Instead, Vectura argues weakly that the license and '991 patent cover "roughly very similar technologies" because both involved MgSt.

Tr. 447:25-448:10 (Schenk).   The Federal Circuit has never adopted a "roughly very similar technologies" standard.  Far more precision is required to support a damages award, let alone one for $89 million.

### C.    The Court Plainly Has the Power to Grant a New Trial

GSK did not waive its objection to Vectura's trial tactics on damages.  Vectura misstates the precedent on waiver on appeal, which does not apply at the district court level, where the Court has broad discretion to grant a new trial.  Moreover, it is well established that "[o]nce the court makes a definitive ruling on the record admitting or excluding evidence, ***either at or before trial***, a party need not renew an objection or offer of proof to preserve a claim of error for appeal."  *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1319 (Fed. Cir. 2011).  Here, the Court made a definitive ruling at trial, placing limits on Vectura's use of the incendiary royalty base.  *See* Tr. 439:20-440:5 (the Court noting "I think the key thing is what Mr. Black did say which clearly is not waived at all, which is you can't appeal to, like, it's just pennies on the dollar, so what's the big deal?  And certainly I don't think the sales should be in any way emphasized beyond what's strictly required by the law.").  Vectura went well beyond the bounds of the Court's ruling and did so intentionally.  *See* Tr. 961:22-962:2 ("I probably mentioned it enough today that I think they'll remember.").  Plainly, the Court has the power to address this conduct, and it should do so here.

## V.    CONCLUSION

For the reasons stated in its opening brief and herein, GSK respectfully requests that the Court grant JMOL, or in the alternative, a new trial or remittitur.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Jack B. Blumenfeld

_____
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
jtigan@mnat.com

*Attorneys for Defendants*

OF COUNSEL:

Martin J. Black
Kevin M. Flannery
Robert Ashbrook
Sharon K. Gagliardi
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA  19104-2808
(215) 994-4000

Blake B. Greene
DECHERT LLP
300 West 6th Street, Suite 2010
Austin, TX  78701
(512) 394-3000

Katherine A. Helm
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY  10036

July 26, 2019

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 26, 2019, I caused the foregoing to be electronically filed with

the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered

participants.

I further certify that I caused copies of the foregoing document to be served on

July 26, 2019, upon the following in the manner indicated:

| | |
|---|---|
| Kelly E. Farnan, Esquire<br>Christine D. Haynes, Esquire<br>RICHARDS, LAYTON & FINGER, P.A.<br>One Rodney Square<br>920 North King Street<br>Wilmington, DE  19801<br>*Attorneys for Plaintiff* | *VIA ELECTRONIC MAIL* |
| Dominick T. Conde, Esquire<br>Christopher P. Borello, Esquire<br>Damien Dombrowski, Esquire<br>Michael Scerbo, Esquire<br>Steven C. Kline, Esquire<br>Joshua D. Calabro, Esquire<br>Zachary L. Garrett, Esquire<br>VENABLE LLP<br>1290 Avenue of the Americas<br>New York, NY  10104-3800<br>*Attorneys for Plaintiff* | *VIA ELECTRONIC MAIL* |

/s/ Jack B. Blumenfeld

_____

Jack B. Blumenfeld (#1014)