# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| VECTURA LIMITED, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 16-638-RGA |
| | ) |
| GLAXOSMITHKLINE LLC and GLAXO GROUP LIMITED, | ) |
| | ) |
| Defendants. | ) |

**VECTURA'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUPPLEMENTAL DAMAGES, ENHANCED DAMAGES, AN ONGOING ROYALTY, <u>PRE- AND POST-JUDGMENT INTEREST, AND ATTORNEY FEES</u>**

OF COUNSEL:

Dominick A. Conde
Christopher P. Borello
Damien N. Dombrowski
Venable LLP
1290 Avenue of the Americas
New York, NY 10104-3800
(212) 218-2100
dconde@venable.com
cborello@venable.com
ddombrowski@venable.com

Dated: July 26, 2019

Kelly E. Farnan (#4395)
Christine D. Haynes (#4697)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com
haynes@rlf.com

Attorneys for Plaintiff

# **TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................................1

ARGUMENT ...................................................................................................................................1

I. Vectura's Motions for Supplemental Damages and Interest Were Timely .........................1

II. GSK's Arguments on Copying and Good-Faith Belief Are Unreasonable in Light of the Evidence, and the Court Should Enhance Damages ....................................3

    A. *Read* Factor #1: Copying ........................................................................................3

    B. *Read* Factor #2: Lack of Good-Faith Belief ............................................................5

        1. GSK Did Not Have a Good-Faith Belief of Non-Infringement ..................................................................................................6

        2. GSK Did Not Have a Good-Faith Belief of Invalidity .............................11

        3. The UK Litigation Cannot Support a Good-Faith Belief..........................12

    C. GSK's Public Interest Argument Does Not Weigh Against Enhancement ........................................................................................................13

III. The Court Should Determine the Ongoing Royalty Rate Now ........................................13

IV. Awarding Pre-Judgment Interest Would Not Be Excessive .............................................15

V. GSK's Comments on Attorney Fees and Exceptional Case Are Baseless ........................15

CONCLUSION..............................................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ahmed v. Dragovich*,
  297 F.3d 201 (3d Cir. 2002)..................................................................................................3

*Apple, Inc. v. Samsung Elecs. Co.*,
  No. 12-CV-00630-LHK, 2014 WL 6687122 (N.D. Cal. Nov. 25, 2014)...........................2, 15

*Brigham & Women's Hosp., Inc. v. Perrigo Co.*,
  No. 17-1950, slip op. (Fed. Cir. Aug. 2, 2017) .......................................................................2

*Cioffi v. Google, Inc.*,
  No. 2:13-cv-103-RG, 2017 WL 4011143 (E.D. Tex. Sept. 12, 2017)................................2, 15

*Cordance Corp. v. Amazon.com, Inc.*,
  730 F. Supp. 2d 333 (D. Del. 2010)......................................................................................13

*Depuy Synthes Prods., LLC v. Globus Med., Inc.*,
  No. 11-652-LPS, 2014 WL 12775326 (D. Del. Mar. 28, 2014) .............................................2

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
  857 F.3d 1347 (Fed. Cir. 2017)...............................................................................................2

*Idenix Pharms. LLC v. Gilead Scis., Inc.*,
  271 F. Supp. 3d 694 (D. Del. 2017)......................................................................................13

*Lizardo v. U.S.*,
  619 F.3d 273 (3d Cir. 2010)....................................................................................................3

*Nova Chems. Corp. v. Dow Chem. Co.*,
  No. 13-1601-LPS, 2015 WL 5766257 (D. Del. Sep. 30, 2015).............................................15

*O. Hommel Co. v. Ferro Corp.*,
  659 F.2d 340 (3d Cir. 1981)....................................................................................................2

*Paice LLC v. Toyota Motor Corp.*,
  504 F.3d 1293 (Fed. Cir. 2007)...............................................................................................2

*Radware, Ltd. v. F5 Networks, Inc.*,
  No. 5:13-cv-02024-RMW, 2016 WL 4427490 (N.D. Cal. Aug 22, 2016)..............................3

*S.O.I.TEC, S.A. v. MEMC Elec. Mats., Inc.*,
  No. 08-cv-292-SLR, 2011 WL 2748725 (D. Del. July 13, 2011) ..........................................3

*Sanders v. DaimlerChysler Corp.*,
  No. 3:05-cv-7056, 2007 WL 405926 (N.D. Ohio Feb. 1, 2007) ................................................2

*Suddreth v. Mercedes-Benz USA, LLC*,
  No. 10-CV-05130, 2012 WL 13034279 (D.N.J. July 31, 2012)...............................................2

*Warsaw Orthopedic, Inc. v. NuVasive, Inc.*,
  515 Fed. Appx. 882 (Fed. Cir. 2012)........................................................................................2

**Statutes**

28 U.S.C. § 1292(c)(2)......................................................................................................................2

**Other Authorities**

Fed. R. Civ. P. 54(a) ........................................................................................................................2

Fed. R. Civ. P. 60 ............................................................................................................................3

11 Wright & Miller, *Fed. Prac. & Proc. Civ.* § 2854 (3d ed.) .........................................................3

# INTRODUCTION

GSK claims that it "won numerous issues during the course of the litigation," apparently based on Vectura's decision to narrow the asserted patents in the run up to trial. (Ans. Br. at 1.) But the fact is the Court did not adopt any of GSK's proposed claim constructions or grant any of the summary judgment relief it sought, and the jury sided with Vectura on every issue including its entire damages request and an ongoing royalty. Now GSK resorts to a meritless procedural argument in an attempt to delay an award of supplemental damages and interest. GSK also requests that the Court defer determination of an ongoing royalty rate until after appeal—which would prevent entry of a final judgment capable of being appealed—or alternatively that the Court ignore the jury's determination that the parties would not agree to a cap on royalties in a hypothetical negotiation. The Court should reject GSK's arguments, and in light of GSK's copying and lack of good-faith defenses enhanced damages are appropriate.

# ARGUMENT

## I.   Vectura's Motions for Supplemental Damages and Interest Were Timely

On the Court's instructions (Tr. at 1063:7-13), the parties met and conferred on May 10 and agreed to a proposed schedule for post-trial briefing with opening briefs on all issues due June 14. The Court entered judgment on May 16 (D.I. 333), and later that day the parties filed their proposed schedule (D.I. 334), which the Court signed the next day (D.I. 335). Now GSK argues (Ans. Br. at 2, 25) that the agreed-upon date that the Court ordered was meaningless and that most of the post-trial briefing was in fact due a day earlier, citing only general cases and not a single case addressing post-trial motions for supplemental damages and interest.

GSK's lack of authority is not surprising because its argument is meritless. The 28-day time limit in Rule 59(e) applies only to final judgments, and the May 16 judgment was not a final

judgment. *See, e.g.*, *Depuy Synthes Prods., LLC v. Globus Med., Inc.*, No. 11-652-LPS, 2014 WL 12775326, at *2-3 (D. Del. Mar. 28, 2014) (citing to Rule 54(a) and finding entered "judgment" was not final because "numerous issues remained unresolved" and "28–day clock on the filing of motions under Rule 50(b) and 59(b) was not started"; motion not untimely because party adhered to jointly submitted post-trial briefing schedule); *O. Hommel Co. v. Ferro Corp.*, 659 F.2d 340, 353-354 (3d Cir. 1981); *Sanders v. DaimlerChrysler Corp.*, No. 3:05-cv-7056, 2007 WL 405926, at *1 (N.D. Ohio Feb. 1, 2007) (time limitation in Rule 59(e) "applies only to final judgments"); *Suddreth v. Mercedes-Benz USA,* LLC, No. 10-CV-05130, 2012 WL 13034279, at *3 (D.N.J. July 31, 2012)(cited by GSK; judgment was final); Fed. R. Civ. P. 54(a).

There were numerous unresolved issues which prevented the May 16 judgment from being final, including ongoing royalties for GSK's continued infringement[1] and enhanced damages for GSK's willful infringement.  *See e.g.*, *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 515 Fed. Appx. 882, 882 (Fed. Cir. 2012) (entered judgment was not "final except for an accounting" within meaning of 28 U.S.C. § 1292(c)(2) "because the district court has not yet determined ongoing royalties"); *Apple, Inc. v. Samsung Elecs. Co.*, No. 12-CV-00630-LHK, 2014 WL 6687122, at *7 (N.D. Cal. Nov. 25, 2014) ("ongoing royalties must be resolved prior to entry of final judgment"); *Cioffi v. Google, Inc.*, No. 2:13-cv-103-RG, 2017 WL 4011143, at *1 (E.D. Tex. Sept. 12, 2017); *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1314-15 (Fed. Cir. 2007) (ongoing royalty is equitable remedy under 35 U.S.C. § 283); *Brigham & Women's Hosp., Inc. v. Perrigo Co.*, No. 17-1950, slip op. at 4-7 (Fed. Cir. Aug. 2, 2017) (judgment not final because enhanced damages unresolved); *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 857 F.3d 1347, 1350-52 (Fed. Cir. 2017) (judgment not final because prejudgment interest unresolved).

---

[1] The jury determined that Vectura is entitled to an "on-going" royalty.  (D.I. 322.)

And even if the Court determines that the May 16 judgment was final, the Court should still award Vectura supplemental damages and interest.  First, GSK cites no authority and Vectura is aware of none requiring Vectura to pursue supplemental damages and interest under Rule 59(e).  Second, even if the Court determines Vectura's motions were untimely, Vectura's motions should be treated as timely filed under Rule 60 and Vectura should be awarded the same relief.[2]  *See Ahmed v. Dragovich*, 297 F.3d 201, 209 (3d Cir. 2002); Fed. R. Civ. P. 60. Alternatively, the Court can apply the "unique circumstances" doctrine to address the merits of Vectura's motions.  *See S.O.I.TEC, S.A. v. MEMC Elec. Mats., Inc.*, No. 08-cv-292-SLR, 2011 WL 2748725, at *7-8 (D. Del. July 13, 2011) (Rule 59(e) is "non-jurisdictional claims processing rule[]"; applying "unique circumstances" doctrine to reach merits of untimely motion where party relied on joint stipulation extending deadline).[3]

GSK's baseless attempt to force Vectura to file a new complaint to obtain supplemental damages and interest should be rejected.[4]

## II. GSK's Arguments on Copying and Good-Faith Belief Are Unreasonable in Light of the Evidence, and the Court Should Enhance Damages

### A. *Read* Factor #1: Copying

GSK suggests that willfulness and copying require Vectura to have marketed products of its own and for GSK to have sold copycats of those products and stolen market share from

---

[2] For example, Rule 60 can be used to make the judgment "speak the truth" in accordance with the verdict.  *See*, 11 Wright and Miller, *Fed. Prac. & Proc. Civ.* § 2854 (3d ed.).  The Court has not expressed that it does not intend to award supplemental damages and pre-judgment interest, the jury has already awarded an "on-going" royalty, and post-judgment interest is mandatory.

[3] GSK is wrong that the Rule 59(e) deadline is "jurisdictional," and the pre-*Bowles* cases it relies on are no longer correct. (Ans. Br. at 2.)  *Lizardo v. U.S.*, 619 F.3d 273, 277-78 (3d Cir. 2010).

[4] *See, e.g.*, *Radware, Ltd. v. F5 Networks, Inc.*, No. 5:13-cv-02024-RMW, 2016 WL 4427490, at *9 (N.D. Cal. Aug 22, 2016) ("Courts regularly award supplemental damages for infringing units that a jury could not consider at trial.  While a patentee could potentially file a new lawsuit to recover damages for these units, additional litigation would be costly and inefficient.").

3

Vectura (Ans. Br. at 4), but there is no support for such a requirement. GSK focuses on the fact that the '991 patent issued in 2012 and that the text of asserted claim 3 first appeared in 2010, which is prior to approval of the infringing products in 2013-2014. (*Id.* at 4-5.) In GSK's cited cases (*id.* at 5), however, issuance of the patent came after approval or sales of the infringing products, and those cases do not relate to the situation where, as here, the invention was communicated directly to the infringer during development of the infringing products.[5]

GSK states that its "work with MgSt was well underway prior to 2006 when Dr. Morton made his mechanofusion presentation," pointing to the TRV "blending regime" it had been using at that time. (*Id.*; DTX-473 at GSKV00136335C (making clear that in 2006 GSK was still researching how to manufacture its formulations).) But that is irrelevant, and there is no basis for GSK's self-serving statements that all Dr. Morton shared was "mechanofusion of actives with MgSt" or that "Dr. Morton's idea was necessarily narrow." (Ans. Br. at 5-6.) There is no dispute that Dr. Morton shared the claimed invention with GSK, which is improving dispersal by coating actives with magnesium stearate. (Tr. at 563:20-564:8, 569:5-21, 573:1-4, 592:22-594:8; DTX-473 at Slides 2-3, 20.) That is not speculation: GSK went out of its way to emphasize that Study 2 "was done at the urging of Professor Morton." (Tr. at 383:8-384:1, 402:12-22.) And the stated goal of Study 2 was to test the effect on dispersal of selectively coating the different components of the formulation with magnesium stearate—not to study mechanofusion devices. (PTX-185 at 3; Tr. at 316:12-327:10, 360:16-17, 383:8-384:1.)[6]

---

[5] *Read* factor #1 concerns copying the "ideas or design of another," and GSK does not cite to any authority requiring Vectura to show when GSK became aware of the exact claim language.

[6] The '991 patent specification (publicly available in 2002) states that "[a] wide range of milling devices and conditions are suitable" to make composite active particles, and the mechanofusion device used in Study 2 and the TRV used in GSK's commercial process are both similar types of high-shear processing methods that the '991 patent teaches are especially preferred ways to make composite active particles. (PTX-3 at 2 (noting continuation of application filed as PCT/GB01/05315, which published June 6, 2002), 3:59-60, 4:20-25; Tr. at 322:14-324:1,

4

Given the testimony of GSK's lead scientist Mr. Roche regarding Dr. Morton's 2006 visit which led GSK to perform Study 2, and Mr. Roche's contemporaneous slides, it is a reasonable conclusion that GSK deliberately copied Vectura's invention.[7] (Tr. at 563:20-564:8, 569:5-21, 573:1-4, 592:22-594:8; DTX-473 at Slides 3, 20 ("[c]onclusions from David Morton's presentation," including "[c]oating particles with MgSt reduces adhesion forces," referring to "Vectura patents," and concluding that "444 [vilanterol active ingredient] must be coated" with magnesium stearate).)[8]

### B. *Read* Factor #2: Lack of Good-Faith Belief

Vectura never told GSK that a specific process was required to make composite active particles, and GSK misconstrues Tim Wright's notes of a call with GSK. (Ans. Br. at 7-8; Tr. at 103:18-104:4, 141:16-142:10; PTX-71.) Vectura never told GSK that the claims require "smearing." (*Id.*) GSK's purported belief that it did not infringe because it does not use a mechanofusion device or "smearing" is not supported by any evidence that anyone at GSK actually looked at the '991 patent prior to the lawsuit and formed a good-faith belief of non-infringement or invalidity.[9] (*See, e.g.*, Tr. at 597:2-22.)

---

821:23-825:23.) All of GSK's purported "meaningful" differences between Study 2 and the commercial products were presented to the jury and rejected. (Tr. at 360:6-365:2, 382:13-410:15, 411:10-17, 573:16-576:17, 713:13-718:5.)

[7] In addition, GSK's 2013 technical memo shows GSK's understanding (based on work of the Vectura inventors) that coating actives gives better dispersion in inhalation formulations compared to coating only lactose particles. (Tr. at 258:21-262:17, 292:22-296:2; PTX-35 at 6-7.)

[8] GSK points to testimony from Mr. Roche and Dr. Riley about dissolution data from GSK's 2008-2009 technical memos (discussed further below) and their interpretation "that GSK did not believe that MgSt had any effect on its actives." (Ans. Br. at 6.) But that *dissolution* data has nothing to do with the effect of magnesium stearate on *dispersion*, and the memos expressly state that the active ingredients are coated with magnesium stearate in the infringing products.

[9] GSK states that it challenged the validity of the '991 patent (Ans. Br. at 7), but the testimony it cites makes clear that it never addressed the validity of the claimed invention.

5

### 1. **GSK Did Not Have a Good-Faith Belief of Non-Infringement**

GSK repeats the arguments it made at trial and states that its "pre-suit assessment was confirmed at trial." (Ans. Br. at 9.) The jury, however, rejected all of its non-infringement arguments, which GSK is now asking the Court to independently assess. The "consistency" of GSK's position (Ans. Br. at 8) does not make it reasonable or excuse GSK's lack of a substantive response during the pre-suit communications. Vectura made substantial efforts during those communications (including sharing testing data) to avoid the need for litigation with a longtime partner. As discussed below, the testing that Vectura shared and the statements and data from GSK's internal documents show that GSK did not have a reasonable good-faith belief.

GSK criticizes the SPAMS testing that Vectura provided as "incapable" of showing composite active particles. (Ans. Br. at 8-10.) Vectura's expert Dr. Zhou testified that the co-associated particles observed in the infringing products using SPAMS are composite active particles comprising magnesium stearate "fixed" to active particles such that they do not separate in the airstream, and that in the SPAMS literature "co-associated" is a standard way of referring to particles fixed together. (Tr. at, 327:12-330:2, 330:16-334:13, 334:23-335:12, 336:15-337:4, 350:13-19, 351:18-352:16, 379:8-11, 381:23-382:12, 411:2-9, 188:19-190:10, 194:10-195:2, 202:11-204:14, 208:15-213:9, 224:13-24.) GSK fixates on the Court's statement at the pretrial conference that "using a word like co-associated . . . that's meaningless." (Ans. Br. at 9, 12.) The Court was noting that the word "co-associated" is not going to mean anything to a lay juror without expert testimony, and that the experts have "latitude" in the words they use to make their infringement arguments. (Pretrial Hr'g Tr. at 19:24-21:22, 24:8-23; D.I. 306 (MIL Order) at 1.) The Court was not suggesting that the SPAMS data is irrelevant to infringement.[10]

---

[10] GSK emphasizes a statement by Dr. Fergenson, the fact witness who performed the SPAMS testing, that he was not familiar with the term "composite active particle." (Ans. Br. at 9, 9 n.4.)

GSK criticizes SPAMS for being incapable of determining "particle morphology" or distinguishing "non-CAPs from CAPs" by citing to hypotheticals posed to Dr. Fergenson about whether a lactose particle could be in between the co-associated active and magnesium stearate particles, or whether the active could be on the surface of the magnesium stearate rather than the other way around. (Ans. Br. at 9; Tr. at 215:13-216:23.) Dr. Zhou specifically addressed both of those hypotheticals and explained why they are "impossible" in this context and are directly ruled out by the ToF-SIMS data that was provided to GSK together with the SPAMS data prior to the lawsuit. (Tr. at 333:17-334:17, 346:3-350:12.)[11]

GSK states that "SPAMS also cannot discern whether the detected MgSt was particulate or molecular." (Ans. Br. at 9.) GSK's expert Dr. Colombo admitted that there is a coating of magnesium stearate on the surface of the active particles in the infringing products, but he manufactured an argument at trial that the coating was "molecular" rather than "particulate." (Tr. at 812:13-816:10.) That is contradicted by the statements in GSK's documents (discussed below) that magnesium stearate forms a "particle-particle coating" on the surface of other particles in the composition, and Dr. Colombo admitted that he was not aware of any GSK

---

But Dr. Fergenson was not opining on infringement and was clear that "I may well have determined that and given them the information without knowing the term." (Tr. at 218:6-219:23.) As noted above, Dr. Zhou explained why the SPAMS data showing co-association means that there are composite active particles in the infringing products.

[11] Dr. Zhou never "acknowledged that the ToF-SIMS measurements carried little weight." (Ans. Br. at 10.) He confirmed that he considered the ToF-SIMS results in combination with all of the evidence, including the SPAMS results, the properties of magnesium stearate, statements in GSK's documents, and GSK's manufacturing process. (Tr. at 379:8-382:12.) Dr. Zhou testified that ToF-SIMS is a method that measures whether magnesium stearate is on the particle surface and was performed prior to the lawsuit by an independent third party, Dr. Price, who is "one of the leading professors" in dry powder inhalation formulations and who expressly concluded that the ToF-SIMS data "confirmed the presence of inhalable composite particles" of magnesium stearate and active ingredients in the infringing products. (Tr. at 346:19-350:12.)

7

documents describing a "molecular" coating of magnesium stearate and that the scientific literature he relied on in fact described magnesium stearate as forming "particulate" coatings.

In a further attempt to discredit the SPAMS results, even though at trial GSK did not dispute the particle size (MMAD) claim limitation, it now states (without citation to any expert testimony) that "the SPAMS measurements excluded particles above six microns" and "therefore were biased in that they showed, at best, a *subset* of the alleged CAPs in GSK's products." (Ans. Br. at 10 (emphasis added).) That there may be even more composite active particles with magnesium stearate in the infringing products beyond the tens of thousands that were observed in the SPAMS testing does not help GSK. (Tr. at 194:10-195:2, 202:11-204:14, 327:12-330:2, 334:23-335:12, 336:15-337:4, 379:8-11, 381:23-382:12, 411:2-9.)

Regarding the express admissions in GSK's 2008-2009 technical memos that the active ingredients in the infringing products are coated with magnesium stearate during GSK's manufacturing process (Tr. at 309:6-315:13; PTX-158; PTX-37), GSK resorts to calling them a mere "hypothesis" that its corporate witness Dr. Riley said was disproven by dissolution studies. (Ans. Br. at 11-12, 8.) But Dr. Riley's testimony is not a reasonable interpretation of the plain language of those statements. GSK does not cite to any expert testimony supporting his post-hoc interpretation. GSK contends that the memos "concluded that magnesium stearate had no effect on the performance of the actives." But the only statements Dr. Riley pointed to in the memos concern dissolution data, not whether magnesium stearate coats the actives or has an effect on dispersion. (Tr. at 539:12-544:9; PTX-158 at 14; PTX-37 at 12.) When asked, he could not point to any statements in the memos concluding that magnesium stearate was not on the surface of the actives or otherwise qualifying the admissions. (Tr. at 550:5-24.)[12] Dr. Riley's self-

---

[12] GSK states that "some undefined 'coating' is insufficient to establish that the active and magnesium stearate particles are fixed." (Ans. Br. at 12.) But Dr. Colombo repeatedly equated

8

serving testimony about the effect of magnesium stearate on dissolution cannot erase the plain meaning of those statements as written.[13]

Regarding the statements in GSK's regulatory documents that when subjected to high-shear blending magnesium stearate forms a "particle-particle coating" on the surface of other particles in the infringing products and that magnesium stearate was selected for this reason (Tr. at 247:21-258:17; PTX-152; PTX-119; PTX-153), GSK's only response is to point to a statement in the documents that "magnesium stearate is blended with lactose monohydrate in a high speed blender" and to summarily conclude (without any citation to expert testimony) that those documents "relate solely to GSK's coating of lactose with magnesium stearate." (Ans. Br. at 12-13.) But there is no dispute that *the exact same TRV high-speed blender is also used to blend magnesium stearate with the active ingredients*. In light of the well-known properties of magnesium stearate, there is no reasonable basis, scientific or otherwise, for concluding that the actives would not be coated (Tr. at 248:24-251:24, 257:25-258:17)—especially in light of the express admissions in the 2008-2009 memos discussed above that the actives are indeed coated with magnesium stearate in the infringing products. And GSK does not point to *anything* in the 2013, 2014, and 2015 GSK documents, or to any other GSK documents, to address the similar statements about how magnesium stearate behaves in the infringing products by "hydrophobic coating of particles" and "a particle-particle coating" on the surface of the other particles in the

---

"coats" with composite active particles in his obviousness arguments, and he testified that the infringing products are made using dry "coating" procedures as described in the '991 patent. (*See, e.g.*, Tr. at 728:15-18, 729:2-4, 730:3-5, 809:8-812:12; Pretrial Hr'g Tr. at 19:24-21:22, 24:8-23; D.I. 306 (MIL Order) at 1; PTX-3 at 2:12-19, 3:49-54, 8:29-31.)

[13] In any event, Dr. Riley's interpretation of the dissolution data was only that there was "no *significant* concentration" and "no *appreciable* contents" of magnesium stearate on the actives (Ans. Br. at 8 (emphasis added); Tr. at 542:24-543:3, 543:21-23)—indicating that GSK does not dispute that some amount of magnesium stearate is fixed on the surface of the actives.

9

composition, and about how the TRV high-speed blender that GSK uses achieves a "high level of active/excipient bonding." (Tr. at 248:24-251:24, 257:25-258:17, 258:21-262:17, 292:22-298:6, 305:24-308:5; PTX-35; PTX-31; PTX-39.) All GSK can do is state, without support or explanation, that the statements "relate solely to GSK's coating of lactose with magnesium stearate." (Ans. Br. at 13.) GSK's argument that only the lactose particles are coated with magnesium stearate in the infringing products is unreasonable, was rejected by the jury, and cannot support a good-faith belief of non-infringement.

Regarding the dispersion limitation, given the evidence discussed above that GSK was aware that the infringing products contain composite active particles with magnesium stearate (including the SPAMS and ToF-SIMS testing that was provided to GSK prior to the lawsuit and the statements in GSK's documents)—and the 2013 technical memo showing GSK's understanding that coating actives gives better dispersion as compared to coating only lactose particles (Tr. at 258:21-262:17, 292:22-296:2; PTX-35), which GSK never addressed at trial or in its answering brief—the only reasonable conclusion is that GSK understood from Study 2 that the composite active particles promote dispersion in the infringing products. (Tr. at 316:12-327:10, 360:16-17, 383:8-384:1, 402:12-22; PTX-185.) GSK's purported "meaningful" differences between Study 2 and the infringing products (Ans. Br. at 11), all of which were rejected by the jury, cannot support a good-faith belief of non-infringement. (Tr. at 360:6-365:2, 382:13-410:15, 411:10-17, 573:16-576:17, 713:13-718:5.)[14]

---

[14] GSK relies on a statement from a GSK technical memo about "drawing conclusions regarding FPF" (Ans. Br. at 11), but that statement refers specifically to content uniformity issues in blends with uncoated active and Dr. Zhou testified that the memo states that the poor uniformity was in fact due to the active being uncoated (further underscoring the importance of the claimed invention). (Tr. at 403:4-410:15; DTX-23 at GSKV00060914.) The statement GSK relies on cannot negate GSK's understanding from Study 2 that coating the actives increases dispersal.

### 2. GSK Did Not Have a Good-Faith Belief of Invalidity

GSK makes no attempt to establish that it had a good-faith belief of invalidity by anticipation or under § 112.[15]

GSK focuses solely on whether all of the elements of the claimed invention were separately disclosed in the prior art (Ans. Br. at 15-16) but makes no attempt to establish that it had a good-faith belief that a POSA would have been motivated to combine the prior art disclosures to arrive at the claimed invention. As discussed in Vectura's answering brief to GSK's motion for JMOL of obviousness, a POSA would not have been so motivated and the prior art taught away from the claimed invention. (D.I. 343 at 12-22.) GSK again resorts to alleging that Vectura used "scare tactics" based on an express prior art teaching that inhalation of magnesium stearate had caused fatalities, but there was nothing improper about Vectura's presentation of that teaching or the numerous other prior art teachings about the toxicity of inhaled magnesium stearate, all of which contradict GSK's obviousness argument. (*Id.* at 17-20; Tr. at 761:4-766:1, 768:25-772:3; PTX-428; PTX-378; PTX-379; PTX-512.)

But more importantly, GSK makes no attempt to address how it could have had a good-faith belief in light of the FDA's 1999 communications with GSK expressing safety concerns about inhaled magnesium stearate (Tr. at 539:8-11, 547:17-549:24; PTX-519) or in light of Dr. Colombo's work in the field just before the priority date. Dr. Colombo authored a prior art paper in 2000 expressing concerns that magnesium stearate was toxic when inhaled, and he testified both that his paper taught to avoid delivering magnesium stearate to the lungs by attaching it to lactose carrier particles which do not travel to the lungs, and that all of the magnesium stearate

---

[15] Nor does GSK respond to Vectura's argument that GSK could not have had a good-faith belief of anticipation based on its failure during expert discovery to even purport to address anticipation of most of the claim limitations and based on Dr. Colombo's admission that no one invented composite active particles with magnesium stearate before Vectura. (Op. Br. at 14-15.)

11

references he relied on were directed to coating only lactose carrier particles, not active particles. (Tr. at 766:19-768:7, 772:4-785:25; PTX-512; DTX-58; DTX-54; DTX-101; DTX-408; DTX-104; DTX-70.)

GSK's only response is to point to the 2000 Musa patent which GSK claims "would have changed [Dr. Colombo's] opinion" and put to rest any concerns about the toxicity of inhaled magnesium stearate. (Ans. Br. at 16.) That cannot be true because Dr. Colombo admitted that in 2004, well after the publication of Musa, he wrote another paper again expressing "concerns" about inhaling magnesium stearate and reiterating that magnesium stearate should be embedded on the surface of lactose to reduce the "risk of inhalation." (Tr. at 830:14-832:22; PTX-386.)[16]

GSK's argument that a POSA would have been motivated to do the exact opposite of what its expert admits the prior art taught and what he himself thought at the time while he was working with the same magnesium stearate-coated lactose technology is unreasonable and cannot support a good-faith belief of obviousness.

### 3. The UK Litigation Cannot Support a Good-Faith Belief

Not only were the issues and patent claims different in the UK case, but GSK knows full well that the UK case did not involve the "same evidence" as the US case. (Ans. Br. at 13.) In fact, *none of the evidence discussed above showing GSK's lack of a good-faith belief of non-infringement was considered in the UK case* (including the SPAMS and ToF-SIMS testing data and the GSK documents and dispersal testing). GSK misleadingly states that it "prevailed" on infringement but fails to mention that in the post-trial hearing, the UK court *refused* to grant

---

[16] GSK refers to a purported "Arakis teaching[] that confirmed the safety of MgSt." (Ans. Br. at 16.) But Dr. Colombo did not rely on that "teaching" in his obviousness arguments, and in any event as discussed elsewhere that relates to an approved inhalation product in which lactose particles coated with magnesium stearate do not travel to the lungs, and has nothing to do with whether magnesium stearate is safe for delivery to the lungs. (D.I. 343 at 21-22.)

12

GSK a declaration of non-infringement and expressly stated that "I certainly made no finding that the processes and products do not fall within the claims." (Ex. A at 45:10-22.) GSK also fails to mention that the UK court found that GSK failed to establish that any of the patents were obvious over the prior art. (D.I. 193, Ex. 39 (UK Judgment) ¶ 259.)

### C. GSK's Public Interest Argument Does Not Weigh Against Enhancement

GSK's reliance on *Idenix* (Ans. Br. at 19-20) is misplaced because there the verdict winner asked the Court "to at least double" a $2.54 ***billion*** jury award, and the Court stated that "given that the jury's damages award is already the ***largest damages verdict ever returned in a patent trial*** . . . additional sanction is just not warranted." *See Idenix Pharms. LLC v. Gilead Scis., Inc.*, 271 F. Supp. 3d 694, 696 n.2, 703 (D. Del. 2017) (emphasis in original). The Court noted that the patent system wants to encourage "exploration and investment . . . in related inventions that may ***reasonably*** appear to be outside the scope of another patentee's claims." *Id.* at 704 (emphasis added). As discussed above, GSK did not have a reasonable good-faith belief of non-infringement. Adopting some *per se* exemption from enhanced damages for companies involved in drug development as GSK urges would eliminate a significant disincentive to stealing patented ideas from research companies they partner with.

### III. The Court Should Determine the Ongoing Royalty Rate Now

GSK asks the Court to "defer any decision on whether to award an ongoing royalty until after an appeal." (Ans. Br. at 20.) But in the *Cordance* case that GSK relies on the Court only postponed determination of an ongoing royalty because damages had been bifurcated until after appeal and "a subsequent jury trial on damages." *See Cordance Corp. v. Amazon.com, Inc.*, 730 F. Supp. 2d 333, 346, 346 n.60 (D. Del. 2010). Here the jury determined on a full record that Vectura is entitled to an "on-going" royalty. (D.I. 322.) GSK wants an "additional opportunity

13

for GSK to present evidence" (Ans. Br. at 20), but it had a full opportunity at trial. GSK refers to "[m]any factors not before the jury," but the only one it mentions is likelihood of success on appeal (Ans. Br. at 21), which the Court does not need to hear "evidence" on.

GSK's argument that the parties would agree to a cap in the hypothetical negotiation (Ans. Br. at 21-22) makes clear that GSK is seeking a second bite at the apple, since that theory was fully presented at trial and rejected by the jury. Vectura's expert Ms. Schenk explained that the hypothetical negotiation would not result in a cap because in the earlier 2010 Vectura-GSK license agreement the cap reflected various uncertainties (for example, whether the infringing products would even be approved, let alone be commercially successful) and was included to benefit GSK as a trade-off for the upfront milestones Vectura received but which would not be part of the 2016 hypothetical negotiation. (Tr. at 456:17-457:2, 483:18-485:8.) GSK does not suggest any reason why that result would be any different in the post-judgment hypothetical negotiation for the ongoing reasonable royalty—at which point the infringing products are even more commercially successful than they were in 2016.[17] Indeed, the law review article that GSK relies on states that "[t]he ongoing royalty question is the very same question the jury has just resolved." (Ans. Br. at 23.) The cap issue was resolved by the jury.

While the Court could certainly order the parties to try to negotiate the ongoing royalty rate on their own before imposing a rate, GSK's claim that "as a practical matter" it will not be possible for the parties to do so until after an appeal (Ans. Br. at 20) makes clear that GSK would not negotiate in good faith now if given the opportunity. And delaying resolution of this issue

---

[17] GSK states that "the difference of $93 million in sales between 2016 and 2019 is one of degree and not of kind" (Ans. Br. at 23)—but to be clear, *quarterly* sales of the infringing products were $93 million higher in Q1 2019 than the corresponding quarter in 2016, and total sales are nearly $3.3 billion since the July 2016 hypothetical negotiation. (D.I. 340 (Schenk Decl.) ¶ 9.)

14

would delay entry of final judgment. *See, e.g.*, *Apple*, 2014 WL 6687122, at *7 ("ongoing royalties must be resolved prior to entry of final judgment"); *Cioffi*, 2017 WL 4011143, at *1.

### IV.     Awarding Pre-Judgment Interest Would Not Be Excessive

GSK labels the jury's damages award as a "windfall to Vectura," again harping on the cap theory that it lost on at trial. (Ans. Br. at 25-26.) The jury's award was just compensation for GSK's infringement and was properly grounded in Ms. Schenk's analysis of comparable license agreements. There is no basis for GSK's claim that awarding pre-judgment interest would "overcompensate" Vectura.[18]

### V.      GSK's Comments on Attorney Fees and Exceptional Case Are Baseless

GSK cites to Rule 54(d) to argue that Vectura has failed to meet procedural requirements for a fee award (Ans. Br. at 26), but for the reasons discussed above in Section I, the time for Vectura to "state the amount sought or provide a fair estimate of it" has not yet run. The Court may first determine whether the case is exceptional before an estimate is submitted. *See e.g.*, *Nova Chems. Corp. v. Dow Chem. Co.*, No. 13-1601-LPS, 2015 WL 5766257, at * 7 (D. Del. Sep. 30, 2015) (granting fees where no estimate submitted (*see* D.I. 31) and ordering further submission on appropriate amount).

In arguing that this case is not exceptional, GSK states that "GSK succeeded in forcing Vectura to drop two patents." Nothing GSK did caused that to happen, and Vectura dropped the other patents to streamline the case for trial.

### CONCLUSION

Vectura respectfully requests that the Court grant its motion for supplemental damages, enhanced damages, an ongoing royalty, pre- and post-judgment interest, and attorney fees.

---

[18] The "generous" jury award GSK refers to in *Conceptus* (Ans. Br. at 25) was a 20% royalty.

15

|  |  |
|---|---|
| | /s/ *Kelly E. Farnan* |
| OF COUNSEL: | Kelly E. Farnan (#4395) |
| | Christine D. Haynes (#4697) |
| Dominick A. Conde | Richards, Layton & Finger, P.A. |
| Christopher P. Borello | One Rodney Square |
| Damien N. Dombrowski | 920 North King Street |
| Venable LLP | Wilmington, DE 19801 |
| 1290 Avenue of the Americas | (302) 651-7700 |
| New York, NY 10104-3800 | farnan@rlf.com |
| (212) 218-2100 | haynes@rlf.com |
| dconde@venable.com | |
| cborello@venable.com | Attorneys for Plaintiff |
| ddombrowski@venable.com | |

Dated:  July 26, 2019